235 P.3d 1103

COUNTY OF HAWAI'I, a municipal corporation of the State of Hawai'i, Respondent–/Plaintiff–/Counterclaim Defendant–Appellee/Cross–Appellee,

v.

ALA LOOP HOMEOWNERS, an unincorporated association, Respondent–/Defendant–/Counter–Claimant–/Cross–Claimant–Appellee/ Cross–Appellant,

and

Wai'ola Waters of Life Charter School, a public school organized under the law of the State of Hawai'i, Respondent–/Defendant–/Cross–Claim Defendant–Appellant/Cross–Appellee;

and

ALA Loop Community Association, an unincorporated non-profit association, Petitioner–/Defendant–/Counter–Claimant–/Cross–Claimant–/Third–Party Plaintiff–Appellee/Cross–Appellant;

v.

Land Use Commission, State of Hawai'i, Respondent–/Third–Party Defendant–Appellee/Cross–Appellee.

No. 27707.

Supreme Court of Hawai'i.

July 9, 2010.

Charlene M. Aina, Deputy Attorney General, for Respondent Wai'ola Waters of Life Charter School.

MOON, C.J., NAKAYAMA, DUFFY, and RECKTENWALD, JJ.; with ACOBA, J., concurring separately and dissenting.

Opinion of the Court by RECKTENWALD, J.

Respondent Wai'ola Waters of Life Charter School (Wai'ola)[1] acquired land in an agricultural use district on Ala Loop Road on the Island of Hawai'i in 2003, with the intention of using it as a working farm and as a campus for its school. A dispute arose between Wai'ola and neighboring residents regarding whether Wai'ola should be required to obtain a special use permit under Hawai'i Revised Statutes (HRS) chapter 205. The County of Hawai'i filed a complaint in the Circuit Court of the Third Circuit (circuit court) seeking declaratory relief with regard to that issue, naming Wai'ola and Petitioner Ala Loop Community Association (Ala Loop)[2] as defendants. Ala Loop filed a cross-claim against Wai'ola, seeking to enforce the provisions of chapter 205.

The circuit court subsequently entered default against Wai'ola on Ala Loop's cross-claim, but denied Ala Loop's request for an award of attorney's fees.[3] Both parties then appealed from the circuit court's First Amended Final Judgment.

The Intermediate Court of Appeals (ICA) filed a summary disposition order (SDO) on March 12, 2009. The ICA, citing *Pono v. Molokai Ranch, Ltd.*, 119 Hawai'i 164, 194 P.3d 1126 (App.2008), *cert. rejected*, 2008 WL 5392320 (Haw. Dec.29, 2008), concluded that Ala Loop did not have a private right of action to enforce its HRS chapter 205 claims against Wai'ola, and, therefore, the circuit court lacked jurisdiction to determine the claims. The ICA entered judgment pursuant to the SDO on April 22, 2009.

Thomas Yeh (Tsukazaki Yeh & Moore) for Petitioner Ala Loop Community Association.

1. Wai'ola is a new century charter school chartered pursuant to HRS § 302A–1181, *et seq.*

2. Ala Loop is a non-profit unincorporated association whose members are residents and owners of lots abutting Ala Loop Road, and was formed pursuant to Hawai'i Revised Statutes (HRS) chapter 429.

3. The Honorable Greg K. Nakamura presided.

Ala Loop filed an application for writ of certiorari (application), requesting this court to review the ICA's judgment. In its application, Ala Loop argues, inter alia, that *Pono* was wrongly decided because it failed to consider article XI, section 9 of the Hawai'i State Constitution[4] and HRS § 607–25 (Supp.2002).[5]

On August 5, 2009, Wai'ola filed a response in opposition (response) to the application, in which it contended that this court should reject the application on mootness grounds.

For the reasons set forth below, we conclude that this dispute is not moot, and that in any event review is appropriate under the public interest exception to the mootness doctrine. We further conclude that article XI, section 9 of the Hawai'i Constitution creates a private right of action to enforce chapter 205 in the circumstances of this case, and that the ICA accordingly erred in its analysis in the SDO. Finally, we conclude that the circuit court erred in declining to set aside the entry of default against Wai'ola.

Accordingly, we vacate the April 22, 2009 judgment of the ICA and the December 12, 2005 First Amended Final Judgment of the circuit court, and remand to the circuit court for further proceedings. In view of this disposition, we do not address the other issues raised by Ala Loop in its application, or by Ala Loop and Wai'ola in their appeals to the ICA.

## I. BACKGROUND

### A. Dispute over whether Wai'ola must obtain a special use permit

Wai'ola is a new century charter school, chartered pursuant to HRS chapter 302A (Supp.1999). In July of 2003, Wai'ola acquired ownership of a 28 acre parcel of land formerly known as the Sunshine Farm property, located in a district designated for agricultural use by the Land Use Commission (LUC) of the State of Hawai'i. Wai'ola intended to maintain the property as a working farm and to use it as a campus for its school.

When residents in the area learned of the acquisition, they began contacting various county officials to express concern. On July 21, 2003, Ala Loop received a letter from the County of Hawai'i Planning Department stating that:

> We have received your letter dated July 11, 2003 regarding the Waters of Life Charter School in escrow to purchase the old Sunshine Farm property on Ala Loop. The Planning Department has received numerous inquiries regarding the operation of charter schools within the State Land Use Agricultural District in regards to H.R.S. § 302A–1184,[6] which exempts char-

---

**4.** Article XI, section 9 provides:

> Each person has the right to a clean and healthful environment, as defined by laws relating to environmental quality, including control of pollution and conservation, protection and enhancement of natural resources. Any person may enforce this right against any party, public or private, through appropriate legal proceedings, subject to reasonable limitations and regulation as provided by law.

**5.** HRS § 607–25 (Supp.2002) provides in relevant part:

> **§ 607–25 Actions based on failure to obtain government permit or approvals; attorney's fees and costs. . . .**
>
> . . . .
>
> (c) For purposes of this section, the permits or approvals required by law shall include compliance with the requirements for permits or approvals established by chapters . . . 205, . . . and ordinances or rules adopted pursuant thereto under chapter 91.
>
> . . . .

> (e) In any civil action in this State where a private party sues for injunctive relief against another private party who has been or is undertaking any development without obtaining all permits or approvals required by law from government agencies:
> (1) The court may award reasonable attorneys' fees and costs of the suit to the prevailing party.
> (2) The court shall award reasonable attorneys' fees and costs of the suit to the prevailing party if the party bringing the civil action:
> . . . .
> (B) Posts a bond in the amount of $2,500 to pay the attorneys' fees and costs provided for under this section if the party undertaking the development prevails.

**6.** HRS § 302A–1184 (Supp.2002), provides in pertinent part, as follows:

> **New century charter schools; exemptions.** Schools designated as new century charter schools shall be exempt from all applicable state laws, except those regarding:

ter schools from state laws, except those relating to health and safety, and a few other exceptions. *Based on this law and a legal opinion received from the County Corporation Counsel, we are exempting charter schools from state land use laws not expressly related to health and safety. The major effect of this exemption is that charter schools located in the State Land Use Agricultural District do not have to obtain special permits.* Normally, a school in the agricultural district would need a special permit with a process that requires notice to nearby landowners and a public hearing.

Charter school facilities may need other approvals and permits, including those related to building, fire, and sanitation.

The law exempting the charter schools is open to interpretation and the courts have the final say. You, as homeowners concerned about the traffic impacts this operation may have on your community, have the right to take this matter to court to have a judge decide if this charter school needs a special permit.

On August 14, 2003, Ala Loop through counsel wrote to the County of Hawaiʻi Office of the Corporation Counsel (Corp. Counsel), inquiring "whether the proposed operation of Waters of Life Charter School upon land zoned for agriculture and accessed through Ala Loop Road in the absence of a state or county land use regulatory process was proper." The letter also stated that Waiʻola purchased the property for the purpose of operating a charter school, and included background on the property as well as the reasons for Ala Loop's opposition to the operation of the charter school. Ala Loop requested that Corp. Counsel review HRS § 302A–1184 (Supp.2002) which ex-

empts new century charter schools from all applicable state laws except, inter alia, "health and safety requirements."

The letter explained Ala Loop's disagreement with the County's interpretation of HRS § 302A–1184 as follows:

As we understand, the County of Hawaii has previously interpreted certain statutes, particularly HRS Section 302A–1184, as exempting charter schools from applicable State land use district law to the effect that charter schools have been deemed exempt from obtaining special permits for the operation of charter schools on lands within the State agricultural district. Based upon our review of Section 302A–1184 and other applicable law, we find that:

1. There is no exemption from land use regulatory law that has been established for the purpose of protecting the public health and safety, and

2. There is no express exemption from or preemption of county land use laws and regulations.

We therefore believe that the County's interpretation is contrary to the plain language and intent of Section 302A–1184 and that the failure to require the Waters of Life school to undergo the scrutiny of a special permit or other land use approval process will severely compromise the health, safety and welfare of the residents of the Ala Loop community, students and others who work at or visit the proposed school, and the public at large. For this reason, we ask that you review the current interpretation that the County has apparently adopted in light of the [above] information and to provide us with your position on the issue.

In summary, Ala Loop argued that

(1) Collective bargaining under chapter 89; provided that:
(A) The exclusive representatives defined in chapter 89 may enter into agreements that contain cost and noncost items to facilitate decentralized decisionmaking;
(B) The exclusive representatives and the local school board of the new century charter school may enter into agreements that contain cost and noncost items;
(C) The agreements shall be funded from the current allocation or other sources of reve-

nue received by the new century charter school; and
(D) These agreements may differ from the master contracts;
(2) Discriminatory practices under section 378–2; and
(3) Health and safety requirements.
. . . .
This section was repealed in 2006 and reenacted as HRS § 302B–9 (Supp.2006). 2006 Haw. Sess. Laws Act 298, §§ 2–3 at 1210–11, 1216.

a special permit was required for the charter school, pursuant to HRS § 205–6 (2001), county zoning laws, and Land Use Commission (LUC) rules, because the special permit requirements specifically involve a review of health and safety issues before an otherwise impermissible use can be established on land within the state agricultural district. [Ala Loop's] attorneys concluded that Wai'ola was not exempt from compliance with State land use laws and county zoning laws, and that a use permit was required under county zoning laws in the absence of a special use permit.

In a letter to the Hawai'i County Council dated October 9, 2003, Corp. Counsel opined that HRS § 302A–1184 exempts new century charter schools from obtaining a special permit under HRS § 205–6,[7] but that such schools are required to obtain a county use permit under Chapter 25 of the Hawai'i County Code 1983 (1995 ed.).

In a letter dated October 22, 2003, the Attorney General (AG) of the State of Hawai'i advised Corp. Counsel that

Although the Office of the Attorney General has not issued a formal opinion concerning [whether charter schools are exempt from the special permit requirement set forth in HRS chapter 205], our position is that new century charter schools are required to adhere to special permit requirements prescribed in H.R.S. chapter 205.

. . . .

Based upon legislative intent and statutory language, our interpretation of H.R.S. § 302A–1184 is that new century charter schools are exempted from state laws that relate to the regulation of education. However new century charter schools are

subject to laws that apply to the general public and other state agencies and entities (i.e. criminal statutes, zoning regulations, etc.). It would be inconceivable to conclude that H.R.S. § 302A–1184 exempts new century charter schools from laws that the general public and other state agencies are required to adhere to.

. . . .

. . . As to the issue of whether new century charter schools are required to adhere to county use permit requirements, we would initially defer to the Office of.the Corporation Counsel, but note that in considering the phrase "health and safety requirements" and its applicability to county use permit requirements, you may, of course, consider the rationale of this letter.

On November 14, 2003, the County filed a Complaint for Declaratory Relief against Ala Loop and Wai'ola. The complaint sought, inter alia, judicial confirmation that new century charter schools "are exempt from obtaining a State special permit, but are required to obtain a County use permit, pursuant to Chapter 25 of the Hawai'i County Code[.]"

On November 20, 2003, Ala Loop filed an answer to the County's complaint, a counterclaim against the County, and a cross-claim against Wai'ola. Ala Loop's counterclaim and cross-claim included five counts.

In Count I, Ala Loop requested declaratory relief "determining that [Wai'ola] must obtain a special permit from the Planning Commission and the LUC pursuant to HRS Section 205–6 and the applicable rules and regulations of the Planning Commission and the Land Use Commission, prior to operating a charter school on [the property]."

---

7. HRS § 205–6 (2001) provides in pertinent part:
**Special permit.** (a) The county planning commission may permit certain unusual and reasonable uses within agricultural ... districts other than those for which the district is classified. Any person who desires to use the person's land within an agricultural ... district other than for an agricultural ... use, as the case may be, may petition the planning commission of the county within which the person's land is located for permission to use the person's land in the manner desired. Each

county may establish the appropriate fee for processing the special permit petition.
. . . .
(d) Special permits for land the area of which is greater than fifteen acres shall be subject to approval by the land use commission. The land use commission may impose additional restrictions as may be necessary or appropriate in granting such approval, including the adherence to representations made by the applicant.

In Count II, Ala Loop requested temporary and permanent injunctive relief enjoining and restraining:

A. The County of Hawaii, its agencies, officers, directors, and employees from issuing any building permits, occupancy permits, or similar permits that would encourage, allow, or permit [Wai'ola] to operate a charter school, or any components or activities connected with the charter school, on [the property] until and unless a special permit has been issued for [the property] and [Wai'ola] has complied with all applicable conditions and laws for the operation as may be established by the Planning Commission and LUC and as may be required by applicable State and County law.

B. [Wai'ola], its agents, officers, directors, employees, teachers or representatives from conducting any classes or school related activities on [the property] until and unless a special permit has been issued for [the property] and [Wai'ola] has complied with applicable conditions for the operation as may be established by the Planning Commission and LUC.

In Count III, Ala Loop alleged that it was entitled to damages, attorneys' fees, and costs from the County. In Count IV, Ala Loop sought damages, attorneys' fees, and costs from Wai'ola based on nuisance per se and HRS § 607–25. Count V sought a production of documents from the County as well as attorneys' fees and costs related to obtaining those records.[8]

Ala Loop's cross-claim was served on November 21, 2003. On November 24, 2003 Wai'ola sought legal representation from the AG. In a letter dated January 21, 2004 to James Killebrew, Chair of the Wai'ola School Board, AG Mark Bennett stated that the Rules of Professional Conduct would preclude the Department of the Attorney General from representing Wai'ola because, although "we have concluded that [HRS] § 302A–1184 does not exempt charter schools categorically from the State's land use laws," "[i]t is my understanding that [Wai'ola] rejects this advice." The letter advised Wai'ola "to apply (through this Department) to the Governor for a waiver under [HRS] § 28–8.3 [9] so that [Wai'ola] may contract directly with a private attorney to represent it in that litigation (at [Wai'ola's] own expense)."

On January 30, 2004, the parties stipulated to an extension for Wai'ola to file an answer or responsive pleading from January 15, 2004 to February 16, 2004. The parties subsequently agreed to another extension giving Wai'ola until February 25, 2004 to file an answer or responsive pleading.

On February 25, 2004, Deputy Attorney General (DAG) Charleen Aina, appearing specially on behalf of Wai'ola, filed a motion requesting an extension of time for Wai'ola to answer or otherwise respond to the complaint and cross-claim. The motion explained that the AG "would ordinarily appear on behalf of Wai'ola in this action, inasmuch as Wai'ola is a state agency," however, the AG's position regarding whether HRS § 302A–1184 exempts Wai'ola from obtaining a special permit under HRS chapter 205 was contrary to Wai'ola's position. The motion further explained that although Wai'ola had been informed that the office would not be

---

8. On December 2, 2003, Ala Loop filed a joinder and third party complaint against the LUC, alleging that the LUC has an interest in the subject and disposition of this action because the LUC has jurisdiction over the approval of special permits for land within the land use agricultural district consisting of more than 15 acres in area.

9. HRS § 28–8.3 (Supp.2003) provides in relevant part:

**Employment of attorneys.** (a) No department of the State other than the attorney general may employ or retain any attorney, by contract or otherwise, for the purpose of representing the State or the department in any litigation, rendering legal counsel to the department, or

drafting legal documents for the department; provided that the foregoing provision shall not apply to the employment or retention of attorneys:

. . . .

(19) By a department, in the event the attorney general, for reasons deemed by the attorney general good and sufficient, declines, to employ or retain an attorney for a department; provided that the governor thereupon waives the provision of this section.

(b) For purposes of this section the term "department" includes any department, board, commission, agency, bureau, or officer of the State.

able to represent it and that it should avail itself of the provisions of HRS § 28–8.3, Wai'ola disagreed that it must bear the cost of retaining legal services. As to the extension of time requested, DAG Aina reasoned that "[b]ecause this motion will not be heard until March 18, 2004, and that interval may be long enough to work out the differences that remain, we respectfully request an extension of no more than 30 days after the motion is decided for counsel to answer or otherwise file a responsive pleading to the complaint and cross-claim."

On March 10, 2004, Ala Loop filed a memorandum in opposition arguing that the "[AG] and [Wai'ola] have had more than ample time to sort out any differences between them as to who should represent [Wai'ola] and the terms of such representation" and that "[a]ny further delays in the case being at issue may result in irreparable harm to the public, the interests of the residents of Ala Loop, and possibly the students of [Wai'ola]."

After a March 18, 2004 hearing,[10] the circuit court entered an order on April 6, 2004 granting Wai'ola's request for an extension of time to file an answer or responsive pleading. The order provided that:

2. Defendant Wai'ola [has] until April 19, 2004 to file an answer or other responsive pleading to the complaint of the County of Hawaii, and the cross-complaint of Defendant–Cross Complainant Ala Loop Homeowners Association filed herein; and

3. If an answer or other responsive pleading is not timely filed, the County of Hawaii and the Ala Loop Homeowners Association may take appropriate action for the entry of default against Wai'ola.

On April 19, 2004, Sandra Pechter Song, an attorney appearing specially for Wai'ola, filed a motion for stay of proceedings, or in the alternative to extend time to file responsive pleadings (motion for a stay). Wai'ola alleged in its motion that it has a "clear and definite right to representation by Bennett." However, Bennett has "refused to defend Wai'ola in the subject action, either through his office or through special counsel appointed by his office" and that "[Wai'ola] has no

funds to hire private counsel; nor does it have the ability to represent itself in this case." Accordingly, Wai'ola requested that this "proceeding be stayed to permit it to obtain an order requiring Bennett to provide it with legal representation." In an attached declaration, Song stated that she had agreed to "file a petition for a writ of mandamus in the Supreme Court on behalf of Wai'ola," directing Bennett and his office to represent Wai'ola in the subject case.

On April 29, 2004, Song filed a petition for writ of mandamus with this court. In the petition, Song argued that AG Bennett was obliged to provide legal representation to Wai'ola, and requested that this court either compel him to defend Wai'ola or pay for special counsel to represent Wai'ola. In an attached declaration, the director of Wai'ola stated the following:

4. Although Wai'ola receives State and Federal funds, those funds are barely sufficient to provide for the daily classroom needs. The State has never given any funds to Wai'ola that were specifically earmarked for a school building or other capital improvement. To my knowledge, all non-conversion charter schools are left to find facilities for their schools without any State assistance.

. . . .

16. Mr. Bennett has repeatedly offered to obtain the consent of the governor to permit Wai'ola to hire private counsel to represent Wai'ola in Civil No. 03–1–0308. However, Wai'ola has no funds to retain a private attorney.

On May 4, 2004, Ala Loop opposed Wai'ola's motion for a stay on several grounds including that "[f]urther delay would be unreasonable" because "[i]nstead of retaining special counsel to seek mandamus, [Wai'ola] could as well have retained counsel to defend it in this proceeding" or alternatively "have its current special counsel provide representation in its defense, and also concurrently seek the mandamus action it has threatened."

On May 4, 2004, Ala Loop filed a request for entry of default against Wai'ola because

**10.** A transcript of the March 18, 2004 hearing is not included as part of the record on appeal.

Wai'ola did not file an answer to Ala Loop's cross-claim.

At a May 13, 2004 hearing,[11] the circuit court orally denied Wai'ola's motion for a stay. The court entered a written order denying the motion on June 29, 2004, stating that:

in the event that a request for a hearing on any issue [related to the entry of default judgment] is requested by any party herein, [Wai'ola] should have the opportunity to retain counsel for the purpose of representation of the school in any such hearing, and the Court considers a 45–day period of time after May 13, 2004 to be a reasonable period of time for [Wai'ola] to retain counsel for that purpose, should it choose to do so.

Default was entered against Wai'ola on May 24, 2004.

On June 2, 2004, the AG sent a letter to Wai'ola outlining the terms of its offer of representation, which included the stipulation that "in defending Wai'ola against the default and in other aspects of the representation, the Department of the Attorney General will proceed without asserting the defense that 'State Land Use laws do not apply to charter schools.'"

On June 2, 2004, Wai'ola accepted the AG's offer of representation.

On June 10, 2004, this court issued an order denying Wai'ola's petition for writ of mandamus.

On June 22, 2004, Wai'ola, now represented by the AG, filed an answer to Ala Loop's cross-claim. On July 6, 2004, Wai'ola filed a motion to set aside entry of default. Wai'ola argued that the entry of default should be set aside because the court may not have jurisdiction over the claims that Ala Loop asserts against Wai'ola, Ala Loop has not proven all of its claims, Wai'ola has made continuous efforts to secure counsel, Wai'ola's defenses are meritorious, and defaults are generally disfavored. On July 14, 2004, Ala Loop filed a memorandum in opposition.

On August 11, 2004, the circuit court entered an order denying the motion,[12] finding and concluding that:

1. [Wai'ola] made a conscious choice not [to] be represented by private legal counsel and therefore, failed to answer Ala Loop's cross-claim in a timely manner. Therefore, it cannot be said that [Wai'ola] was guilty only of excusable neglect.

2. If it is assumed that [Wai'ola] is a State agency, Rule 55(e), Hawaii Rules of Civil Procedure (HRCP), does not prohibit a default judgment against a State agency. HRCP Rule 55(e) allows for a default judgment against a State agency if the claimant State agency establishes a claim or right to relief by evidence satisfactory to the court. Therefore, where there is an entry of default, a claimant may obtain a default judgment against a State agency, if there is a hearing in which the claimant presents sufficient evidence establishing a claim or right to relief. 10 Moore's Federal Practice § 55.3[2][a](Matthew Bender 3rd ed.)

3. [Wai'ola] has failed to satisfy the necessary criteria for setting aside an entry of default, and therefore, its Motion to Set Aside Entry of Default Dated May 24, 2004, Filed Herein July 6, 2004, should be denied.

On October 20, 2004, Ala Loop filed a Motion for Entry of Default Judgment and Permanent Injunction Against Defendant Wai'ola (motion for entry of default judgment). The motion was supported, inter alia, by the record, pleadings, attached declarations of neighbors, excerpts of depositions of Wai'ola officials, and correspondence with county officials.

The circuit court held a hearing on December 2, 2004. With respect to the declaratory relief sought by Ala Loop, the circuit court stated the following:

The subject land abutting Ala Loop Road is classified as agricultural. Consistent with the State Deputy Attorney Gen-

---

**11.** A transcript of the May 13, 2004 hearing is not included as part of the record on appeal. However, portions of what appears to be a transcript were attached as an exhibit to a July 6,

2004 motion to set aside entry of default filed by Wai'ola in the circuit court.

**12.** The motion was decided without a hearing.

eral's position set forth in that letter dated October 22nd, 2003, charter schools are required to comply with chapter 205 of the Hawaii Revised Statutes. As such, the subject real property may be used only for the purposes permitted under HRS Section 205–4 ... unless a special permit is granted pursuant to HRS Section 205–6.

Wai'ola has indicated that it will not undertake construction on the land until a special permit is secured. However this does not mean that the matter is not ripe for adjudication at this juncture. Wai'ola initially indicated that it did not intend to obtain a special permit and now states that it will. The Court's concern is that unless there's a Court order in place, Wai'ola is free to change its mind and generate another—create another generation of litigation.

Also there is the issue of whether Wai'ola's ongoing activities are permitted under HRS Section 205–4 ..., and we are here on a motion for entry of default judgment.

So, the Court will order as follows.

One, declare that Wai'ola is subject to the restrictions of Chapter 205 of the Hawaii Revised Statutes.

Two, order that Wai'ola not construct facilities, educational facilities, on the real property unless it first receives a special permit.

And, third, will order that Wai'ola not violate Chapter 205, HRS, with its ongoing activities.

With respect to the injunctive relief sought by Ala Loop, the circuit court stated that "no instruction or educational meetings are to occur on the premises[,]" but that "farming activities" and a "once-a-week field trip per student would be acceptable."

On February 4, 2005, the circuit court entered Findings of Fact, Conclusions of Law and Judgment which stated in pertinent part:

**I. Findings of Fact.**

. . . .

12. Since the acquisition of the Subject Property, Wai'ola has used the Subject Property for the following purposes: (a) operating its administrative offices; (b) storing its office equipment, files, computers and books; (c) holding instructional and laboratory classes; and (d) the growing of crops and associated activities, such as testing, conducting experiments and making observations.

13. Wai'ola students have been bussed to the Subject Property.

14. It is Wai'ola's intention to use the Subject Property for school activities and associated facilities, to include a school building, an athletic field, athletic building, amphitheater and smaller structures for classes.

15. If Wai'ola is to use the Subject Property as a school, certain improvements relating to health and safety are necessary or appropriate: to include: (a) an expansion of the Ala Loop, (b) an increase in water availability to fight fires, and (c) an individual waste water system.

16. Members of [Ala Loop], as neighbors of the Subject Property, may suffer injury if the Subject Property is used as a school.

17. Initially, Wai'ola declined to obtain a special permit even though it understood from the Attorney General, State of Hawai'i, pursuant to a letter dated October 22, 2003, that it was the Attorney General's Office's opinion that Wai'ola, even though it was a new century charter school, was subject to the requirements of Chapter 205, HRS.

18. While Wai'ola now asserts that it intends to obtain a special permit, it seeks to use the Subject Property for uses other than permitted under Chapter 205, HRS, while its application for a special permit is pending.

**II. Conclusions of Law.**

1. [Ala Loop] has standing to assert its claims regarding Wai'ola's use of the Subject Property. In particular, it has suffered an actual or threatened injury as a result of Wai'ola's conduct, the injury is fairly traceable to the conduct of Wai'ola and a favorable decision would likely provide relief for [Ala Loop's] injury.

2. Since the Subject Property is located in an agricultural use district, its use is limited by HRS § 205–4.5. Schools and school activities are not permitted under HRS § 205–4.5.

3. HRS § 302A–1184 does not apply to so as [sic] to exempt a new century charter school from complying with the requirements and limitations of Chapter 205, HRS.

4. Under HRS § 205–6, an entity may obtain [a] special permit to make "unusual and reasonable uses" of agricultural land which are not otherwise permitted under HRS § 205–4.5.

5. Since the acquisition of the Subject Property, Wai'ola has used the Subject Property in violation of Chapter 205, HRS, at least in the following ways: (a) operating its administrative offices; (b) storing its office equipment, files, computers and books; and (c) holding instructional and laboratory classes.

6. There is a reasonable apprehension that Wai'ola may use the Subject Property in violation of the requirements and limitations of Chapter 205, HRS, unless it is enjoined from doing so.

7. [Ala Loop] is entitled to a permanent injunction against Wai'ola enjoining Wai'ola from violating the requirements of Chapter 205, HRS.

8. There is an actual controversy regarding the applicability of Chapter 205, HRS, to Wai'ola. [Ala Loop] is entitled to a declaratory judgment against Wai'ola.

9. [Ala Loop] has provided evidence satisfactory to the Court that is entitled to relief as required by Rule 55(e), HRCP.

### III. Judgment.

Based upon the foregoing, it is hereby ordered, adjudged and decreed as follows:

1. Notwithstanding HRS § 302A–1184, Wai'ola is subject to the limitations and requirements of Chapter 205, HRS. Accordingly, Wai'ola may not conduct school activities on the Subject Property which would otherwise violate Chapter 205, HRS, unless Wai'ola first receives a special permit under HRS 205–6.

2. Accordingly, Wai'ola, and its agents, representatives, faculty and students, are permanently enjoined from undertaking school activities on the Subject Property which would otherwise violate Chapter 205, HRS, unless Wai'ola first receives a special permit under HRS § 205–6 which permits the otherwise unpermitted activities. The prohibited school activities on the Subject Property, include, but are not limited to:

a. Operating administrative offices;

b. Storing office equipment, files, computers and books;

c. Holding instructional and laboratory classes;

d. Holding parent-teacher conferences and staff meetings; and

e. The construction of educational facilities.

However, Wai'ola, and its agents, representatives, faculty and students are specifically allowed use of the Subject Property as follows:

a. A student may be bussed no more than once a week to the Subject Property during school hours for agricultural activities; and

b. Permitted agricultural activities by students using the Subject Property include the cultivation of crops, the making of observations of crops, the undertaking of individual tests or experiments designed to improve the cultivation of crops and the receipt of individual advice from faculty members regarding the cultivation of crops or the [ ] individual tests or experiments.

Final judgment was entered on March 4, 2005. Wai'ola filed a notice of appeal on March 4, 2005. On July 29, 2005, this court issued an order dismissing the appeal because the judgment did not comply with *Jenkins v. Cades Schutte Fleming & Wright*, 76 Hawai'i 115, 119–120, 869 P.2d 1334, 1338–39 (1994).

On August 23, 2005, Ala Loop filed a motion for an award of attorney's fees and costs against Wai'ola. A hearing was held on the motion on September 13, 2005. On October 28, 2005, the circuit court entered an order

granting Ala Loop all of its costs, but denying Ala Loop its attorney's fees.

A First Amended Final Judgment was entered on December 12, 2005. The First Amended Final Judgment entered judgment in favor of Ala Loop and against Wai'ola on Counts I and II. As to Count IV, the circuit court dismissed with prejudice Ala Loop's cross-claim against Wai'ola alleging damages on the basis of nuisance per se, and entered judgment in favor of Wai'ola on Ala Loop's claim for attorney's fees, and against Wai'ola for costs in the sum of $3,878.64.[13]

Wai'ola timely filed a Notice of Appeal on January 10, 2006. Ala Loop filed a Notice of Cross–Appeal on January 24, 2006.

### B. ICA Appeal

On May 22, 2006, Wai'ola filed its opening brief in which it raised the following points of error:

1. "Because [Ala Loop] lacked standing and its claim to require Wai'ola to obtain a special use permit was either moot or not ripe, the circuit court did not have subject matter jurisdiction, and erred by proceeding to adjudicate [Ala Loop's] cross-claim to judgment";

2. "The circuit court erred in failing to recognize that [Ala Loop's] claims for declaratory and injunctive relief and for nuisance per se against Wai'ola as a state agency are barred by sovereign immunity";

3. "The circuit court misapplied HRCP Rule 55(c) and abused its discretion in denying Wai'ola's Motion to Set Aside Entry of Default";

4. "The circuit court lacked sufficient admissible, competent evidence for, and therefore erred in entering default judgment under [HRCP Rule] 55(e) in [Ala Loop's] favor"; and

5. "The circuit court erred in concluding that Wai'ola was using its farm in violation of the State's and the County's land use and zoning laws."

On June 2, 2006, Ala Loop filed its opening brief which raised the following points of error on cross-appeal:

1. "The Court erred in determining that [Ala Loop] was required by HRS Section 607–25(e)(2) to post a bond at the time it filed its Answer and Cross–Claim against [Wai'ola], thus denying [Ala Loop] a mandatory award of attorneys' fees and costs";

2. "The Court erred when it failed to award [Ala Loop] attorneys['] fees under HRS Section 607–25(e)(1)";

3. "The Court erred when it determined that HRS Section 607–25 did not include [Wai'ola's] activities of operating the school on the Property and that such activities did not constitute 'development' under the statute"; and

4. "The Court erred when it determined that [Wai'ola] was not considered a private party under HRS Section 607–25."

The ICA's March 12, 2009 SDO reversed the circuit court's December 12, 2005 First Amended Final Judgment. The ICA cited its decision in *Pono v. Molokai Ranch, Ltd.*, 119 Hawai'i 164, 180–90, 194 P.3d 1126, 1142–52 (App.2008), *cert. rejected*, 2008 WL 5392320 (Haw. Dec.29, 2008),[14] for the proposition that "private citizens do not have a private right of action to enforce the provisions of HRS chapter 205 and, therefore, lack standing to invoke a circuit court's jurisdiction to determine their claims to enforce Chapter 205." Accordingly, the ICA concluded that "[Ala Loop] did not have a private right of action to enforce their Chapter 205 claims and, therefore, the Circuit Court lacked subject matter jurisdiction over [Ala Loop's] claims." Based on that conclusion, the ICA did not "reach the merits of Wai'ola's other grounds for challenging the Circuit Court's rulings in favor of [Ala Loop] and against Wai'ola on [Ala Loop's] cross-claim."

As for Ala Loop's cross-appeal, the ICA noted that "[i]n light of our conclusion that

---

13. The court noted in a footnote that Counts III and V sought relief solely from the County of Hawai'i.

14. The parties in this action filed their opening briefs with the ICA prior to the ICA's decision in *Pono. Pono* was decided on October 21, 2008, and the ICA's disposition in this case was filed on March 12, 2009.

[Ala Loop] has no authority to prosecute a private action against Waiʻola to enforce HRS § 205–6," "we need not address the other issues raised by [Ala Loop] in conjunction with their request for an award of attorneys' fees."

The ICA entered judgment on April 22, 2009.

## C. Application

Ala Loop timely filed its application on July 21, 2009. In its application, Ala Loop stated that:

.... It is Petitioner's position that the ICA:

(1) ignored Petitioner's standing under HRS Section 632–1 based on the personal stake its members had in the controversy relating to the exemption issue,

(2) ignored the direct procedural injury suffered by its members when they were deprived of the opportunity to participate in public hearings and contested case hearings which are available under the applicable special permit procedures mandated under HRS Section 205–6,

(3) ignored the provisions of Article XI, Section 9 of the Hawaii State Constitution or the legislative intent of HRS Section 607–25, which expressly provides private parties with the right to sue for injunctive relief when a development is undertaken without obtaining all permits or approvals required by law, including permits required by Chapter 205, and

(4) did not account for the fact that Petitioner was named as a defendant to the action, in which both the County of Hawaii and the Land Use Commission of the State of Hawaii ("LUC") were parties, and the County of Hawaii sought declaratory relief as to the same issues.

Accordingly, Ala Loop characterized the "question for decision" as

[W]hen property is being used by an entity in violation of Chapter 205, HRS and the entity claims an exemption from the coverage of the land use statute, does an association comprised of neighbors of the entity named as a party have standing to obtain declaratory relief as to the exemption issue particularly when the public agencies provided with express statutory authority to enforce the chapter have failed to do so, or should the neighbors be without a remedy? [15]

Waiʻola timely filed its response on August 5, 2009. In its response, Waiʻola contends that this court should reject the application on mootness grounds.

On August 6, 2009, this court ordered Ala Loop to show cause why this case is not moot. On August 11, 2009, Ala Loop filed its response to the order to show cause.

On July 28, 2009, the Native Hawaiian Legal Corporation filed an amicus curiae brief (NHLC amicus brief) in support of Ala Loop's application for writ of certiorari. On July 29, 2009, Hawaii's Thousand Friends filed an amicus curiae brief (HTF amicus brief) also in support of the application.

## II. STANDARDS OF REVIEW

### A. Mootness

This court has stated that

It is axiomatic that mootness is an issue of subject matter jurisdiction. Whether a court possesses subject matter jurisdiction is a question of law reviewable de novo.

---

15. Ala Loop also raised the following subsidiary questions:

1. Whether [Ala Loop has] established standing based on injury in fact or procedural injury.

2. Did the Circuit Court have jurisdiction to enter a judgment in favor of [Ala Loop] when the County of Hawaii and Land Use Commission have specific notice of a violation of Chapter 205, ...?

3. Where as here, the neighbors also sought injunctive relief based on the law of nuisance, did the Circuit Court have jurisdiction to determine that the activities upon which the nuisance claim is based are in violation of Chapter 205 when the public agencies provided express authority to enforce the statute are named as parties and have the opportunity to provide input on the issues?

4. As a matter of procedural due process, did the circuit court have jurisdiction to consider the position of [Ala Loop] on the issues raised by the County in its Complaint, and by [Ala Loop] in its Counterclaim and Cross-claim?

*Hamilton ex rel. Lethem v. Lethem,* 119 Hawai'i 1, 4–5, 193 P.3d 839, 842–43 (2008) (citation and internal quotation marks omitted).

**B. Interpreting the Hawai'i Constitution**

In interpreting constitutional provisions:

"[W]e have long recognized that the Hawai'i Constitution must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional provision is to give effect to that intent." *Hirono v. Peabody,* 81 Hawai'i 230, 232, 915 P.2d 704, 706 (1996) (citation omitted). "This intent is to be found in the instrument itself." *State v. Kahlbaun,* 64 Haw. 197, 201, 638 P.2d 309, 314 (1981).

As we recently reiterated in *State of Hawai'i, ex rel. Bronster v. Yoshina,* 84 Hawai'i 179, 932 P.2d 316 (1997), "[t]he general rule is that, if the words used in a constitutional provision ... are clear and unambiguous, they are to be construed as they are written." *Id.* [at 186], 932 P.2d [at] 323 (quoting *Blair* [*v. Cayetano*], 73 Haw. [536,] 543, 836 P.2d [1066,] 1070, [ (1992) ] (citation omitted)). "In this regard, the settled rule is that in the construction of a constitutional provision the words are presumed to be used in their natural sense unless the context furnishes some ground to control, qualify, or enlarge them." *Pray v. Judicial Selection Comm'n,* 75 Haw. 333, 342, 861 P.2d 723, 727 (1993) (citation, internal quotation marks, brackets, and ellipses omitted).

Moreover, "a constitutional provision must be construed in connection with other provisions of the instrument, and also in the light of the circumstances under which it was adopted and the history which preceded it[.]" *Carter v. Gear,* 16 Haw. 242, 244 (1904), *affirmed,* 197 U.S. 348, 25 S.Ct. 491, 49 L.Ed. 787 (1905).

*In re Water Use Permit Applications,* 94 Hawai'i 97, 131, 9 P.3d 409, 443 (2000) (brackets in the original) (quoting *Hawaii State AFL–CIO v. Yoshina,* 84 Hawai'i 374, 376, 935 P.2d 89, 91 (1997)).

**C. Motion to Set Aside An Entry of Default**

The application of HRCP Rule 55, which governs the entry of default judgment, is reviewed for abuse of discretion. *See Gonsalves v. Nissan Motor Corp.,* 100 Hawai'i 149, 158, 58 P.3d 1196, 1205 (2002).

**III. DISCUSSION**

**A. Ala Loop's chapter 205 claim is not moot and would, in any event, fall within the "public interest" exception to the mootness doctrine**

In its response to Ala Loop's application, Wai'ola contends that this court should not accept the application because the case is moot. Wai'ola asserts that "Wai'ola School no longer owns the property ... on Ala Loop Road where the events and controversies that spawned this case occurred," [16] and that it "no longer conducts classes or other school activities on the Ala Loop property, *see* declaration of Daniel Caluya, and would need the current owner's permission before it could do so." [17] Accordingly, Wai'ola argued, "[b]ecause Wai'ola School no longer owns the subject property, and no longer conducts classes or activities at that location, the issues and claims for relief raised by [Ala Loop] are moot."

However, we conclude that Wai'ola failed to establish that Ala Loop's cross-claim is

---

**16.** Attached to Wai'ola's response is a certified copy of a warranty deed conveying the property back to its former owner.

**17.** The declaration of Daniel Caluya, which was attached to the response, provides:

I, DANIEL CALUYA, declare as follows:
1. I have personal knowledge of the following facts and am competent to testify to them.
2. I am the current director of Wai'ola Waters of Life Public Charter School ("Wai'ola School").
3. Wai'ola School no longer owns the property that is located at Ala Loop, and that is the subject of this case.
4. Wai'ola [S]chool no longer conducts classes or activities at that location.
I declare the foregoing to be true and correct under penalty of perjury.

moot, and even if this case is moot, the "public interest" exception applies.

This court has stated that:

A case is moot if it has lost its character as a present, live controversy of the kind that must exist if courts are to avoid advisory opinions on abstract propositions of law. The rule is one of the prudential rules of judicial self-governance founded in concern about the proper-and properly limited-role of the courts in a democratic society. We have said the suit must remain alive throughout the course of litigation to the moment of final appellate disposition to escape the mootness bar.

*Kona Old Hawaiian Trails Group v. Lyman,* 69 Haw. 81, 87, 734 P.2d 161, 165 (1987) (internal quotation marks, citations, and brackets omitted).

■ In sum, "[a] case is moot if the reviewing court can no longer grant effective relief." *Kaho'ohanohano v. State,* 114 Hawai'i 302, 332, 162 P.3d 696, 726 (2007) (brackets in original) (emphasis and citations omitted).

■ Wai'ola failed to establish that Ala Loop's cross-claim is moot. In its February 4, 2005 order, the circuit court found, inter alia, that Wai'ola was storing computers and equipment at the property as well as using the property as the site for its administrative offices,[18] and concluded that these activities violated chapter 205 in the absence of a special use permit. However, Mr. Caluya's declaration is silent as to whether Wai'ola continues to store equipment or supplies at the site, or remains in possession of any portion of the property.

Moreover, although Wai'ola states that it "no longer owns the property" and "no longer conducts classes or other activities on the Ala Loop Property," it does not assert that it has abandoned its attempts to operate a school there. Rather, Wai'ola states that "it would need the current owner's permission" before operating a school on the property. Thus, Wai'ola could lease or otherwise secure the property for future school operations. *Cf. Lathrop v. Sakatani,* 111 Hawai'i 307, 313, 141 P.3d 480, 486 (2006) (holding that

sale of property rendered appeal moot because the property plaintiffs sought to record a *lis pendens* upon was no longer owned by defendants).

■ Even if Ala Loop's claim is moot, it falls within the "public interest" exception to the mootness doctrine. *Doe v. Doe,* 116 Hawai'i 323, 327, 172 P.3d 1067, 1071 (2007). When analyzing the public interest exception, this court reviews the following three factors: "(1) the public or private nature of the question presented, (2) the desirability of an authoritative determination for future guidance of public officers, and (3) the likelihood of future recurrence of the question." *Id.* (citations omitted).

Wai'ola argues that the "[public interest exception] is not implicated here because the neighbors['] counterclaim against the county is still pending in the Third Circuit Court." However, this argument is inconsistent with Wai'ola's contention that the cross-claim is moot, since presumably the same mootness arguments would apply to the counterclaim as to the cross-claim. Moreover, Wai'ola cites no authority for the proposition that the public interest exception should not apply to claims against one party based on the possibility that the issues could be litigated in connection with claims against another party.

All three prongs of the public interest test are satisfied here. First, even if this dispute is viewed as one between two private parties, the ICA's ruling that there is no private right of action under chapter 205 "inject[ed] the requisite degree of public concern" in support of having the public interest exception apply. *See id.* (finding that, although the underlying proceedings were private in nature, the family court's invalidation of the grandparent visitation statute made the question public in nature). Second, because the availability of private enforcement is a potentially important consideration for public officers to take into account in performing their own duties under HRS chapter 205, public officials need guidance with regard to whether private citizens have a private right of action to enforce HRS chapter 205. As for the third prong, given the volume of land

---

**18.** These findings are supported by deposition testimony.

development activity in the State and the frequency with which issues relating to chapter 205 have been litigated, the question regarding whether a private party may seek to enforce HRS chapter 205 is likely to recur in the future.[19]

This case is similar to *Kona Old,* where an environmental group challenged the county planning director's issuance of "special management area minor permit" to the owner of property situated within a special management area. The owner moved to dismiss the appeal as moot, arguing that no work remained to be done under the minor permit. 69 Haw. at 86–87, 734 P.2d at 165. Although it was unclear whether all construction was in fact complete, this court nevertheless proceeded to the merits of the group's appeal reasoning that the questions raised were "of public concern." *Id.* at 87–88, 734 P.2d at 165–166.

Likewise, the question of whether there is a private right of action to enforce claims brought under chapter 205 is of equal "public concern." Accordingly, we will address the merits of Ala Loop's application even if Wai'ola has sold the property where the events underlying this case took place.

**B. Ala Loop had a private right of action to enforce HRS chapter 205**

**1.** ***Pono* erred in failing to consider the effect of article XI, section 9 of the Hawai'i Constitution**

▮▮▮▮ Since the ICA relied on *Pono* in determining that Ala Loop did not have a private right of action, and that the circuit court accordingly lacked subject matter jurisdiction, we begin our analysis there. The ICA held in *Pono* that private citizens do not have the authority to enforce the provisions of HRS chapter 205 and, therefore, lack standing to invoke a circuit court's jurisdiction to adjudicate their claims under chapter 205.[20] 119 Hawai'i at 167, 194 P.3d at 1129. The plaintiffs, an unincorporated association and several of its members (collectively Pono), filed a complaint in circuit court against Molokai Ranch (MR) for allegedly violating HRS chapter 205 by developing fifteen overnight campgrounds on agricultural lands without obtaining a special use permit pursuant to HRS § 205-6.[21] The complaint alleged jurisdiction "pursuant to HRS §§ 6E-13, 603-21.5, 603-21.7(b), 632-1, and Article XI, Sec. 9, Hawaii Constitution." *Id.* at 173–74, 194 P.3d at 1135–36 (footnotes omitted). The circuit court, relying on a

**19.** Wai'ola contends that "the plain language of HRS § 205-12 obviates any need for a court to determine who is responsible for enforcing land use classification laws." However, this argument goes more to the merits rather than the question of mootness, and makes no attempt to address the arguments regarding the significance of article XI, section 9, HRS § 607-25, or this court's previous decisions. *See* sections III(B)(4) and (5), *infra.*

**20.** While the term "standing" is sometimes used to describe the private right of action inquiry, *see, e.g., Pono* 119 Hawai'i at 167, 194 P.3d at 1129, nevertheless, our cases make clear that the two inquiries involve distinct policy considerations and distinct tests, *see, e.g., Pele Defense Fund v. Paty,* 73 Haw. 578, 591, 837 P.2d 1247, 1256–57 (1992) (finding that, in action under 42 U.S.C. § 1983 for alleged breach of trust by the state, this court separately analyzes whether plaintiff had a "right to sue" "to enforce federal rights created by § 5(f) of the Admission Act" and whether plaintiff had "standing" under the injury-in-fact test). The private right of action inquiry focuses on the question of whether *any* private party can sue to enforce a statute, while the standing inquiry focuses on whether *a partic-*

*ular* private party is an appropriate plaintiff. *See Sierra Club v. Hawai'i Tourism Auth.,* 100 Hawai'i 242, 271, 59 P.3d 877, 906 (2002) (Moon, C.J., dissenting) ("This court has long acknowledged that '[s]tanding is that aspect of justiciability focusing on the party seeking a forum rather than on the issues he [or she] wants adjudicated.' ") (brackets in the original) (quoting *Citizens for Prot. of N. Kohala Coastline v. County of Hawai'i,* 91 Hawai'i 94, 100, 979 P.2d 1120, 1126 (1999)).

**21.** Prior to Pono filing its lawsuit, the Director of the Department of Public Works and Waste Management stated in a letter dated December 11, 1995 to MR's vice president that "camping is a permitted use in agricultural districts having a soil classification rating of C, D, E, or U[.]" *Id.* at 170, 194 P.3d at 1132. Based on the director's opinion, MR did not apply for a special use permit for its proposed campgrounds. *Id.* at 170–71, 194 P.3d at 1132–33. Thereafter, MR applied to the Department of Public Works and Waste Management (DPW) for, and was issued, approximately one hundred building permits for construction of different camping facilities along the Great Molokai Ranch Trail. *Id.* at 171, 194 P.3d at 1133.

Special Master's report,[22] dismissed the complaint and Pono appealed. *Id.* at 179, 194 P.3d at 1141.

The ICA began its analysis by noting that this court in *Reliable Collection Agency v. Cole*, 59 Haw. 503, 584 P.2d 107 (1978), had utilized the United States Supreme Court's approach set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), to determine whether " 'a private remedy is implicit in a statute not expressly providing one'—an analysis that also involves the determination of whether a statute creates a right upon which a plaintiff may seek relief." *Pono*, 119 Hawai'i at 184–85, 194 P.3d at 1146–47. The ICA further noted that the *Reliable* court discussed the following three relevant factors used in *Cort* to make this determination:

> First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted['] ...—that is, does the statute create a...right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

*Id.* at 185, 194 P.3d at 1147 (emphasis and citations omitted).

The ICA also cited to *Rees v. Carlisle*, 113 Hawai'i 446, 153 P.3d 1131 (2007), wherein this court stated that

> Subsequent to *Cort*, decisions of the United States Supreme Court have emphasized that "the key inquiry is whether Congress intended to provide the plaintiff with a private right of action." *Whitey's Boat Cruises, Inc. v. Napali–Kauai Boat Charters, Inc.*, 110 Hawai'i 302, 313 n. 20, 132 P.3d 1213, 1224 n. 20 (2006) (quoting *First Pac. Bancorp, Inc. v. Helfer*, 224 F.3d 1117, 1121–22 (9th Cir.2000)). Therefore, as we recognized in *Whitey's Boat Cruises*, "we apply *Cort's* first three factors in de-

termining whether a statute provides a private right of action though understanding that legislative intent appears to be the determinative factor." *Id. See also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) (For a statute to create private rights, its text must be phrased in terms of the persons benefitted.); *Alexander v. Sandoval*, 532 U.S. 275, 286, 121 S.Ct. 1151 [1511], 149 L.Ed.2d 517 (2001) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.").

*Pono*, 119 Hawai'i at 185, 194 P.3d at 1147 (quoting *Rees*, 113 Hawai'i at 458, 153 P.3d at 1143).

Applying the *Rees/Reliable* test, the ICA first concluded that no statute expressly creates a private right to enforce HRS chapter 205. *Id.* at 187, 194 P.3d at 1149. Unlike other statutes enacted by the legislature which expressly authorize private causes of actions for violations of those statutes, the ICA noted that "there is no provision in HRS chapter 205 that expressly authorizes a private individual to enforce the chapter." *Id.* at 187, 194 P.3d at 1149.

As to the second factor, the ICA concluded that there was no indication of legislative intent, explicit or implicit, to create a private right of action to enforce chapter 205, and that implying a private right of action on the basis of legislative silence would be a "hazardous enterprise, at best." *Id.* at 189, 194 P.3d at 1151 (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 571, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979)).

Finally, as to the third factor, the ICA concluded that recognizing a private right of action to enforce HRS chapter 205 is not consistent with the underlying purposes of HRS chapter 205. *Id.* The ICA noted that pursuant to HRS § 205–12 (1993),[23] "the leg-

---

22. The Special Master, relying on *Kona Old*, in which this court held that judicial relief is not available unless the party affected has taken advantage of the procedures provided for in the administrative process, concluded that the circuit court lacked jurisdiction over Pono's HRS chapter 205 claims because Pono failed to appeal its

chapter 205 claim to the Maui County Board of Variances and Appeals (BVA). *Id.* at 178–79, 194 P.3d at 1140–41.

23. HRS § 205–12 (1993) provides:
 **Enforcement.** The appropriate officer or agency charged with the administration of

islature has delegated enforcement of the restrictions and conditions relating to land-use-classification districts in a county to the county official charged with administering the zoning laws for that county[.]" *Id.* Relying on *Lanai Co. v. Land Use Commission,* 105 Hawaiʻi 296, 97 P.3d 372 (2004), in which this court held that HRS § 205-12 authorizes counties, but not the LUC, to enforce chapter 205, the ICA concluded that "it would be incongruous to hold that the legislature intended to grant private citizens a right to enforce the provisions of HRS chapter 205 against violators of the chapter." *Pono,* 119 Hawaiʻi at 190–91, 194 P.3d at 1152–53.

In a concurring opinion, Judge Foley, relying on *Kona Old,* stated that, "I would hold that Pono did not exhaust its administrative remedies prior to bringing suit in the circuit court because Pono did not appeal [the DPW director's] decision to the BVA." *Id.* at 200, 194 P.3d at 1162. Judge Foley noted that at the time of the events that led to Pono's lawsuit, Section 8-5.4(2) of the Maui County Charter provided that the BVA "[h]ear and determine appeals alleging error from any person aggrieved by a decision or order of any department charged with the enforcement of zoning, subdivision and building ordinances." *Id.* at 199, 194 P.3d at 1161. Under the Maui County Code, the DPW was charged with the "enforcement of zoning, subdivision and building ordinances." *Id.* at 200, 194 P.3d at 1162. Pursuant to § 8-5.4(2), the BVA had the authority "to hear and determine appeals alleging error from any person aggrieved by a decision or order" of the DPW director. *Id.* Accordingly, in Judge Foley's view, Pono was required to exhaust its administrative remedies, by appealing the DPW's determination that camping was a permitted use and that a special use permit accordingly was not required, before it could seek judicial review. *Id.*

Ala Loop and the amicus fault the ICA's analysis in *Pono* on several grounds. First, they note that the ICA did not consider the effect of article XI, section 9 of the Hawaiʻi Constitution in its *Rees/Reliable* analysis.

Second, they argue that the ICA failed to consider the effect of HRS § 607-25, which authorizes the award of attorneys' fees in actions brought by private parties to enjoin development undertaken without permits, including permits required under Chapter 205. Finally, they argue that the ICA's analysis is inconsistent with cases of this court that granted standing to plaintiffs in environmental cases, and with cases of this court which have implicitly recognized private rights of action to enforce environmental laws, including chapter 205.

We conclude that Ala Loop had a private right of action to enforce chapter 205 against Waiʻola. While the *Rees/Reliable* test is appropriately used to determine whether the legislature intended to create a private right of action when it enacts a statute, it is not applicable when the state constitution creates the private right of action. In *Reliable,* the question was whether the legislature intended to create a private right of action when it enacted prohibitions on the unauthorized practice of law. 59 Haw. at 506, 584 P.2d at 109. In *Rees,* the question was whether the ordinances of the City and County of Honolulu created a private right of action by which a citizen could seek to enforce the provisions of the city's ethics code against a public official. 113 Hawaiʻi at 456–459, 153 P.3d at 1141–1144. Neither case addressed the question of whether a provision of the state constitution had created a private right of action. Thus, the ICA erred in *Pono* and here by applying the *Rees/Reliable* analysis to chapter 205, without also addressing the question of whether article XI, section 9 created a private right of action for the enforcement of that chapter.

For the reasons set forth below, article XI, section 9 creates a private right of action to enforce chapter 205 in the circumstances of this case, and the legislature confirmed the existence of that right of action by enacting HRS § 607-25, which allows recovery of attorneys' fees in such actions.

county zoning laws shall enforce within each county the use classification districts adopted by the land use commission and the restriction

on use and the condition relating to agricultural districts under section 206-4.5 and shall report to the commission all violations.

## 2. Article XI, section 9

Article XI, section 9 of the Hawai'i Constitution provides:

Each person has the right to a clean and healthful environment, as defined by laws relating to environmental quality, including control of pollution and conservation, protection and enhancement of natural resources. Any person may enforce this right against any party, public or private, through appropriate legal proceedings, subject to reasonable limitations and regulation as provided by law.

This provision was proposed by the 1978 Constitutional Convention, and approved by the voters in the November 7, 1978 general election. *See* Stand. Comm. Rep. No. 77, in 1 Proceedings of the Constitutional Convention of 1978, at 689 (1980). It has both a substantive and a procedural component. First, it recognizes a substantive right "to a clean and healthful environment," with the content of that right to be established not by judicial decisions but rather "as defined by laws relating to environmental quality." [24] Second, it provides for the enforcement of that right by "any person" against "any party, public or private, through appropriate legal proceedings, subject to reasonable limitations and regulation as provided by law."

In order to determine the relevance of article XI, section 9 here, we must answer several questions. First, is chapter 205 a "law[ ] relating to environmental quality" within the meaning of article XI, section 9? Second, is article XI, section 9 self-executing, i.e., does the legislature need to act before the ability to "enforce this right" can be realized? Finally, if the provision is self-executing, has the legislature acted to impose "reasonable limitations and regulation" that are applicable in the circumstances of this case, and which would preclude Ala Loop from maintaining an action for alleged violations of Chapter 205?

## 3. Chapter 205 is a "law[ ] relating to environmental quality" within the meaning of article XI, section 9

Article XI, section 9 establishes the right to a clean and healthful environment, "as defined by laws relating to environmental quality." The provision goes on to set forth examples of such laws, including laws relating to "control of pollution" and the "conservation, protection and enhancement of natural resources."

HRS chapter 205 is a law relating to the conservation, protection and enhancement of natural resources, and thus falls within the scope the enforcement right established by article XI, section 9. When the legislature enacted what became HRS chapter 205 in 1961, it stated that the purpose of the statute was "to preserve, protect and encourage the development of the lands in the State for those uses to which they are best suited for the public welfare[.]" 1961 Haw. Sess. Laws Act 187, § 1. A committee report on the bill stated that its purpose was to "protect and conserve through zoning the urban, and agricultural and conservation lands within all counties" in order to, inter alia, "conserve forests, water resources and land." *See* H. Stand. Comm. Rep. No. 395, in 1961 House Journal, at 855. Moreover, in *Curtis v. Board of Appeals, County of Hawai'i*, 90 Hawai'i 384, 978 P.2d 822 (1999), this court examined the "reason and spirit" of the stat-

---

24. As the committee report from the 1978 Constitutional Convention observed regarding this section:

Your Committee believes that a clean and healthful environment is an important right of every citizen and that this right deserves constitutional protection. The definition of this right would be accomplished by relying on the large body of statutes, administrative rules and ordinances relating to environmental quality. Defining the right in terms of present laws imposes no new legal duties on parties, a point of fairness important to parties which have invested or are investing large sums of money to comply with present laws.

Developing a body of case law defining the content of the right could involve confusion and inconsistencies. On the other hand, legislatures, county councils and administrative agencies can adopt, modify or repeal environmental laws or regulation laws [sic] in light of the latest scientific evidence and federal requirements and opportunities. Thus, the right can be reshaped and redefined through statute, ordinance and administrative rule-making procedures and not inflexibly fixed.

Stand. Comm. Rep. No. 77, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 689.

ute and concluded that its "overarching purpose ... is to *'protect and conserve' natural resources* and foster 'intelligent,' 'effective,' and 'orderly' land allocation and development." *Id.* at 396, 978 P.2d at 834 (emphasis added, citation omitted).

Consistent with that understanding, the provisions of chapter 205 expressly require consideration of issues relating to the preservation or conservation of natural resources. *See* HRS § 205–17(3) (requiring that the land use commission in reviewing any petition for reclassification of district boundaries consider among other things "[t]he impact of the proposed reclassification" on the "[p]reservation or maintenance of important natural systems or habitats," the "[m]aintenance of valued cultural, historical, or natural resources" and the "[m]aintenance of other natural resources relevant to Hawaii's economy, including, but not limited to, agricultural resources"); HRS § 205–2(e) (mandating that land classified as conservation districts include "areas necessary for protecting watersheds and water sources; preserving scenic and historic areas; providing park lands, wilderness and beach reserves; conserving indigenous or endemic plants, fish and wildlife....").

Finally, HRS § 607–25 reflects the legislature's determination that chapter 205 is an environmental quality law. That determination is particularly pertinent since article XI, section 9 does not itself define the substantive content of the right to a clean and healthful environment, but rather leaves it to the legislature to determine. HRS § 607–25 is a fee recovery statute that authorizes the recovery of attorneys' fees and costs by private parties against other private parties who undertake development without "obtaining all permits or approvals required by law from government agencies[.]" HRS § 607–25(e). HRS § 607–25(c) provides that "[f]or purposes of this section, the permits or approvals required by law shall include compliance with the requirements for permits or approvals established by chapter[ ] ... 205 ... and ordinances or rules adopted pursuant thereto under chapter 91." Thus, permits or approvals required by chapter 205 are expressly covered by the statute.

The legislature explained the purpose of HRS § 607–25 as follows:

> *The legislature finds that article XI, section 9, of the Constitution of the State of Hawaii has given the public standing to use the courts to enforce laws intended to protect the environment.* However, the legislature finds that the public has rarely used this right and that there have been increasing numbers of after-the-fact permits for illegal private development. Although the legislature notes that some government agencies are having difficulty with the full and timely enforcement of permit requirements against private parties, after-the-fact permits are not a desirable form of permit streamlining. For these reasons, *the legislature concludes that to improve the implementation of laws to protect health, environmental quality, and natural resources,* the impediment of high legal costs must be reduced for public interest groups by allowing the award of attorneys' fees, in cases involving illegal development by private parties.

1986 Haw. Sess. Laws Act 80, § 1 at 104–105 (emphasis added).

Thus, in enacting HRS § 607–25, the legislature recognized that chapter 205 implements the guarantee of a clean and healthful environment established by article XI, section 9. Accordingly, we conclude that chapter 205 is a "law[ ] relating to environmental quality" within the meaning of article XI, section 9.

### 4. Article XI, section 9 is self-executing in the circumstances presented here

In *State v. Rodrigues,* 63 Haw. 412, 629 P.2d 1111 (1981), this court held that a constitutional provision is self-executing "if it supplies a sufficient rule by means of which the right may be enjoyed and protected, or the duty imposed may be enforced[.]" *Id.* at 414, 629 P.2d at 1113 (citing *Davis v. Burke,* 179 U.S. 399, 403, 21 S.Ct. 210, 45 L.Ed. 249 (1900)). However, a provision "is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law." *Id.*

The Hawai'i Constitution itself addresses the subject of whether its provisions are self-executing, providing in article XVI, section 16 that "[t]he provisions of this constitution shall be self-executing to the fullest extent that their respective natures permit."

In *Rodrigues,* the question was whether article I, section 11 relating to the appointment of independent grand jury counsel was self-executing.[25] *Id.* at 413–14, 629 P.2d at 1113. We evaluated the plain language of the provision, as well as the intent of the framers as reflected in the standing committee reports from the 1978 Constitutional Convention. *Id.* at 416–17, 629 P.2d at 1114–15. We concluded that the provision's reference to the appointment, term and compensation of the independent counsel "as provided by law" reflected the framers' intent that "subsequent legislation was required to implement the amendment[,]" since at the time the amendment was adopted, "there [were] no other constitutional provisions or statutes to which the phrase could refer." *Id.* at 415, 629 P.2d at 1114.

We have revisited the analysis of *Rodrigues* in several subsequent cases. In *In re Water Use Permit Applications,* 94 Hawai'i 97, 131–32, 9 P.3d 409, 443–44 (2000), this court considered a challenge to actions taken by the Commission on Water Resource Management, including the apportionment of water for various uses. The Commission had cited the public trust doctrine, in addition to the State Water Code, as support for its decisions. *Id.* at 113, 9 P.3d at 425. We held that article XI, section 1[26] and article XI, section 7[27] adopted the public trust doctrine as a fundamental principle of constitutional law in Hawai'i, and rejected a claim that the doctrine was not self-executing. *Id.* at 132 n. 30, 9 P.3d at 444 n. 30. We examined the history of the provisions, and concluded that "[w]hereas review of the history of article I, section 11 in *Rodrigues* evidenced the intent to require further legislative action, the same inquiry here reveals that the framers intended to invoke the public trust in article XI, section 7." *Id.* We cited to article XVI, section 16 as further support for that conclusion. *Id.*

In *United Public Workers, AFSCME, Local 646 v. Yogi,* 101 Hawai'i 46, 62 P.3d 189 (2002), this court considered whether a statute which prohibited public employers and public employee unions from collectively bargaining over cost items for the 1999–2001 biennium violated article XIII, section 2[28] of the Hawai'i Constitution. *Id.* at 47, 62 P.3d at 190. This court noted that at the time article XII, section 2 was amended in 1968,[29]

25. That provision, which was adopted in 1978, provides:

> Whenever a grand jury is impaneled, there shall be an independent counsel appointed as provided by law to advise the members of the grand jury regarding matters brought before it. Independent counsel shall be selected from among those persons licensed to practice law by the supreme court of the State and shall not be a public employee. The term and compensation for independent counsel shall be provided by law.

26. Article XI, section 1 provides:

> For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.
>
> All public natural resources are held in trust by the State for the benefit of the people.

27. Article XI, section 7 provides:

> The State has an obligation to protect, control and regulate the use of Hawaii's water resources for the benefit of its people.
>
> The legislature shall provide for a water resources agency which, as provided by law, shall set overall water conservation, quality and use policies; define beneficial and reasonable uses; protect ground and surface water resources, watersheds and natural stream environments; establish criteria for water use priorities while assuring appurtenant rights and existing correlative and riparian uses and establish procedures for regulating all uses of Hawaii's water resources.

28. Article XIII, section 2 [formerly Article XII, section 2] provides that:

> Persons in public employment shall have the right to organize for the purpose of collective bargaining as provided by law.

29. In a footnote this court explained that:

> Prior to the 1968 amendment, article XII, section 2 provided that "[p]ersons in public employment shall have the right to organize and to present their grievances and proposals to

"collective bargaining as provided by law" had a well recognized meaning, usage and application under both federal and state laws. *Id.* at 51, 62 P.3d at 194. Thus, we concluded that *"Rodrigues* is inapposite[,]" and explained:

> The context in which the phrase "as provided by law" in *Rodrigues* was used is factually distinguishable from the situation presented in the instant case. Unlike the amendment at issue in *Rodrigues*, when article XII, section 2 was amended in 1968, there were pre-existing federal and state statutes, constitutional provisions, and court cases which give meaning to the term "collective bargaining."

*Id.*

After evaluating the intent of the framers as reflected in committee reports from the 1968 Constitutional Convention as well as the voters' understanding of the term "collective bargaining" as reflected by its common definition at the time, this court concluded that the provision's reference to "collective bargaining" had a clear meaning which entailed the "ability to engage in negotiations concerning core subjects such as wages, hours, and other conditions of employment." *Id.* at 53, 62 P.3d at 196. Accordingly, this court held that lawmakers did not have the absolute discretion to define the scope of collective bargaining. *Id.*

In *Save Sunset Beach Coalition v. City and County of Honolulu*, 102 Hawai'i 465, 78 P.3d 1 (2003), this court considered whether article XI, section 3 [30] relating to the conservation and protection of agricultural land was self-executing. *Id.* at 474–76, 78 P.3d at 10–12. This court concluded that article XI, section 3 read as a whole required future action be taken by the legislature in order for the "two-thirds vote of the body responsible for the reclassification or rezoning action" provision to be effective. *Id.* This court explained that since the text imposes a duty on the legislature to "provide standards and criteria to accomplish the foregoing [mandate with respect to the preservation of agricultural lands]," it did not appear that the framers considered article XI, section 3 to be "complete in itself," and instead required implementing legislation. *Id.* at 475–76, 78 P.3d at 11–12.

Several principles emerge from these cases. First, we closely review the language of the provision at issue to determine whether it indicates that the adoption of implementing legislation is necessary. While a reference to a right being exercised "as provided by law" may reflect an intent that implementing legislation is anticipated, *see Rodrigues*, 63 Haw. at 415, 629 P.2d at 1114, it can be interpreted in other ways, such as simply referring to an existing body of statutory and other law on a particular subject, *see Yogi*, 101 Hawai'i at 51–53, 62 P.3d at 194–96.[31] Second, we review the history of

---

the State, or any political subdivision or any department or agency thereof." Article XII, section 2 was amended in 1968 to read, "[p]ersons in public employment shall have the right to organize for the purpose of collective bargaining as prescribed by law." Ten years later, at the 1978 Constitutional Convention, article XII, section 2 was renumbered to article XIII, section 2, and the phrase, "as prescribed by law" was replaced with as "provided by law."
101 Hawai'i at 47 n.5, 62 P.3d at 190 n. 5 (internal citations omitted).

30. Article XI, section 3 provides:
 The State shall conserve and protect agricultural lands, promote diversified agriculture, increase agricultural self-sufficiency and assure the availability of agriculturally suitable lands. The legislature shall provide standards and criteria to accomplish the foregoing.
 Lands identified by the State as important agricultural lands needed to fulfill the pur-

poses above shall not be reclassified by the State or rezoned by its political subdivisions without meeting the standards and criteria established by the legislature and approved by a two-thirds vote of the body responsible for the reclassification or rezoning action.

31. Thus, we respectfully disagree with the dissent's reliance on *Board of Education of State of Hawaii v. Waihee*, 70 Haw. 253, 264 n. 4, 768 P.2d 1279, 1286 n. 4 (1989) for the proposition that "[t]he phrase 'as provided by law' in the context of . . . state constitutional provisions [is a directive] to the legislature to enact implementing legislation" in the circumstances here. Dissenting opinion at 451, 235 P.3d at 1163–64 & 1164 n. 23 (ellipses and brackets in the original). *Waihee* is distinguishable from the instant case because *Waihee* concerned whether what had been "provided by law" was consistent with the constitutional provisions, not whether the provisions were self-executing.

the provision, to determine if the framers' intent as reflected in that history confirms our analysis of the plain language.

The plain language of article XI, section 9 suggests that the right of enforcement described in the provision is self-executing. While the right is "subject to reasonable limitations and regulation as provided by law," that provision does not suggest that legislative action is needed before the right can be implemented. Put another way, although the provision preserves the ability of the legislature to impose reasonable limitations on the exercise of the right, the right exists and can be exercised even in the absence of such limitations.

It is noteworthy that some limitations already existed in the State's environmental laws at the time the amendment was approved in 1978. For example, HRS § 343–7(a) (Supp.1975) provided that judicial proceedings challenging the failure to prepare an environmental impact statement must be brought within 180 days. Absent the final clause in article XI, section 9, it could be argued that such provisions would be unconstitutional because they restrict the right to enforce environmental quality laws. Thus, the situation here is similar to that in *Yogi*, where the phrase "as provided by law" in article XIII, section 2 was interpreted as a reference to the existing law of collective bargaining, rather than that in *Rodrigues*, where article I, section 11 established a new right to grand jury counsel, and the phrase "as provided by law" reflected the framers' understanding that administrative details such as the compensation of the counsel needed to be addressed by the legislature first.

It is also worth noting that the right at issue here—i.e., the right to seek enforcement "through appropriate legal proceedings"—is within the ability of the judiciary to implement without legislative action. Unlike the establishment of a new right to grand jury counsel, which raised issues of implementation such as who gets to serve as such counsel and how much they will be paid, establishing a right to enforce environmental rights does not raise practical issues of implementation.

This interpretation of the plain language of article XI, section 9 is confirmed by an examination of the intent of its framers, as reflected in the proceedings of the 1978 Constitutional Convention. The report of the Committee on Environment, Agriculture, Conservation and Land observed:

> Your Committee believes that a clean and healthful environment is an important right of every citizen and that this right deserves constitutional protection.
>
> . . . .
>
> Your Committee believes that this important right deserves enforcement and has removed the standing to sue barriers, which often delay or frustrate resolutions on the merits of actions or proposals, and provides that individuals may directly sue public and private violators of statutes, ordinances and administrative rules relating to environmental quality. The proposal adds no new duties but does add potential enforcers. This private enforcement right complements and does not replace or limit existing government enforcement authority.
>
> Your Committee intends that the legislature may reasonably limit and regulate this private enforcement right by, for example, prescribing reasonable procedural and jurisdictional matters, and a reasonable statute of limitations.
>
> Your Committee believes that this new section adequately recognizes the right to

---

Moreover, the case from which *Waihee* draws this proposition, *State v. Rodrigues*, 63 Haw. 412, 415, 629 P.2d 1111, 1114 (1981) considered the phrase "as provided by law" in the context of a constitutional amendment where, "[a]t the time the amendment was adopted, there was no other constitutional provision or statute to which the phrase could refer. Absent such provision, subsequent legislation was required to implement the amendment." *Id*. However, in the instant case, the framers specifically noted that "[d]efining the right *in terms of present laws* imposes no new legal duties on parties," indicating that, at the time the amendment was adopted, there were other laws in existence to which the phrase "as provided by law" could refer. Stand. Comm. Rep. No. 77, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 689 (1980) (emphasis added); *see* discussion *infra*.

**414**

a clean and healthful environment and at the same time would prevent abuses of this right. Concern was expressed that the exercise of this right to a clean and healthful environment would result in a flood of frivolous lawsuits. However, your Committee believes that if environmental law enforcement by government agencies is adequate in practice, then there should be few additional lawsuits, given the barriers that litigation costs present.

Moreover, your Committee is convinced that the safeguards of reasonable limitations and regulations as provided by law should serve to prevent abuses of the right to a clean and healthful environment.

Stand. Comm. Rep. No. 77, in 1 Proceedings of the Constitutional Convention of 1978, at 689–690 (1980).

The committee report does not indicate that the framers understood that implementing legislation was needed before enforcement actions could be brought pursuant to

article XI, section 9. To the contrary, the report explicitly recognizes that the provision "provides that individuals may directly sue public and private violators." [32] *Id.* at 690. While the report recognizes that the legislature retains the power to impose reasonable limits on the right to bring suit, such as statutes of limitations,[33] it does not suggest that such limits must be in place before actions can be brought.[34] *Id.* at 689–90.

This interpretation is further confirmed by the subsequent actions of the legislature, which reflect its understanding that the provision was self-executing. In 1979, the State House appointed the committees on Ecology and Environmental Protection and the Judiciary to serve as a joint Interim Committee to review article XI, section 9 "to determine whether legislation is necessary to implement" the right to a clean and healthful environment established by the provision. H. Spec. Comm. Rep. No. 22, in 1980 House

**32.** A 1978 study prepared for the constitutional convention by the Legislative Reference Bureau contained a section entitled "The Right to Sue For Environmental Grievances." *Hawaii Constitutional Convention Studies, Article X: Conservation and Development of Resources*, Legislative Reference Bureau, at 35–38 (May 1978). The study examined provisions from other states, including one from Illinois which it characterized as "[p]erhaps the strongest constitutional expression of the right to sue[.]" *Id.* at 35–36 (citing Illinois Constitution, Art. XI, § 2, which provided in relevant part that "Each person has the right to a healthful environment" and "[e]ach person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitations and regulation by law."). The study did not indicate that implementing legislation would be required; to the contrary, it clearly assumed the opposite. *Id.* at 36 ("[t]here are a number of advantages to the inclusion of a constitutional provision, in contrast to a statute, granting the right to sue[.]").

**33.** The standing committee report of the 1978 constitutional convention provides that "the legislature *may* reasonably limit and regulate this private enforcement right by, *for example*, prescribing ... a reasonable statute of limitations." Stand. Comm. Rep. No. 77, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 690 (1980) (emphasis added). "[T]he term 'may' is generally construed to render optional, permissive or discretionary the provision in which it is embodied," *State v. Kahawai*, 103 Hawai'i 462, 465, 83 P.3d 725, 728 (2004) (cita-

tions omitted), and there is nothing about the context of its use here to suggest a contrary meaning. Thus, we respectfully disagree with the dissent's assertion that "the framers clearly intended that *a* specific statute of limitations be enacted" before article XI, section 9 can be enforced. Dissenting opinion at 453, 235 P.3d at 1165 (emphasis in original).

Thus, the legislature *may*, consistent with article XI, section 9, enact a specific statute of limitations applicable to actions seeking to enforce the provisions of HRS Chapter 205. Alternatively, statutes of limitations of general application can be applied to such claims consistent with article XI, section 9. *Cf. Pele Defense Fund v. Paty*, 73 Haw. 578, 595, 837 P.2d 1247, 1259 (1992).

**34.** We respectfully disagree with the dissent's suggestion that the plain language of article XI, section 9 does not reflect the clearly-stated intention in the committee report that the right of enforcement be self-executing without further action by the legislature. To the contrary, for the reasons set forth supra, the text of article XI, section 9 unambiguously establishes a self-executing private right of action, and is therefore completely consistent with the committee report's understanding that by recommending adoption of that provision, the committee "*has* removed the standing to sue barriers" and thereby "*provide[d]* that individuals may directly sue public and private violators." Stand. Comm. Rep. No. 77, in 1 Proceedings of the Constitutional Convention of 1978, at 689–690 (1980) (emphasis added).

Journal, at 1247. The joint Interim Committee reviewed the provision and its history, and held a hearing at which various witnesses testified, including four former delegates who served on the committee that drafted the provision. *Id.* at 1247–48. The committee reported to the House as follows:

> Your joint Interim Committee ... finds that both of the constitutional rights contained in the environmental rights amendment took effect and were granted to each person in Hawaii immediately upon ratification, at the general election of November 7, 1978, of the amendment to the Hawaii State Constitution now designated as Article XI, Section 9.

> Your Committee relatedly finds and concludes that the environmental rights amendment (Article XI, Section 9) is self-executing or self-implementing, and that no legislation is necessary at this time to implement its provisions.

*Id.* at 1248.

The committee further reported that "[a]lthough Article XI, Section 9 does not mandate the legislature to enact limitations and regulations, testimonies presented by representatives from the private sector ... expressed concern that the broad, liberalized standing-to-sue provision in the subject amendment will encourage a flood of lawsuits[.]" *Id.* at 1250. The report noted that the experience to date in Hawai'i with the provision, as well as that in other states (such as Illinois) with similar provisions, did not justify those concerns. *Id.* Thus, the report concluded that "your joint Interim Committee on Environmental Rights recommends no legislation, *at this particular time*, to implement, limit or regulate the provisions of, or the rights granted by[ ]" article XI, section 9. *Id.* (emphasis in original).

The report is not dispositive in our analysis since it cannot change the meaning of article XI, section 9 as approved by the voters in 1978, and since it sets forth the views only of the joint committee, rather than the legislature as a whole. Nevertheless, it is relevant to the extent that it provides an explanation for the non-action of the legislature, which is the body that would be charged with enacting legislation to implement the provision if it was not self-executing.

Even stronger evidence of the legislature's views on the self-executing nature of article XI, section 9 came in 1986, when the legislature enacted Act 80, which was codified as HRS § 607-25. When the legislature enacted Act 80, it specifically included chapter 205 among the list of provisions for which attorneys' fees could be recovered in a suit by one private party against another for an injunction against development undertaken without permits or approvals. *See* 1986 Haw. Sess. Laws Act 80, § 607 at 105 ("[f]or purposes of this section, the permits or approvals required by law shall include compliance with the requirements for permits or approvals established by chapter[ ] ... 205 ... and ordinances or rules adopted pursuant thereto under chapter 91.").

Although one might read the inclusion of chapter 205 within HRS § 607-25 as creating a cause of action under HRS § 607-25, the legislature's findings and committee reports all suggest that the legislature understood that such causes of action already existed and were authorized by article XI, section 9. *See* 1986 Haw. Sess. Laws Act 80, § 1 at 104-05 ("The legislature finds that article XI, section 9 of the Constitution of the State of Hawaii has given the public standing to use the courts to enforce laws intended to protect the environment. However, the legislature finds that the public has rarely used this right...."); H. Stand. Comm. Rep. No. 766-86, in 1986 House Journal, at 1373 ("Your Committee further finds that if the bill is adopted, it will give fuller effect to Article XI, Section 9 of the State Constitution, which gives Hawaii's people the right to bring lawsuits enforcing environmental laws."); S. Stand. Comm. Rep. No. 450-86, in 1986 Senate Journal at 976 ("The bill will give fuller effect to Article XI, Section 9 of the Constitution of the State of Hawaii, which gives Hawaii's people the right to bring lawsuits enforcing environmental laws.").

In sum, it appears that the legislature found in 1986 that article XI, section 9 was self-executing. Moreover, to ensure that the public was not dissuaded from asserting their

rights under that provision, the legislature enacted HRS § 607–25 to allow citizens to recover their attorneys' fees for bringing a successful civil action against a private party for a violation of the enumerated chapters (including chapter 205) contained within the statute.

This view is consistent with this court's discussion of HRS § 607–25 in *Kahana Sunset Owners Association v. Maui County Council,* 86 Hawai'i 132, 948 P.2d 122 (1997). In *Kahana,* the plaintiffs failed to prevail on appeal in an action against a private defendant with regard to the approval of a rezoning application. *Id.* at 133, 948 P.2d at 123. After a review of the legislative history of HRS § 607–25, this court concluded "that the legislature intended that individuals and organizations would help the state's enforcement of laws and ordinances controlling development by acting as private attorneys general and suing developers who did not comply with the proper development laws." *Id.* at 134–35, 948 P.2d at 124–25. We concluded that an award of attorney's fees to the defendants was not warranted, because the plaintiffs' arguments were not frivolous. *Id.* at 135, 948 P.2d at 125.

The conclusion that article XI, section 9 is self-executing is also widely supported in the scholarly writing about the provision. *See* Susan Morath Horner, *Embryo, Not Fossil: Breathing Life into the Public Trust in Wildlife,* 35 Land & Water L.Rev. 23, 65 (2000) (describing article XI, section 9 as expressing a "manifest self-executing nature"); Janelle P. Eurick, *The Constitutional Right to a Healthy Environment: Enforcing Environmental Protection Through State and Federal Constitutions,* 11 Int'l Legal Persp. 185, 208 (2001) (noting that this court in *Kahana* found that "Hawaii's environmental constitutional provision, Article XI, Section [9], gives citizens standing to use the court to protect the environment"); Carole L. Gallagher, *The Movement to Create an Environmental Bill of Rights: From Earth Day, 1970 to the Present,* 9 Fordham Envtl. L.Rev. 107, 139 (1997) (noting that this court in *Kahana* "affirmed that article XI, section 9 gives the Hawaiian people the right to bring lawsuits to enforce environmental laws"); David Kimo Frankel, *Enforcement of Environmental Laws in Hawaii,* 16 U. Haw. L.Rev. 85, 135 (1994) (noting that article XI, section 9 was "intended to be self-executing" and that "[t]he plain language and history of [that] provision declare that citizens have the right to sue, but that this right can be limited and regulated by the Legislature").

This court's other decisions have not directly addressed whether article XI, section 9 is self-executing. *See Sierra Club v. Dep't of Transp. (Superferry I),* 115 Hawai'i 299, 320 n. 28, 167 P.3d 292, 313 n. 28 (2007) (stating that "[a]lthough this court has cited [article XI, section 9] as support for our approach to standing in environmental cases, we have not directly interpreted the text of the amendment," and declining to discuss the meaning of article XI, section 9 further because the environmental statute at issue contained specific language regarding who may enforce the law and the parties did not discuss the constitutional provision in their appellate briefs) (internal citations omitted); *Life of the Land v. Land Use Comm'n,* 63 Haw. 166, 172 n. 5, 623 P.2d 431, 438 n. 5 (1981) (noting that standing requirements are "tempered" by article XI, section 9); *see also Bremner v. City & County of Honolulu,* 96 Hawai'i 134, 145 n. 3, 28 P.3d 350, 361 n. 3 (App.2001) (addressing the text of article XI, section 9 to the extent it recognized that, "[i]n his complaint, Bremner asserts the omission of an environmental assessment violated his environmental rights under article XI, section 9 of the Hawai'i Constitution. The manner in which Bremner's rights under article XI may be enforced, however, is governed by section 9's qualification that any such legal proceeding be 'subject to reasonable limitations and regulation as provided by law.' Haw. Const. art. XI, § 9. Because Hawai'i Revised Statutes ch. 343 provides reasonable limitations and regulations for adjudicating disputes involving environmental assessments, Bremner's failure to comply with its provisions forecloses further consideration of his constitutional claim."). While several of our decisions have touched upon the existence of private rights of action for violations of environmental laws, they did not consider article XI, section 9. *See Citizens for the Prot. of the N. Kohala Coastline v. County of Hawai'i,*

91 Hawai'i 94, 979 P.2d 1120 (1999); *Whitey's Boat Cruises, Inc. v. Napali–Kauai Boat Charters, Inc.*, 110 Hawai'i 302, 132 P.3d 1213 (2006).[35]

For the foregoing reasons, we conclude that article XI, section 9 is self-executing. Having determined that article XI, section 9 is self-executing, we turn to whether the legislature has acted to impose "reasonable limitations and regulation" that might preclude Ala Loop from maintaining an action for alleged violations of chapter 205.

### 5. HRS § 205–12 does not preclude Ala Loop from bringing an action to enforce chapter 205 against Wai'ola

Article XI, section 9 provides that the legislature has the authority to impose "reasonable limitations and regulation" on potential litigants, such as Ala Loop, who seek to bring private actions to enforce laws relating to environmental quality. In its response to the application, Wai'ola argues that the legislature has expressly delegated enforcement of chapter 205 to the counties in HRS § 205–12,[36] and thereby precluded a private right of action by Ala Loop. In support of its argument, Wai'ola cites to *Lanai Co. v. Land Use Commission*, 105 Hawai'i 296, 318, 97 P.3d 372, 394 (2004).

Although the response does not discuss article XI, section 9, Wai'ola's argument amounts to a contention that HRS § 205–12 is a "reasonable limitation[ ] and regulation" within the meaning of the provision. However, HRS § 205–12 does not preclude Ala Loop's private right of action to enforce chapter 205. In *Lanai Co.*, this court considered the power of the Land Use Commission (LUC) to enforce the provisions of chapter 205. After examining the authority granted to the LUC under chapter 205, we concluded that "the LUC must necessarily be able to order that a condition it imposed be complied with, and that violation of a condition cease." *Id.* However, we further concluded that HRS § 205–12 gave the counties, rather than the LUC, the authority to enforce the provisions of chapter 205. *Id.* We noted that although HRS § 205–12 expressly gave enforcement authority to the counties, "[t]here is no provision in HRS § 205–12 that expressly delegates enforcement power to the LUC." *Id.* We added that "[i]f the legislature intended to grant the LUC enforcement powers, it could have expressly provided the LUC with such power." *Id.*

Thus, the issue in *Lanai Co.* was which of two governmental entities (the LUC, or the county) was authorized by the legislature to enforce chapter 205. There was no suggestion that article XI, section 9 was relevant to that analysis, or that HRS § 205–12 reflected any intent by the legislature to preclude

---

**35.** In *Citizens for the Protection of North Kohala Coastline*, a community group sought declaratory and injunctive relief alleging that the county wrongfully failed to allow for proper state land use review as required by HRS chapter 205. 91 Hawai'i at 96, 979 P.2d at 1122. This court emphasized the state's liberal standing doctrine "where the interests at stake are in the realm of environmental concerns," *id.* at 100, 979 P.2d at 1126 (citation omitted), and reasoned that "[b]ecause a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to this proceeding and will foster 'the needs of justice,' " the community group had standing to participate in the action for declaratory and injunctive relief, *id.* at 101–02, 979 P.2d at 1127–28. This court then reached the merits of the group's claim and concluded that the county did not violate HRS chapter 205. *Id.* at 106, 979 P.2d at 1132.

 In *Whitey's Boat Cruises*, several commercial tour boat operators brought common law tort claims against other operators and promoters, alleging that their failure to obtain permits required by state and county regulations promul-

gated under HRS chapters 200 and 205A amounted to unfair competition and tortious interference with prospective business advantage. This court found that the regulations in question did not provide the parties a private right of action "in the circumstances of this case" because the regulations "were not promulgated with the objective of protecting business interests or competition but rather with the objective of protecting and preserving the environment for the general public[.]" 110 Hawai'i at 313, 132 P.3d at 1224. *Whitey's Boat Cruises* is thus distinguishable from the circumstances here, where there are no allegations of commercial injury.

**36.** HRS § 205–12 (1993) provides:

 **Enforcement.** The appropriate officer or agency charged with the administration of county zoning laws shall enforce within each county the use classification districts adopted by the land use commission and the restriction on use and the condition relating to agricultural districts under section 205–4.5 and shall report to the commission all violations.

private enforcement. Thus, *Lanai Co.* is not dispositive of the issues here.

In any event, if we were to interpret HRS § 205–12 as Wai'ola suggests, it would exceed the power granted to the legislature in article XI, section 9 to impose "reasonable limitations and regulation" on the right of private enforcement. The inclusion of the word "reasonable" in that phrase clearly indicates that the power to limit or regulate is not unfettered. The abolishment of the private right altogether by HRS § 205–12, on the theory that the county would enforce the same underlying substantive interests, would not be a "reasonable" limitation within the meaning of the provision.

This interpretation is supported by the history of article XI, section 9. After discussing the right to a clean and healthful environment, the report of the 1978 Constitutional Convention's Committee on Environment, Agriculture, Conservation and Land observed:

> Your Committee believes that this important right deserves enforcement and has removed the standing to sue barriers, which often delay or frustrate resolutions on the merits of actions or proposals, and provides that individuals may directly sue public and private violators of statutes, ordinances and administrative rules relating to environmental quality. The proposal adds no new duties but does add potential enforcers. *This private enforcement right complements and does not replace or limit existing government enforcement authority.*
>
> Your Committee intends that the legislature may reasonably limit and regulate this private enforcement right by, for example, prescribing reasonable procedural and jurisdictional matters, and a reasonable statute of limitations.
>
> Your Committee believes that this new section adequately recognizes the right to a clean and healthful environment and at the same time would prevent abuses of this right. Concern was expressed that the exercise of this right to a clean and healthful environment would result in a flood of frivolous lawsuits. However, *your Committee believes that if environmental law*

> *enforcement by government agencies is adequate in practice, then there should be few additional lawsuits, given the barriers that litigation costs present.*
>
> Moreover, your Committee is convinced that the safeguards of reasonable limitations and regulations as provided by law should serve to prevent abuses of the right to a clean and healthful environment.

Stand. Comm. Rep. No. 77, in 1 Proceedings of the Constitutional Convention of 1978, at 690 (emphasis added).

As the highlighted sections of the report indicate, the framers understood that private enforcement would "complement" government enforcement, rather than be supplanted by it. The clear import of the passage is that "reasonable limitations and regulation" would encompass matters such as statutes of limitations or procedural or jurisdictional limitations. While such restrictions might preclude a particular plaintiff from bringing suit in a particular circumstance, the framers did not envision that they would be used to eliminate private enforcement altogether.

Accordingly, we conclude that HRS § 205–12 does not limit or restrict the ability of Ala Loop to enforce the provisions of chapter 205 against Wai'ola.

Finally, we note that Wai'ola has not identified any other "reasonable limitations or regulation." Specifically, it has not suggested that exhaustion or primary jurisdiction applies. Accordingly, we do not address whether the application of those doctrines would constitute a reasonable limitation or restriction under the facts of this case. *Cf. Pono,* 119 Hawai'i at 192–201, 194 P.3d at 1154–1163 (Foley, J., concurring) (concluding that Pono's action was properly dismissed since Pono did not exhaust its administrative remedies prior to bringing suit in the circuit court, because Pono did not appeal the decision of the director of Public Works and Waste Management to the Board of Variances and Appeals).

**6. The cases cited by the dissent address requirements for standing and do not establish the existence of a statutory private right of action**

We respectfully disagree with the dissent's suggestion that this court has recognized a

private right of action for "adjoining landowners" who are affected by "land use decisions that interfere with the enjoyment of their property," dissenting opinion at 429, 235 P.3d at 1141, based on our holdings in *Dalton v. City and County of Honolulu*, 51 Haw. 400, 462 P.2d 199 (1969), *East Diamond Head Association v. Zoning Board of Appeals of the City and County of Honolulu*, 52 Haw. 518, 479 P.2d 796 (1971), *Town v. Land Use Commission*, 55 Haw. 538, 524 P.2d 84 (1974), *Perry v. Planning Commission of the County of Hawaii*, 62 Haw. 666, 619 P.2d 95 (1980), and *Mahuiki v. Planning Commission and Planning Department of the County of Kauai*, 65 Haw. 506, 654 P.2d 874 (1982). To the extent the cases cited by the dissent focus on the status of the plaintiffs as adjoining landowners, they did so in the context of assessing standing.[37] Moreover, the appeals in *East Diamond Head Association, Town, Perry*, and *Mahuiki* were brought pursuant to chapter 91, and do not establish the existence of a private right of action outside of that context.

In *Dalton*, the plaintiffs, who "apparently 'live[d] across the street from [the] real property'" at issue, sought a declaratory judgment that four Honolulu zoning ordinances were null and void. 51 Haw. at 400–01, 403, 462 P.2d at 201, 202. The defendants, lessees and developers of land rezoned under the ordinances, "argued that plaintiffs *lacked standing to sue.*" *Id.* at 402, 462 P.2d at 202 (emphasis added). This court identified "the issues to be resolved" as "*standing*, laches, and the validity of the ordinances." *Id.* (emphasis added). In addressing the defendants' standing argument, this court concluded that "[p]laintiffs' interest in this case is

that they 'reside in very close proximity' to the proposed development.... Clearly this is a 'concrete interest' in a 'legal relation'." *Id.* Accordingly, this court concluded that "plaintiffs *have standing* to challenge the validity of the ordinances in question." *Id.* (emphasis added). Without addressing whether the plaintiffs had a private right of action to challenge the ordinances,[38] this court went on to address the plaintiffs' contention that the ordinances were null and void, and concluded that the trial court's grant of summary judgment in favor of defendants was erroneous. *Id.* at 408, 417, 462 P.2d at 205, 209.

In *East Diamond Head Association*, an association of neighboring landowners challenged the trial court's order concluding that the association was not a "person aggrieved" within the meaning of the Hawai'i Administrative Procedures Act (HAPA), and was therefore not entitled to judicial review of the zoning board's issuance of a variance allowing a parcel of land to be used for movie production.[39] 52 Haw. at 518–19, 479 P.2d at 796–97. The zoning board had held a public hearing on the movie studio's petition for the variance, at which members of the association had testified that "the movie operation interfered with the enjoyment of their property[.]" *Id.* at 520–21, 479 P.2d at 797–98. After the zoning board's decision to issue the variance, the association "instituted proceedings for a judicial review under [§ ] 91–14(a) (1968) of the [HAPA]." *Id.* at 521, 479 P.2d at 798. The trial court dismissed the association's agency appeal, finding that the association was not "entitled to review as a person aggrieved by a final decision and order in a

---

**37.** As noted in n. 20, *supra*, while the term "standing" is sometimes used to describe the private right of action inquiry, *see, e.g., Pono* 119 Hawai'i at 167, 194 P.3d at 1129, nevertheless, our cases make clear that the two inquiries involve distinct policy considerations and distinct tests, *see e.g., Pele Defense Fund v. Paty*, 73 Haw. 578, 591, 837 P.2d 1247, 1256–57 (1992).

**38.** We note that *Dalton* was decided prior to the United States Supreme Court's decision in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). This court first utilized the *Cort* analysis for determining whether a statute authorized an implied private right of action in *Reliable Collection Agency v. Cole*, 59 Haw. 503, 584 P.2d 107 (1978). Thus, our analysis of private rights of

action has been modified since our decision *Dalton*, and we therefore respectfully disagree with the dissent's assertion that *Dalton* should control our analysis here.

**39.** We have since characterized the determination of whether a party is a "person aggrieved" for the purposes of chapter 91 as comprising part of the standing inquiry. *See Bush v. Hawaiian Homes Comm'n*, 76 Hawai'i 128, 133–34, 870 P.2d 1272, 1277–78 (1994) ("Appellants' standing to invoke judicial review under the HAPA is contingent upon a showing that they are 'person[s] aggrieved by a final decision and order in a contested case' conducted before an administrative agency") (brackets in the original; citation omitted).

contested case as provided for in HRS Chapter 91 and HRS [§ ] 91–14(a)" because it had not "intervened in the board's proceedings[.]" *Id.*

This court disagreed and concluded both that the association was a "person aggrieved" and that the public hearing was a "contested case." *Id.* at 522, 524, 479 P.2d at 798, 799. In concluding that the association was a "person aggrieved," this court noted that the "[s]tudio's industrial use within [the association members'] residential neighborhood as sanctioned by the board's zoning variance immediately and directly affects each homeowner[,]" and that the association members were therefore not "merely tangentially touched by the zoning change[.]" *Id.* at 522, 479 P.2d at 798. In holding that the public hearing was a "contested case," this court concluded that the association had "done everything possible to perfect an appeal" by "comport[ing] with all board procedural dictates[.]" *Id.* at 524, 479 P.2d at 799. Accordingly, this court remanded the case for a new trial. *Id.*

In *Town,* adjoining landowners challenged the trial court's grant of a motion for summary judgment in favor of the Land Use Commission (LUC), where the LUC had approved a petition to amend the district designation for a parcel of land from agricultural to rural. 55 Haw. at 539, 524 P.2d at 85. The LUC had held a public hearing on the petition, at which the adjoining landowners "spoke in opposition to the [ ] petition." *Id.* at 539, 524 P.2d at 86. Two subsequent meetings were held, at which a decision on the petition was deferred. *Id.* At a third meeting, where the adjoining landowners were not present, the owner of the parcel spoke to "rebut all statements made by the opposition to his petition and submitted documents for the consideration of the [LUC.]" *Id.* at 540, 524 P.2d at 86. A motion to approve the petition was carried, but the Vice–Chairman of the LUC noted that the motion was " 'not based on anything that was said here today because these facts were

made known to us before.' " *Id.* The adjoining landowners appealed, seeking reversal of the LUC's decision. *Id.*

In the adjoining landowners' agency appeal, this court concluded that the meeting at which the petition was approved was a "contested case," *id.* at 548, 524 P.2d at 91, the provisions of the HAPA were applicable, *id.* at 545, 524 P.2d at 89, and the LUC had violated the provisions of the HAPA in accepting the owner's testimony and evidence, *id.* at 549, 524 P.2d at 91. In concluding that the meeting was a "contested case" [40] within the meaning of HRS § 91–1(5), we noted that:

> The appellant has a property interest in the amending of a district boundary when his property adjoins the property that is being redistricted. Therefore, any action taken on the petition for boundary change is a proceeding in which appellant has legal rights as a specific and interested party and is entitled by law to have a determination on those rights.

*Id.* at 548, 524 P.2d at 91 (citations and footnoted omitted).

This court further concluded that the approval of the petition "was rendered in violation of HRS [§§ ] 205–3 and 205–4 as well as Land Use Regulation 2.35" because the LUC had failed to act on the petition within the prescribed statutory period. *Id.* at 542–545, 524 P.2d at 87–89.

In *Perry,* adjoining landowners challenged the grant of a special permit to Shield–Pacific, Ltd. and Kapoho Land and Development Company (hereinafter Applicants), who had filed an application with the County of Hawai'i Planning Commission (planning commission) seeking permission to use a parcel of land for quarrying purposes. 62 Haw. at 669, 619 P.2d at 99. "Since the land was within an 'agricultural' district for purposes of Land Use Law, HRS Chapter 205, favorable actions upon the request by both the [planning commission] and the [LUC] were

---

40. We have also characterized a party's participation in a "contested case" as a standing requisite in an administrative appeal. *See Bush,* 76 Hawai'i at 134, 870 P.2d at 1278 (noting that a party " 'must have participated in [a] contested case before [an] administrative agency[,]' to acquire standing to challenge the decision in court") (brackets in the original; citation omitted).

necessary before such use was permissible." *Id.* The planning commission held a public hearing, at which opponents "object[ed] to the proposed quarrying operations[.]" *Id.* at 670–71, 619 P.2d at 100. The planning commission later voted to permit the requested use, and the planning commission's decision was transmitted to the LUC pursuant to HRS § 205–6. *Id.* at 671, 619 P.2d at 100. Following a lengthy public meeting in which "opponents of the application again voiced their ... concerns," the LUC approved the special permit. *Id.* at 672, 619 P.2d at 101. The owners of property adjoining the proposed quarry site appealed from the decision and order of the LUC, and the circuit court set aside the grant and approval of the special permit on several grounds, including that the planning commission had not acted on the application in a timely manner and that the LUC therefore lacked jurisdiction to act on the permit. *Id.* at 672–73, 619 P.2d at 101. The government agencies and the Applicants appealed the circuit court's judgment. *Id.* at 673, 619 P.2d at 101.

On appeal of the circuit court's judgment, this court did not address jurisdiction, but instead proceeded directly to address the appellants' arguments on the merits and reversed the circuit court. *Id.* at 673–86, 619 P.2d at 101–08. Thus, although *Perry* provides an example of adjoining landowners bringing a chapter 91 appeal of a LUC decision,[41] it contains no discussion directly relevant to the issues here.

In *Mahuiki*, a limited partnership sought to develop a condominium and single family residence project at Haena on Kaua'i. 65 Haw. at 508, 654 P.2d at 876. The partnership sought various approvals from the Kaua'i Planning Commission, including a special management area use permit under the Coastal Zone Management Act (CZMA), HRS chapter 205A. *Id.* at 508, 654 P.2d at 876. The commission held a hearing on the request, and approved the permit with conditions. *Id.* at 511, 654 P.2d at 877–78. The

appellants, who were "adjacent landowners or residents of Haena," *id.* at 515, 654 P.2d at 880, appealed to the circuit court, challenging the commission's approval of the permit on numerous grounds, *id.* at 512, 654 P.2d at 878. The circuit court dismissed the appeal "on the ground that appellants had not participated in the administrative proceedings." *Id.*

On appeal, this court first considered "the appellants' standing to seek review of the administrative action[,]" and concluded that two of the appellants had satisfied the requirements of HRS § 91–14 since there was a final decision and order in a contested case, appellants' interests were injured, and they had submitted written testimony in opposition to the permit request and thus were involved in the contested case proceedings. *Id.* at 508, 512, 514–15, 654 P.2d at 876, 878–80. With regard to the injury to the appellants' interests, we noted that:

> The interests asserted by appellants were "special" and "personal" unto themselves, as they are adjacent landowners or residents of Haena. And a decision to permit the construction of multi-family housing units on undeveloped land in the special management area could only have an adverse effect on their environment.

*Id.* at 515, 654 P.2d at 880.

We then concluded that the planning commission erred by omitting a required finding, and accordingly vacated the dismissal of the case. *Id.* at 519, 654 P.2d at 883.

In sum, each of these five cases addressed standing requisites. *Dalton* expressly discussed its determination that adjoining landowners had "a 'concrete interest' in a 'legal relation'" in standing terms. 51 Haw. at 403, 462 P.2d at 202. *Mahuiki, Town* and *East Diamond Head Association* directly addressed questions relating to whether the adjoining landowners had standing to appeal an agency action in a contested case under

---

41. Although *Perry* does not explicitly mention chapter 91, the court's discussion of the LUC proceedings clearly reflects that it was an administrative appeal. 62 Haw. at 668, 672, 619 P.2d at 98, 101 (noting that "[t]his case is before us on an appeal from an order and judgment of the

Circuit Court of the Third Circuit reversing and vacating *an order of the Land Use Commission of the State of Hawaii*" and that the appellees "filed a timely Notice of Appeal *from the foregoing decision and order [of the LUC]* to the circuit court") (emphasis added).

HRS § 91–14.[42] *Perry*, similarly, was an agency appeal, and did not directly discuss standing or private rights of action. Moreover, to the extent that *Mahuiki, Town* and *East Diamond Head Association* discussed the nature of the parties' status as adjoining landowners, they did so in the context of determining whether they were "person[s] aggrieved" for purposes of HRS § 91–14. Because the landowners lived adjacent to the properties that were the subject of the proposed land use action at issue in each case, we determined that they had a sufficient stake to be aggrieved persons. Thus while the nature of the impacts that the neighboring landowners alleged provided the basis for determining that they had standing under HRS § 91–14 as "persons aggrieved," at no point in our discussion in those cases did we suggest that they had a cause of action independent of chapter 91 based on their status as neighboring landowners. *See Punohu v. Sunn*, 66 Haw. 485, 487, 666 P.2d 1133, 1135 (1983) (holding that "it would be anomalous to permit a declaratory judgment action to be substituted for an appeal from an agency determination in a contested case").

Accordingly, we respectfully disagree with the dissent's interpretation of these cases, and conclude that they did not recognize the existence of a private right of action in the circumstances here.

**42.** We have elsewhere characterized the discussion in *Mahuiki* and *East Diamond Head Association* as addressing the question of "standing." *Sierra Club v. Hawai'i Tourism Auth.*, 100 Hawai'i 242, 252, 59 P.3d 877, 887 (2002) (plurality opinion) (finding that *Mahuiki* held that "adjacent landowners [ ] had standing to invoke judicial review" and *East Diamond Head Association* held that neighboring landowners "had standing to challenge movie operation" based on impacts that showed "each appellant was a person aggrieved") (internal quotation marks omitted).

**43.** Ala Loop also had standing to bring its claims. Hawai'i courts determine "whether a plaintiff has the requisite stake" in an action so as to have standing by asking "(1) has the plaintiff suffered an actual or threatened injury ...; (2) is the injury fairly traceable to the defendant's actions; and (3) would a favorable decision likely provide relief for plaintiff's injury." *See Sierra Club v. Dep't of Transp.*, 115 Hawai'i 299, 319, 167 P.3d 292, 312 (2007) ("*Superferry I*"). (footnote and citation omitted; ellipses in original). Here, the record amply supports the circuit court's conclusion that:

### 7. Conclusion

▇▇▇ Ala Loop had a private right of action under article XI, section 9 of the Hawai'i Constitution to enforce its chapter 205 claims against Wai'ola.[43] Accordingly, the ICA erred in its March 12, 2009 SDO, and the ICA's April 22, 2009 judgment must be vacated.

### C. The circuit court abused its discretion in denying the motion to set aside default

▇▇▇ Wai'ola argues that the circuit court abused its discretion in denying its motion to set aside the entry of default. In denying the motion, the circuit court ruled in its August 11, 2004 order as follows:

> 1. [Wai'ola] made a conscious choice not [to] be represented by private legal counsel and therefore, failed to answer Ala Loop's cross-claim in a timely manner. Therefore, it cannot be said that [Wai'ola] was guilty only of excusable neglect.
>
> . . . .
>
> 3. [Wai'ola] has failed to satisfy the necessary criteria for setting aside an entry of default, and therefore, its Motion to Set Aside Entry of Default Dated May 24,

[Ala Loop] has standing to assert its claims regarding Wai'ola's use of the Subject Property. In particular, it has suffered an actual or threatened injury as a result of Wai'ola's conduct, the injury is fairly traceable to the conduct of Wai'ola and a favorable decision would likely provide relief for [Ala Loop's] injury.

For example, the record includes declarations from residents of Ala Loop detailing, inter alia, the impact of Wai'ola's school operations on traffic in the neighborhood, and the potential impacts that expanded operations could have on sewage and water systems. Accordingly, Ala Loop has shown that it suffered an "actual or threatened injury" that is "fairly traceable" to Wai'ola's use of the property without a permit, and that relief could be provided by the court. *See Superferry I*, 115 Hawai'i at 319, 167 P.3d at 312.

Because we conclude that Ala Loop has standing under the traditional injury-in-fact test, we need not reach whether the doctrine of procedural standing is applicable in this case.

2004, Filed Herein July 6, 2004, should be denied.

HRCP Rule 55 governs the entry of default and default judgments. With regard to the entry of default, it provides in pertinent part as follows:

(a) **Entry.** When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default.

. . . .

(c) **Setting Aside Default.** For good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b).

 We review the denial of a motion to set aside default for abuse of discretion. *Hupp v. Accessory Distrib., Inc.*, 1 Haw.App. 174, 177, 616 P.2d 233, 235 (1980) (holding that "an application under Rule 55(c), Hawai'i Rules of Civil Procedure to set aside entry of default is addressed to the sound discretion of the court"); *see also Gonsalves v. Nissan Motor Corp.*, 100 Hawai'i 149, 158, 58 P.3d 1196, 1205 (2002).

 Defaults are generally disfavored. *See Rearden Family Trust v. Wisenbaker*, 101 Hawai'i 237, 254, 65 P.3d 1029, 1046 (2003) (holding that "defaults and default judgments are not favored and [ ] any doubt should be resolved in favor of the party seeking relief, so that, in the interests of justice, there can be a full trial on the merits") (citations omitted). In *BDM, Inc. v. Sageco, Inc.*, 57 Haw. 73, 549 P.2d 1147 (1976), this court held that a party seeking to set aside a default must demonstrate the following three factors:

In general, a motion to set aside a default entry or a default judgment may and should be granted whenever the court finds (1) that the nondefaulting party will not be prejudiced by the reopening, (2) that the defaulting party has a meritorious defense, and (3) that the default was not

the result of inexcusable neglect or a wilful act.

*Id.* at 76, 549 P.2d at 1150 (citations omitted).

In *BDM*, we observed that the showing necessary to set aside the entry of default was lower than that needed to set aside a default judgment. *Id.* ("It should be noted that a motion to set aside a default entry, which may be granted under Rule 55(c) 'for good cause shown', gives the court greater freedom in granting relief than is available on a motion to set aside a default judgment where the requirements of Rule 60(b) must be satisfied.") (citation omitted). This is a reasonable distinction, since the entry of default occurs at a more preliminary stage of the case than does the entry of judgment.

Applying these principles here, we conclude that the circuit court abused its discretion in denying the motion to set aside the entry of default. In denying the motion, the circuit court appeared to find that Wai'ola's conduct constituted inexcusable neglect. However, the circumstances here are dissimilar from those in which relief from default is typically denied. For example, this is not a case in which a defendant that was properly served with a complaint fails to answer without any reason, or for an improper reason. *See, e.g., Pogia v. Ramos,* 10 Haw.App. 411, 416–17, 876 P.2d 1342, 1345 (1994) (noting that the circuit court properly refused to set aside default when defendant claims that she did not answer because "she was having 'problems with her marriage,'" claimed that she "did not understand what the legal papers meant," and believed that when she signed the summons, "that was all she 'had to do.'"). To the contrary, Wai'ola wanted to defend against the cross-claim, tendered the defense to the AG within a few days of being served, and continued to aggressively pursue representation by the AG thereafter, culminating in the filing of the petition for writ of mandamus.

Nor is this a case in which the defaulting party failed to file an answer without seeking the approval of the court for the delay. *See, e.g., Hupp v. Accessory Distrib., Inc.,* 1 Haw. App. at 178–79, 616 P.2d at 236 (holding that the circuit court properly refused to set aside default when defendant's insurer failed to file

an answer for nine months without seeking approval of the court, based on insurer's understanding that it had an " 'open' extension of time from [plaintiff's] attorneys"). After stipulating with Ala Loop for two extensions to answer, Wai'ola, with the AG specially appearing on its behalf, filed a motion on February 25, 2004, asking for an extension of time to answer or otherwise respond. The motion noted the existence of the conflict between Wai'ola and the AG, and suggested that the court extend the deadline until approximately 30 days after the motion was heard on March 18, 2004, since "that interval may be long enough to work out the differences that remain[.]" The court granted the extension to April 19, 2004. On April 19, Wai'ola filed the motion for a stay, noting that it had been unable to resolve the dispute with the AG and accordingly was about to file a petition for writ of mandamus.

Nor is this a case in which there was a lengthy delay between the entry of default and the filing of the motion to set the default aside. *See, e.g., Pogia,* 10 Haw.App. at 413–14, 876 P.2d at 1344 (noting that the motion to set aside entry of default and default judgment was not filed until more than 3 years after entry of default and nine months after entry of judgment). Default was entered on May 24, 2004, Wai'ola agreed to representation by the AG on June 2, 2004, and the motion to set aside default was filed on July 6, 2004.

In the circuit court's August 11, 2004 Order denying Wai'ola's motion to set aside default, the court found that "[Wai'ola] made a conscious choice not [to] be represented by private legal counsel and therefore, failed to answer [the] cross-claim in a timely manner. Therefore, it cannot be said that [Wai'ola] was guilty only of excusable neglect." However, the record does not support the conclusion that Wai'ola could have retained private counsel to file an answer. To the contrary, the record contains a declaration from Wai'ola's director that details the organization's extremely limited financial resources, and states that Wai'ola could not afford to retain private counsel.

Ala Loop argues that Wai'ola's ability to obtain attorney Sandra Song to appear spe-

cially on its behalf to file the motion to stay and the petition for a writ of mandamus indicates that it could have retained private counsel to file an answer. However, it is unclear from the record whether Song was retained or acting pro bono, and whether she would have been willing to appear for the purpose of filing an answer, with the potentially more significant involvement in ongoing litigation that such an appearance could entail. Ala Loop also contends that in January of 2004, Wai'ola's board authorized the expenditure of $10,000 to construct a temporary building on the site at issue here. However, the record does not establish that those funds were in fact expended.

Finally, it is noteworthy that once default was entered, Wai'ola agreed to the AG's demand that it relinquish its potential HRS § 302A–1184 defense, and the AG entered the case on Wai'ola's behalf. The fact that Wai'ola eventually accepted representation from the AG under these circumstances belies the suggestion that it had the resources available to hire its own counsel.

This is not to say that Wai'ola was without fault in its approach to its dispute with the AG. Most notably, Wai'ola should not have waited until April 19, 2004, the last day of the extension that had been granted by the circuit court, to file the motion for a stay so that it could pursue the mandamus petition. The circuit court, in its order granting the extension, had clearly warned Wai'ola that it could be defaulted for failing to answer or otherwise respond by April 19. In those circumstances, the entry of default was appropriate, as would be other sanctions such as requiring Wai'ola to pay Ala Loop's attorneys' fees and costs in connection with the ensuing motion to set aside default. However, the circuit court went further and denied the motion to set aside, thereby imposing the ultimate sanction of denying Wai'ola the opportunity to defend on the merits. In the circumstances of this case, where Wai'ola could not afford private counsel and could obtain representation by the attorney general only by relinquishing its primary defense on the merits, imposition of that sanction was an abuse

of discretion.[44] *Rearden Family Trust*, 101 Hawai'i at 255, 65 P.3d at 1047 (concluding that circuit court abused its discretion by defaulting defendant for failing to attend a settlement conference, since "lesser sanction[s]" would "better serve the interest of justice") (citation and internal brackets omitted). This is particularly so given the fact that the court was being asked to set aside the entry of default, rather than a default judgment, *see BDM*, 57 Haw. at 76, 549 P.2d at 1150, and the relative promptness with which the motion was brought.

## IV. CONCLUSION

Ala Loop had a private right of action under article XI, section 9 of the Hawai'i Constitution to enforce its chapter 205 claims against Wai'ola. Accordingly, we vacate the April 22, 2009 Judgment of the Intermediate Court of Appeals.

We further conclude that the Circuit Court of the Third Circuit erred in failing to' set aside the entry of default against Wai'ola, and accordingly we vacate the circuit court's First Amended Final Judgment entered on December 12, 2005, and remand to the circuit court for further proceedings.

In view of this disposition, we need not address the other issues raised by Ala Loop in its application, or by Ala Loop and Wai'ola in their appeals in the ICA.

Concurring and Dissenting Opinion by ACOBA, J.

I would hold that (1) Petitioner–/Defendant–/Counter–Claimant/Cross–Claimant–/Third–Party Plaintiff-Appellee/Cross–Appellant Ala Loop Community Association (Ala Loop) may seek a declaratory judgment to protect the interests of its members' enjoyment of their real property, (2) Ala Loop and its members have standing to enforce chapter 205 of the Hawai'i Revised Statutes (HRS), (3) the Circuit Court of the Third Circuit (the court) did not abuse its discretion in denying the motion to set aside default of Respondent–/Defendant–/Cross–Claim Defendant–Appellant/Cross–Appellee Wai'ola Waters of Life Charter School (Wai'ola), and (4) Ala Loop is not entitled to attorney's fees under HRS § 607-25 (Supp. 2002). I respectfully disagree, then, with the majority's holding that the court abused its discretion in denying Wai'ola's motion to set aside default. Thus, in my view, it is unnecessary to decide that Ala Loop had a private right of action to enforce HRS chapter 205 under article XI, section 9 of the Hawai'i State Constitution, but inasmuch as the majority does so hold, I believe it is wrong. Therefore, I would vacate the April 22, 2009 judgment of the Intermediate Court of Appeals (ICA) and affirm the court's December 12, 2005 First Amended Judgment.[1]

### I.

Wai'ola is a new century charter school, chartered in July 2000, pursuant to HRS chapter 302A (Supp.1999). Wai'ola acquired ownership of a 28-acre parcel of land, known as the Sunshine Farm Property (Sunshine Farms), with the intention of using it as a working farm and as a campus for its school. The property is located in an agricultural use district on Ala Loop Road on the Island of Hawai'i.

Ala Loop is an unincorporated non-profit association consisting of the residents and owners of the property located adjacent to Ala Loop Road and organized pursuant to HRS chapter 629. The purpose of the asso-

---

44. The circuit court did not address the first two prongs of the three-part *BDM* test, i.e., lack of prejudice to the non-defaulting party and the existence of a meritorious defense. *BDM*, 57 Haw. at 76, 549 P.2d at 1150. However, both of those requirements were satisfied here. There was no apparent prejudice to Ala Loop, other than the burden of having to litigate its claims, and Wai'ola raised significant issues concerning whether its activities on the site at the time of the motion violated chapter 205 and whether there was a ripe dispute.

1. I concur with the majority that (1) the dispute in the instant case is not moot; (2) Petitioner may bring its suit inasmuch as it has demonstrated "injury in fact" standing under *Sierra Club v. Department of Transportation of the State of Hawai'i*, 115 Hawai'i 299, 328, 167 P.3d 292, 321 (2007) [hereinafter, *Superferry I*]; and (3) Petitioner has set forth a legally cognizable cause of action in its cross complaint (but on different grounds than set out by the majority). In all other respects, I disagree with the majority's disposition of this case.

ciation "included those related to the protection of health, safety, welfare and interests of the residents of Ala Loop [Road]." When Ala Loop learned of Wai'ola's acquisition of Sunshine Farms, it began contacting various county officials such as the County of Hawai'i Planning Department (Planning Department) and the County of Hawai'i Office of the Corporation Counsel (Corp. Counsel).

On July 21, 2003, Ala Loop received a letter from the Planning Department, stating in part that

> [t]he Planning Department has received numerous inquiries regarding the operation of charter schools within the State Land Use Agricultural District in regards to H.R.S. § 302A–1184, which exempts charter schools from state laws, except those relating to health and safety, and a few other exceptions. Based on this law and a legal opinion received from the [Corp. Counsel], *we are exempting charter schools from state land use laws not expressly related to health and safety.* The major effect of this exemption is that *charter schools located in the State Land Use Agricultural District do not have to obtain special permits.*

(Emphases added.) The Planning Department did, however, believe that Wai'ola was required to obtain a county use permit under Chapter 25 of the Hawai'i County Code 1983 (1995 ed.).

On November 14, 2003, Respondent–/Plaintiff–/Counterclaim Defendant–Appellee/Cross–Appellee County of Hawai'i (County) filed its complaint for declaratory relief against Wai'ola and Ala Loop.[2] In its complaint, the County asked that the court (1) exercise jurisdiction over the case and controversy, (2) declare that new century charter schools be exempt from obtaining a State special permit, but be required to obtain a county use permit pursuant to Chapter 25 of the Hawai'i County Code, (3) declare that Wai'ola did not, and had not, relied to its detriment on representations made by the County, (4) declare that Wai'ola had no vested right in the continued operation of its school at Sunshine Farms, (5) declare that Wai'ola's continued operation of the school was at its own expense and peril, and subject to Wai'ola obtaining a county use permit, and (7) grant the County its costs, attorney's fees, and other such relief as it deems just.

On November 20, 2003, Ala Loop filed a counter-claim against the County, a cross-claim against Wai'ola, and a third-party complaint against Respondent–/Third–Party Defendant–Appellee/Cross–Appellee Land Use Commission, State of Hawai'i (LUC). In Ala Loop's counter-claim against the County and cross-claim against Wai'ola, Ala Loop asserted five counts for relief. The five counts requested (1) a declaratory judgment that Wai'ola must obtain the special permits and follow all applicable rules and regulations from the Planning Commission and the LUC pursuant to HRS § 205–6 (2001 Repl.),[3] (2) temporary and permanent injunctions to restrain the County from issuing any building permits until special permits are obtained and to restrain Wai'ola from conducting school-related activities on the property until special permits are obtained, (3) damages against the County for civil rights violations pursuant to 42 U.S.C. Section 1983, and attorney's fees and costs, (4) damages against

---

2. The Ala Loop Community Association was incorrectly named Ala Loop Homeowners in the County's complaint.

3. HRS § 205–6 provides in relevant part:
 **Special permit.** (a) The county planning commission may permit certain unusual and reasonable uses within an agricultural ... district[ ] other than those for which the district is classified. *Any person who desires to use ... land ... other than for an agricultural ... use, as the case may be, may petition the planning commission of the county within which the person's land is located for permission ....*
 (b) The planning commission ... shall establish by rule or regulation, the time within

which *the hearing and action on petition for special permit shall occur. The planning commission shall notify the [LUC] and such persons and agencies that may have an interest in the subject matter of the time and place of the hearing.*
 . . . .
 (d) Special permits for land the area of which is greater than fifteen acres shall be subject to approval by the [LUC]. The [LUC] may impose additional restrictions as may be necessary or appropriate in granting such approval, including the adherence to representations made by the applicant.
(Emphases added.)

Wai'ola for nuisance per se and attorney's fees and costs, and (5) attorney's fees and costs incurred in obtaining records.

Wai'ola sought representation from the Attorney General's office (the AG) on November 24, 2003. However, in a letter dated January 21, 2004, the AG stated that the Rules of Professional Conduct precluded it from representing Wai'ola because the AG's position, contrary to Wai'ola's position, was that charter schools were not exempt from the State's land use laws.

On January 30, 2004, Ala Loop, Wai'ola, the County, and the LUC stipulated to an extension for Wai'ola and the LUC to file their answers or responsive pleadings, which extended the deadline from January 15, 2004, to February 16, 2004. The parties subsequently agreed to another extension, giving Wai'ola and LUC until February 25, 2004, to file their answers or responsive pleadings. The LUC filed its answer on February 17, 2004.

On February 25, 2004, Wai'ola filed a motion to extend time to answer or file a responsive pleading for a third time. In its motion, Wai'ola asked for "an extension of *no more than 30 days* after the motion is decided *to answer or otherwise file a responsive pleading.*" (Emphases added.) At the March 18, 2004 hearing, the court orally granted this motion, giving Wai'ola until April 19, 2004, to comply with its motion. In its written order on April 6, 2004, the court stated that, "[i]f an answer or other responsive pleading is not timely filed, [the County] and [Ala Loop] *may take appropriate action for the entry of default against Wai'ola.*" (Emphasis added.)

On the April 19, 2004 deadline, Wai'ola again failed to file its answer. Instead, on the day its answer was due, Wai'ola filed a motion for stay of the proceedings by special counsel, to "permit it to obtain an order requiring [the AG] to provide it with legal representation" or again, in the alternative, to extend time to file its responsive pleadings. The declaration of special counsel indicated that a petition for writ of mandamus would be filed in this court requesting that this court order the AG to represent Wai'ola.

Subsequently, on April 29, 2004, Wai'ola filed a petition for a writ of mandamus in this court. The writ requested that this court either compel the AG to defend Wai'ola, or pay for special counsel to represent Wai'ola.

On May 4, 2004, Ala Loop filed a request for entry of default against Wai'ola because Wai'ola did not file an answer to Ala Loop's cross-claim on April 19, 2009. At a hearing on May 13, 2004, the court orally denied Wai'ola's motion for stay or, in the alternative, a motion to extend time. On May 24, 2004, the court entered default judgment against Wai'ola.

On June 2, 2004, Wai'ola accepted the AG's representation but agreed to the condition that the AG would not assert that Wai'ola was exempt from State land use laws in defending Wai'ola against default and in other aspects of representation. This court denied Wai'ola's petition for mandamus on June 10, 2004.

On June 22, 2004, Wai'ola filed a cross-claim and motion to set aside entry of default. On June 29, 2004, the court entered a written order denying Wai'ola's April 19, 2004 motion for a stay or, in the alternative, to extend time. The court entered an order denying the motion to set aside entry of default on August 11, 2004. The order stated:

1. Defendant Wai'ola made a conscious choice not [to] be represented by private legal counsel and therefore, failed to answer Ala Loop's cross-claim in a timely manner. *Therefore, it cannot be said that Defendant Wai'ola was guilty only of excusable neglect.*

. . . .

3. Defendant Wai'ola has failed to satisfy the necessary criteria for setting aside an entry of default, and therefore, its Motion to Set Aside Entry of Default Dated May 24, 2004, Filed Herein July 6, 2004, should be denied.

(Emphasis added.)

Final Judgment was entered on March 4, 2005. On August 23, 2005, Ala Loop filed a motion for an award of attorney's fees and costs. On October 20, 2005, Ala Loop filed a Motion for Entry of Default Judgment and

Permanent Injunction against Wai'ola. On October 28, 2005, the court entered an order granting Ala Loop all of its costs, but denying Ala Loop its attorney's fees. A First Amended Final Judgment was entered on December 12, 2005, and stated in relevant part:

1. Count I: On Count I of [Ala Loop's] Cross–Claim against Wai'ola requesting *declaratory relief,* more particularly *a determination that Cross–Claim Defendant Wai'ola must obtain a special permit from the Planning Commission and the [LUC] pursuant to HRS Section 205–6 prior to operating a charter school* on its farm at Ala Loop Road, *judgment is hereby entered in favor of [Ala Loop] and against Wai'ola;* ....

2. Count II: On Count II of [Ala Loop's] Cross–Claim against Wai'ola requesting *temporary and permanent injunctive relief* enjoining and restraining Wai'ola from conducting any classes or school related activities on its farm at Ala Loop Road *until and unless a special permit has been issued, judgment is hereby entered in favor of [Ala Loop] and against Wai'ola;* [4] ....

. . . .

4. Count IV: As to [Ala Loop's] claim for damages in the form of attorneys and costs in Count IV of [Ala Loop's] Cross–Claim against Wai'ola, consistent with the Order Granting in Part and Denying in Part [Ala Loop's] Motion for Award of Attorney's Fees and Costs Against [Wai'ola], filed herein on October 28, 2005, *judgment is hereby entered in favor of Wai'ola on [Ala Loop's] claim for attorney's fees, and judgment is hereby entered in favor of [Ala Loop] and against Wai'ola for costs* in the sum of $3,878.64;....

(Emphases added.)

On May 22, 2006, Wai'ola appealed the court's decision to the ICA. On June 2, 2006, Ala Loop filed a cross-appeal to the ICA. On March 12, 2009, the ICA issued a summary disposition order reversing the court's December 12, 2005 First Amended Final Judgment for lack of subject matter jurisdiction. *County of Hawaii v. Ala Loop Homeowners,* No. 27707, 2009 WL 623377 at *6 (Haw.App. Mar. 12, 2009).

## II.

On certiorari, Ala Loop urges this court to rely on case law, HRS § 607–25,[5] and article XI, section 9 of the Hawai'i Constitution,[6] to

---

4. By entering judgment in favor of Ala Loop and against Wai'ola and enjoining Wai'ola from activities "until and unless a special permit has been issued" the court in effect and for all practical purposes decided the question of whether the County should have convened a special permit proceeding under HRS § 205-6.

5. As will be discussed in detail, *infra,* HRS § 607–25 authorizes the recovery of attorneys' fees and costs by private parties against other private parties who undertake a "development" without obtaining all the permits or approvals required by law. HRS § 607–25 states in pertinent part:

(e) In any civil action in this State where a private party sues for injunctive relief against another private party who has been or is undertaking any development without obtaining all permits or approvals required by law from government agencies:

(1) The court may award reasonable attorneys' fees and costs of the suit to the prevailing party.

(2) The court shall award reasonable attorneys' fees and costs of the suit to the prevailing party if the party bringing the civil action:

(A) Provides written notice, not less than forty days prior to the filing of the civil action, of any violation of a requirement for a permit or approval to:

(i) The government agency responsible for issuing the permit or approval which is the subject of the civil action;

(ii) The party undertaking the development without the required permit or approval; and

(iii) Any party who has an interest in the property at the development site recorded at the bureau of conveyances.

(B) Posts a bond in the amount of $2,500 to pay the attorneys' fees and costs provided for under this action if the party undertaking the development prevails.

6. Article XI, section 9 of the Hawai'i Constitution, entitled Environmental Rights, states:

Each person has the right to a clean and healthful environment, as defined by laws relating to environmental quality, including control of pollution and conservation, protection and enhancement of natural resources. Any person may enforce this right against any party, public or private, through appropriate legal proceedings, subject to reasonable limitations and regulation as provided by law.

determine that there was a private right of action to enforce its rights. It argues that the ICA's analysis is inconsistent with cases of this court that have implicitly recognized private rights of action to enforce laws, including HRS chapter 205. Ala Loop's cross-claim "specifically alleged that [Ala Loop's] members (all of whom reside on neighboring property) have already been deprived of the right to participate in agency hearings[.]"

## A.

### 1.

This court has indeed recognized a private right of action that allows adjoining landowners to challenge land use decisions that interfere with the enjoyment of their property. *See Mahuiki v. Planning Comm'n,* 65 Haw. 506, 515, 654 P.2d 874, 880 (1982) (recognizing that "a decision to permit the construction of multi-family housing units on undeveloped land in the special management area could only have an adverse effect on [the adjacent landowners'] environment"); *E. Diamond Head Ass'n v. Zoning Bd. of Appeals of City & County of Honolulu,* 52 Haw. 518, 521–22, 479 P.2d 796, 798 (1971) (allowing adjoining property owner to "seek redress" in court to protect his realty from "threatening neighborhood change") (citation omitted); *Dalton v. City & County of Honolulu,* 51 Haw. 400, 403, 462 P.2d 199, 202 (1969) (allowing adjoining property owners to bring a declaratory judgment action to declare ordinances enacted by the City and County of Honolulu as unconstitutional).

In *Dalton,* the plaintiffs filed a complaint seeking a declaratory judgment that four Honolulu ordinances were null and void and an injunction restraining the enactment of further ordinances relating to a parcel of land "across the street from" their properties. 51 Haw. at 400–01, 403, 462 P.2d at 201–02. The trial court granted summary judgment in favor of the defendants, and the plaintiffs appealed. This court determined, *inter alia,* that summary judgment in favor of defendants on the validity of the ordinances should not have been granted. *Id.* The plaintiffs in *Dalton* "reside[d] in very close proximity to the proposed development[,]" and the developer's plan to build

high rise apartment buildings would have "restrict[ed] the scenic view, limit[ed] the sense of space and increas[ed] the density of [the] population." *Id.* at 403, 462 P.2d at 202. As a result, *Dalton* held that neighboring plaintiffs landowners had "a concrete interest[,]" *id.* (internal quotation marks and citations omitted), that could be legally protected. Hence, in addressing the merits of whether the ordinances were null and void, *id.* at 408–17, 462 P.2d at 205–09, *Dalton* necessarily decided that neighboring landowners had a right of action to protect that "concrete interest in a legal relation[,]" *id.* at 403, 462 P.2d at 202. *See Black's Law Dictionary* 1349 (8th ed.2004) (defining a "right of action" as "[t]he right to bring a specific case to court" or "[a] right that can be enforced by legal action; a chose in action").

This right of action was confirmed in *East Diamond Head,* where this court reaffirmed the same "concrete interest in a legal relation" recognized in *Dalton.* There, adjoining landowners challenged a variance that enabled a neighboring landowner to use its land as a location for a movie production. 52 Haw. at 519, 479 P.2d at 797. The adjoining landowners asserted that "the movie operation interfered with the enjoyment of their property" and "presented evidence of an increase in noise, traffic, and congestion during day and night hours, inconvenience by electrical and telephone work crews, and a fear that the studio's facilities would permanently remain and detract from the aesthetic residential character of the neighborhood." *Id.* at 521, 479 P.2d at 797–98. Citing *Dalton,* 51 Haw. at 403, 462 P.2d at 202, this court recognized that "*an owner whose property adjoins land subject to rezoning has a legal interest worthy of judicial recognition should he seek redress in our courts to preserve the continued enjoyment of his realty by protecting it from threatening neighborhood change*" and that "[e]ach [landowner in that case] asserts ... *such a right.*" *E. Diamond Head,* 52 Haw. at 521–22, 479 P.2d at 798 (emphases added).

As a result, *East Diamond Head* confirmed that adjoining landowners had a "right" in "preserv[ing] the continued enjoyment of [their] realty by protecting [them]

from threatening neighborhood change." *Id.* Furthermore, the rights of those adjoining landowners were "worthy of judicial recognition." *Id.* at 521, 479 P.2d at 798. Accordingly, such landowners could bring suit to protect their right inasmuch as this court recognized that the landowners could "seek redress in our courts" to vindicate that right. *Id.*

Thus, this court has held that adjoining landowners have a "right" denoted as a "a legal interest worthy of judicial recognition . . . [that is] redress[able] in our courts to preserve the continued enjoyment of . . . realty by protecting it from threatening neighborhood change." *Id.* at 521–22, 479 P.2d at 798. "Each landowner" then can bring suit to "assert[ ] . . . such a right," *id.* at 522, 479 P.2d at 798, in the "enjoyment of his [or her] realty[,]" *id.* at 521, 479 P.2d at 798. Consequently, Ala Loops's cross claim sounds in a legally cognizable cause of action.

### 2.

This adjoining landowners' right of a "legal interest worthy of judicial recognition" has also been confirmed in HRS chapter 205 proceedings, similar to that in controversy here. *See Perry v. Planning Comm'n of* *County of Hawaii,* 62 Haw. 666, 619 P.2d 95 (1980) (allowing property owners adjoining a proposed quarry site within an agricultural district to challenge the LUC's order approving the grant of a special land use permit authorizing quarrying operations under HRS § 205–6); *Town v. Land Use Comm'n,* 55 Haw. 538, 524 P.2d 84 (1974) (allowing plaintiffs to challenge the LUC's approval of a neighbor's petition to amend the district designation of neighbor's land from agricultural to rural because it violated HRS § 205–4). For example, in *Town,* a landowner filed a petition with the LUC to amend the district designation of his property from agricultural to rural. 55 Haw. at 539, 524 P.2d at 86. After four public hearings, the LUC approved the landowner's petition. *Id.* at 539–40, 524 P.2d at 86. The appellant, an adjoining property owner to the subject property, filed an appeal challenging the LUC's decision. *Id.* at 540, 524 P.2d at 86. The appellant argued that the petition was null and void because the approval was not decided after forty-five, but within ninety days, following a public hearing required under HRS § 205–4, the statute that governs amendments to district boundaries involving land greater than fifteen acres.[7] *Id.* at 542, 524

7. HRS § 205–4 at that time read:

**Amendments to district boundaries.** Any department or agency of the State or county, or any property owner or lessee may petition the [LUC] for a change in the boundary of any district. Within five days of receipt, the commission shall forward a copy of the petition to the planning commission of the county wherein the land is located. Within forty-five days after receipt of the petition by the county, the county planning commission shall forward the petition, together with its comments and recommendations, to the commission. Upon written request by the county planning commission, the commission may grant an extension of not more than fifteen days for the receipt of any comments and recommendations. The commission may also initiate changes in a district boundary which shall be submitted to the appropriate county planning agency for comments and recommendations in the same manner as any other request for a boundary change.

After sixty days but within one hundred and twenty days of the original receipt of a petition, the commission shall advertise a public hearing to be held on the appropriate island in accordance with the requirements of section 205–3. *The commission shall notify the per-* *sons and agencies that may have an interest in the subject matter of the time and place of the hearing. Within a period of not more than ninety days and not less than forty-five days after the hearing, the commission shall act upon the petition for change.* The commission may approve the change with six affirmative votes. . . .

*Town,* 55 Haw. at 542 n. 2, 524 P.2d at 87 n. 2 (emphasis added). HRS § 205–4 has subsequently been amended and now reads in part:

**Amendments to district boundaries involving land greater than fifteen acres.** (a) Any department or agency of the State, any department or agency of the county in which the land is situated, or any person with a property interest in the land sought to be reclassified, may petition the [LUC] for a change in the boundary of a district. . . .

(b) Upon proper filing of a petition pursuant to subsection (a) the commission shall, within not less than sixty and not more than one hundred and eighty days, conduct a hearing on the appropriate island in accordance with the provisions of sections 91–9, 91–10, 91–11, 91–12, and 91–13, as applicable.

. . . .

(g) *Within a period of not more than three hundred sixty-five days after the proper filing of*

P.2d at 87. The circuit court rendered summary judgment in favor of the LUC and the appellant appealed. *Id.* at 540, 524 P.2d at 86. *Town* concluded, *inter alia,* (1) that the time period in HRS § 205-4 "requiring a decision to be rendered after 45 days and before 90 days ha[d] elapsed following the public hearing clearly [was] a mandatory requirement[,]" *id.* at 543, 524 P.2d at 88, (2) that the time limitation could not be waived solely by the applicant, *id.,* (3) that the decision rendered 175 days after initial public hearing was void, *id.* at 544, 524 P.2d at 89, and (4) that the case was a "contested case" within the Hawai'i Administrative Procedure Act (HAPA), *id.* at 548, 524 P.2d at 91.

Concluding that the time limitation could not be waived solely by the landowner applying for the amendment, this court noted that "[a]n interested party ... *especially where he is an adjoining property owner, has an inherent interest in the decision* no matter what that decision may be and he is entitled to have that decision within the specified period of time." *Id.* at 543–44, 524 P.2d at 88 (emphasis added). Furthermore, "[t]he impact that the change in boundary will have, if approved, to the use and value of adjoining property are factors that must be considered." *Id.* at 544, 524 P.2d at 88. *Town* also

determined that the proceeding was a "contested case" within the definition of HRS § 91-1(5)[8] because the *"appellant has a property interest in the amending of a district boundary when his property adjoins the property that is being redistricted [,]" id.* at 548, 524 P.2d at 91 (citing *E. Diamond Head,* 52 Haw. 518, 479 P.2d 796; *Dalton,* 51 Haw. 400, 462 P.2d 199) (emphasis added), and, "[t]herefore[,] any action taken on the petition for boundary change is a proceeding *in which appellant has legal rights as a specific and interested party and is entitled by law to have a determination on those rights[,]" id.* (emphasis added). Thus, *Town* reiterated that an adjoining landowner had legal rights, as held by this court in *East Diamond Head* and *Dalton,* which could be asserted in administrative and in court proceedings.

In *Perry,* landowners adjoining a proposed quarry site appealed the LUC's order approving the grant of a special permit pursuant to HRS § 205-6. 62 Haw. at 672, 619 P.2d at 101. They alleged, *inter alia,* that "the application was void because the Planning Commission failed to conduct a hearing within one hundred twenty days of its receipt, and therefore, the [LUC] lacked jurisdiction to act on the permit."[9] *Id.* Among

---

*a petition, unless otherwise ordered by a court, or unless a time extension,* which shall not exceed ninety days, is established by a two-thirds vote of the members of the commission, *the commission,* by filing findings of fact and conclusions of law, *shall act to approve the petition, deny the petition, or to modify the petition* by imposing conditions necessary to uphold the intent and spirit of this chapter or the policies and criteria established pursuant to section 205-17 or to assure substantial compliance with representations made by the petitioner in seeking a boundary change.... (Emphases added.)

**8.** HRS § 91-1(5) defines the term "contested case" as "a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing."

**9.** HRS § 205-6 at the time that the approval was granted read, in pertinent part:

**Special permit.** The county planning commission may permit certain unusual and reasonable uses within agricultural and rural districts other than those for which the district is classified. Any person who desires to use his

land within an agricultural or rural district other than for an agricultural or rural use, as the case may be, may petition the planning commission of the county within which his land is located for permission to use his land in the manner desired.

*The planning commission shall conduct a hearing within a period of not less than thirty nor more than one hundred twenty days from the receipt of the petition. The planning commission shall notify the [LUC] and such persons and agencies that may have an interest in the subject matter of the time and place of the hearing.*

The planning commission may under such protective restrictions as may be deemed necessary, permit the desired use, but only when the use would promote the effectiveness and objectives of this chapter....

*Perry,* 62 Haw. at 672 n. 4, 619 P.2d at 101 n. 4 (emphasis added). The provision for a hearing within "a period of not less than thirty nor more than one hundred twenty days from the receipt of the petition" was deleted by Act 166 of the 1978 legislative session. *Id. See* 1978 Haw. Sess. Laws Act 166 § 1, at 337. However, the requirement that a hearing shall be conducted was not. *See* HRS § 205-6 (Supp.2001).

other matters, the circuit court agreed with the landowners on this point. The County and the LUC appealed. This court determined that the timing requirements for the hearing were "to counter possible administrative sluggishness" and "[s]ince the interests of neither the county planning commission, the adjoining landowners, nor the public were likely to be advanced by quick administrative action ..., [this court] believe[d that] the provision was enacted for the primary benefit of those seeking such permits ...." *Id.* at 675, 619 P.2d at 102. Thus, this court concluded that the timing requirements had a "non-mandatory effect" because "[t]here was no discernible loss or destruction of advantage, benefit, or right on anyone's part occasioned by the delay." *Id.* at 677, 619 P.2d at 103. However, the court also noted that "[w]here public interests and *private rights* are adversely affected by procedural irregularity or agency indiscretion, we would not hesitate to follow *Town* [,]" *id.* at 678, 619 P.2d at 104 (emphasis added), which, as discussed above, rendered a LUC decision void. Again, *Perry* confirmed the "private right" acknowledged in *Town*, established in *Dalton* in a court proceeding, and reaffirmed in *East Diamond Head* in an administrative proceeding.

Similar to the appellant in *Town* and the landowners in *Perry*, the members of Ala Loop are adjacent landowners who have a "right" in the preservation of "the continued enjoyment of [ ] realty by protecting it from threatening neighborhood change." *E. Diamond Head,* 52 Haw. at 521–22, 479 P.2d at 798; *see Town,* 55 Haw. at 543–44, 524 P.2d at 88; *Perry,* 62 Haw. at 678, 619 P.2d at 104; *see also Mahuiki,* 65 Haw. at 515, 654 P.2d at 880 (recognizing that "a decision to permit construction ... on undeveloped land in the special management area could only have an adverse effect on [the adjacent landowners'] environment"); *Dalton,* 51 Haw. at 403, 462 P.2d at 202 (recognizing that adjacent landowners have a "concrete interest" in scenic views, sense of space, and density of population). The members of Ala Loop have a right to protect their property from the claimed increase in noise and traffic, as well as from inadequate infrastructure and sewer and water facilities attributed to Wai'ola. In that regard, this court has confirmed that Ala Loop's members have the legal *right* to contest agency decisions affecting their "concrete interest[s]" before the agency that issued the decision, *see Mahuiki,* 65 Haw. at 515, 654 P.2d at 880; *Town,* 55 Haw. at 543–44, 524 P.2d at 88; *E. Diamond Head,* 52 Haw. at 521–22, 479 P.2d at 798; as well as in court, *see E. Diamond Head,* 52 Haw. at 521, 479 P.2d at 798; *Dalton,* 51 Haw. at 403, 462 P.2d at 202.

### B.

As noted before, *see supra* note 3, HRS § 205–6 requires, in part, that "the planning commission ... shall establish by rule or regulation, the time within which the hearing and action on petition for special permit shall occur" and "shall notify the [LUC] and such persons and agencies that may have an interest in the subject matter" of the hearing. HRS § 205–6(b). Absent a hearing, adjoining landowners affected by changes in land use would be deprived of the right to protect their interests in the permitting process; therefore, there is clearly a "discernible loss" if a permit hearing is wrongfully denied. *See Perry,* 62 Haw. at 677, 619 P.2d at 103. Because the "public interests and private rights are adversely affected by procedural irregularity or agency indiscretion," *id.* at 678, 619 P.2d at 104, Ala Loop is entitled to seek redress in our courts for Wai'ola's failure to obtain a special permit and the County's alleged erroneous decision to not conduct a special permit hearing under HRS § 205–6.

Furthermore, similar to *Town*, this dispute would be subject to contested case requirements stemming from § 91–1(5) if a hearing were held.[10] *See Mahuiki,* 65 Haw. at 515, 654 P.2d at 880 (holding that landowners who filed their objections in conformity with notice published by the county planning commission satisfied the requirement of "adversary participation" for purposes of appeal);

---

10. HRS § 91–1(5) (1993) defines the term "contested case" as "a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing."

*Town,* 55 Haw. at 548, 524 P.2d at 91 (holding that proceeding was a "contested case" under HRS § 91–1 inasmuch as appellant had "a property interest in the amend[ment] of a district boundary when his property adjoins the property that is being redistricted" and that "any action taken on the petition for boundary change is a proceeding in which appellant has legal rights as a specific and interested party and is entitled by law to have a determination on those rights"); *E. Diamond Head,* 52 Haw. at 518–21, 479 P.2d at 796–98 (holding that adjoining landowners were "person(s) aggrieved" within the meaning of HRS § 91–14(a)). In this case, the members of Ala Loop have a legal right to protect their properties from threatening neighborhood change, *Dalton,* 51 Haw. at 403, 462 P.2d at 202, and Ala Loop has pled that its interest would be "adversely affected," *Perry,* 62 Haw. at 678, 619 P.2d at 104, by the improvements its neighbor Wai'ola had contemplated making. The question of whether or not Wai'ola required a special permit to make such improvements falls squarely within HRS § 205–6. Under HRS § 205–6, a special permit application is subject to notice and hearing requirements for "interested part[ies]." *Town,* 55 Haw. at 543, 524 P.2d at 88. Therefore, Ala Loop has "legal rights as a specific and interested party and is entitled by law to have a determination on those rights." *Id.* at 548, 524 P.2d at 91. In light of the fact that adjoining landowners have been afforded the right to a hearing to adjudicate their interests under HRS § 205–6, and this court has confirmed that adjoining landowners have a "right" in terms of "a legal interest . . . redress[able] in our courts to preserve the continued enjoyment of . . . realty[,]" *E. Diamond Head,* 52 Haw. at 521, 479 P.2d at 797, Ala Loop's cross claim correctly sounds, *inter alia,* for a declaratory judgment that Wai'ola obtain a special permit and for allied injunctions to issue.

**C.**

Unable to assert its rights in a HRS § 205–6 proceeding because the County will not convene such a proceeding, Ala Loop properly sought relief under the declaratory judgment statute. The declaratory judgment statute, HRS § 632–1 (1993), grants courts of record the power to make "binding adjudications of right" in justiciable cases, under three types of situations:

> [1] where an actual controversy exists between contending parties, *or* [2] where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, *or* [3] where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which *the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein.*

*Rees v. Carlisle,* 113 Hawai'i 446, 458, 153 P.3d 1131, 1143 (2007) (quoting HRS § 632–1) (emphases added). A court must be "satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding." *Id.* at 457, 153 P.3d at 1142. Also, "[a]s the declaratory judgment statute thus makes clear, there must be some 'right' at issue in order for the court to issue relief." *Id.*

Moreover, HRS chapter 632 is to be *"liberally interpreted and administered,* with a view of making the courts more serviceable to the people." HRS § 632–6 (emphasis added).[11] The original purpose of HRS § 632–1 was to "allow parties in dispute and in controversy over any issue to obtain judicial determination of their respective rights and obligations before a cause of action accrue[d] by breach of such right of either party[,]" S. Stand. Comm. Rep. No. 263, in 1921 Senate Journal, at 616, and to "enable the settlement of legal rights which are in doubt or dispute,

---

11. HRS § 632–6 states:

> This chapter is declared to be remedial. Its purpose is to afford relief from the uncertainty and insecurity attendant upon controversies over legal rights, without requiring one of the parties interested so to invade the rights assert-ed by the other as to entitle the party to maintain an ordinary action therefor. *It is to be liberally interpreted and administered, with a view to making the courts more serviceable to the people.*
> (Emphasis added.)

and not to answer merely hypothetical questions involving no uncertain relations or conflicting claims[,]" H. Stand. Comm. Rep. No. 594, in 1921 House Journal, at 1296.

However, since its enactment in 1921, HRS § 632–1 has undergone several amendments. In 1945, a pertinent amendment was made to HRS § 632–1 with the intent "to expand the proceedings for declaratory judgments to a scope that will render such proceedings of real value[.]" S. Stand. Comm. Rep. No. 235, in 1945 Senate Journal, at 656. Furthermore, the House Committee on the Judiciary noted that the amendment would "afford greater relief by declaratory judgment than the present law." H. Stand. Comm. Rep. No. 76, in 1945 House Journal, at 566. This court has recently determined that, by this amendment, the legislature "intended to 'afford [citizens] greater relief,' " and, therefore, a petitioner was not precluded "from bringing a declaratory judgment action under the current HRS § 632–1, even though [relief through another right of action was] available provided that 'the other essentials to such relief [were] present.' " *Dejetley v. Kaho'ohalahala*, 122 Hawai'i 251, 268, 226 P.3d 421, 438 (2010) (quoting HRS § 632–1). Thus, the right to bring a declaratory judgment action is broadly construed.

As a community association of adjoining landowners to Wai'ola's Sunshine Farms, Ala Loop is a party that may bring an action to protect its members' land. HRS § 632–1. As exemplified in the case law, Ala Loop's members had a legal right to protect their interests against encroachment by Wai'ola, and in conjunction therewith, to challenge the County's decision to not conduct a hearing otherwise required under HRS chapter 205. Thus, there was "some 'right' at issue in order for the court to issue relief." *Rees*, 113 Hawai'i at 458, 153 P.3d at 1143. The failure of Wai'ola to obtain a special permit was clearly a "challenge or denial of a ... right ... by an adversary party[,]" HRS § 632–1, and therefore, " 'the other essentials to such relief are present[,]' " *Dejetley*, 122 Hawai'i at 268, 226 P.3d at 438 (quoting HRS § 632–1) (emphasis omitted). Given the command by HRS § 632–6 to the courts to "liberally interpret[ ] and administer[ ]" HRS

chapter 632 governing declaratory judgments, Ala Loop's attempt to seek relief under the declaratory judgment statute was correct.

### D.

In its opening brief, Wai'ola argues that the "[l]egislature clearly kn[ew] how to draft provisions to allow a citizen's suit to be brought" but "did not," and instead enacted HRS § 205–12, which gives enforcement power to the counties. Wai'ola also quotes *Lanai Co. Inc. v. Land Use Comm'n*, 105 Hawai'i 296, 97 P.3d 372 (2004), as support for the proposition that a private person cannot enforce HRS § 205–6, stating that, "[i]f the principal agency for the implementation of the State's land use laws is without authority to bring an action for injunctive relief to correct violations of [HRS chapter] 205, then most certainly the neighbors of a public charter school must be foreclosed from doing the same[.]" Wai'ola's argument here is wrong.

This court in *Lanai* determined that as between two government entities (the LUC or the county), the county was the entity expressly authorized by the legislature to enforce HRS chapter 205. In *Lanai*, a land developer appealed a LUC's cease and desist order, which had found that the developer had violated a condition amending the developer's land from agricultural to rural. 105 Hawai'i at 306, 97 P.3d at 382. On appeal, the circuit court reversed the LUC's decision, holding that the LUC's interpretation of the condition was erroneous. *Id.* The LUC and a citizens group appealed the circuit court's decision. *Id.*

*Lanai* held that the circuit court properly interpreted the condition in the LUC order and that the LUC's findings in support of the order were inadequate to determine whether the developer had violated the condition and, thus, remand was required. *Id.* at 316, 97 P.3d at 392. It was decided that "the LUC must necessarily be able to order that a condition it imposed be complied with, and that violation of a condition cease[,]" *id.* at 318, 97 P.3d at 394, but that, "the LUC does not have the power to enforce a cease and desist order[,]" *id.* at 319, 97 P.3d at 395.

Instead, "the power to enforce the LUC's conditions and orders ... lies with the various counties." *Id.* (citing HRS § 205–12).

However, *Lanai* also determined that "the county has an *affirmative duty* to enforce the LUC's conditions, according to HRS § 205–12." *Id.* at 319, 97 P.3d at 395 (emphasis added). Thus, *Lanai* does not preclude private persons from asserting a right of action when the County allegedly fails to act pursuant to its affirmative duties to enforce HRS chapter 205, as in *Town*, 55 Haw. at 545, 524 P.2d at 89. *Cf. E. Diamond Head*, 52 Haw. at 522, 479 P.2d at 798. A contrary interpretation may enable a county to avoid its alleged legal and affirmative duty to uphold HRS chapter 205 by failing to conduct a public hearing on a permit application, or as in this case, deciding that a permit is not needed at all. Such alleged violations obviously give rise to a cognizable suit in which the right to a hearing afforded to persons who "may have an interest in the subject matter" under HRS § 205–6, may be brought. *See Mahuiki*, 65 Haw. at 515, 654 P.2d at 880; *Perry*, 62 Haw. at 678, 619 P.2d at 103; *Town*, 55 Haw. at 543–44, 524 P.2d at 88; *E. Diamond Head*, 52 Haw. at 519–20, 479 P.2d at 797.

### E.

The majority asserts that while the ICA used the appropriate test in *Pono v. Molokai Ranch, Ltd.*, 119 Hawai'i 164, 194 P.3d 1126 (App.2008), "to determine whether the legislature intended to create a private right of action when it enact[ed] a statute," the ICA erred in *Pono* by not "addressing the question of whether article XI, section 9 [of the Hawai'i Constitution] created a private right of action." Majority opinion at 408, 235 P.3d at 1120. Respectfully, this assertion is wrong for the reasons stated above and under *Pono*.

In *Pono*, an unincorporated association and several of its members filed a complaint in circuit court challenging defendant Molokai Ranch's development of fifteen campgrounds on agricultural land without obtaining a special permit under HRS § 205–6. 119 Hawai'i at 174–75, 194 P.3d at 1136–37. The ICA determined that private citizens do not have the authority to enforce the provisions of HRS chapter 205, and therefore, private citizens lacked standing to invoke a circuit court's jurisdiction to adjudicate their claims under HRS chapter 205. *Id.* at 167, 194 P.3d at 1129. In arriving at this conclusion, the ICA stated that "the supreme court ... [has] made clear that in order for a private citizen to seek a declaratory judgment that a statute has been violated, the private citizen must, as a threshold matter, have a private right of action to enforce the statute." *Id.* at 186, 194 P.3d at 1148 (citations omitted). To determine whether " 'a private remedy is implicit in a statute not expressly providing one[,]' " the court applies the three factors set forth in *Reliable Collection Agency v. Cole*, 59 Haw. 503, 584 P.2d 107 (1978), and *Rees*, 113 Hawai'i 446, 153 P.3d 1131.[12] *Pono*, 119 Hawai'i at 185, 194 P.3d at 1147 (quoting *Reliable*, 59 Haw. at 507, 584 P.2d at 109) (other citation omitted).

As explained above, Ala Loop, as an association of adjoining landowners to Wai'ola's property, had a right, recognized by our courts, to challenge the County's decision that Wai'ola was exempt from HRS § 205–6. *See Mahuiki*, 65 Haw. at 515, 654 P.2d at 880; *Town*, 55 Haw. at 543–44, 524 P.2d at 88; *E. Diamond Head*, 52 Haw. at 518–19, 479 P.2d at 796. Thus, the *Pono* requirement that private citizens seeking a declaratory judgment "ha[d] a private right of action to enforce the statute" has been satisfied here. 119 Hawai'i at 186, 194 P.3d at 1148. The determination of whether "a private remedy is implicit in a statute not expressly providing one[,]" *id.* at 185, 194 P.3d at 1147, is thus not material.

---

**12.** These three factors are:

First, is the plaintiff "one of the class for whose especial benefit the statute was enacted["] ... —that is, does the statute create a ... right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

*Rees*, 113 Hawai'i at 458, 153 P.3d at 1143 (brackets and ellipses in original) (emphases omitted) (quoting *Reliable*, 59 Haw. at 507, 584 P.2d at 109).

Second, *Pono* is distinguishable from the present case. Unlike Ala Loop, there is no indication that the plaintiffs in *Pono* were adjoining landowners. *See id.* at 165–66, 194 P.3d at 1127–28. As explained above, this court has recognized that adjoining landowners have the right to enforce concrete interests that are not shared with other members of the public. *See Mahuiki,* 65 Haw. at 515, 654 P.2d at 880; *Town,* 55 Haw. at 543–44, 524 P.2d at 88; *E. Diamond Head,* 52 Haw. at 522, 479 P.2d at 798; *Dalton,* 51 Haw. at 403, 462 P.2d at 202. As members of the general public who were not adjacent landowners, the plaintiffs in *Pono* could not rely on such case law, which recognized that a change in the use of adjoining land creates a "legal interest worthy of judicial recognition," *E. Diamond Head,* 52 Haw. at 521, 479 P.2d at 798, and presents an "actual controversy" and not merely a hypothetical question, *Dalton,* 51 Haw. at 403, 462 P.2d at 202.

Third, the tests utilized in *Pono* and set forth in *Reliable* and *Rees* are employed to determine whether the legislature intended to create a private right of action when it enacted a statute. In *Reliable,* the issue was whether a private individual had a private right of action to challenge the unauthorized practice of law under HRS § 605–14. 59 Haw. at 506, 584 P.2d at 109. In *Rees,* the issue was whether a private citizen could seek to enforce the city's code of ethics provided in section 3–8.6 of the Revised Ordinances of Honolulu against a public official. 113 Hawai'i at 456–59, 153 P.3d at 1141–44. Neither of these cases involved an existing right of action already afforded by the courts.

## F.

The majority argues that (1) "to the extent that [*Dalton, East Diamond Head, Town, Perry,* and *Mahuiki* ] focus on the status of the plaintiffs as adjoining landowners, they did so in the context of assessing standing[,]" majority opinion at 419, 235 P.3d at 1131, (2) "*East Diamond Head*[ ], *Town, Perry,* and *Mahuiki* were brought pursuant to chapter 91, and do not establish the existence of a private right of action outside that context[,]" *id.,* and (3) "at no point in [this court's]

discussion in those cases did [this court] suggest that [adjoining landowners] had a cause of action independent of chapter 91 based on their status as neighboring landowners[,]" *id.* at 422, 235 P.3d at 1134 (citing *Punohu v. Sunn,* 66 Haw. 485, 487, 666 P.2d 1133, 1135 (1983)). I respectfully disagree with the majority for the reasons following.

1.

With regard to majority's first argument, the majority contends that (a) *Dalton* discussed adjoining landowner's " 'concrete interest' ... in standing terms[,]" *id.,* at 72 (citation omitted) "[w]ithout addressing whether the plaintiffs had a private right of action to challenge the ordinances[,]" *id.* at 419, 235 P.3d at 1131; (b) *Dalton* should not control because it "was decided prior to the United States Supreme Court's decision in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)," which was "utilized" by this court's "analysis for determining whether a statute authorized an implied private right of action in [*Reliable,*]" majority opinion at 419, 235 P.3d at 1131 n. 38; (c) *East Diamond Head, Town,* and *Mahuiki* "directly addressed ... whether the adjoining landowners had standing to appeal an agency action in a contested case hearing under HRS § 91–14[,]" *id.* at 421–22, 235 P.3d at 1133–34; and (d) *Perry* "was an agency appeal, and did not directly discuss standing or private rights of action[,]" *id.*

As to (a), the majority's assertion that *Dalton* did not "address[ ] whether the plaintiffs had a private right of action to challenge the ordinances," *id.* at 419, 235 P.3d at 1131, is plainly wrong. This court in *Dalton* stated that the "issues to be resolved ... are standing, laches, and *the validity of the ordinances.*" 51 Haw. at 402, 462 P.2d at 202 (emphasis added). Therefore, the validity of the ordinances was an issue separate from the matter of standing. This court decided that the trial court erred in granting summary judgment in favor of the defendants with respect to the ordinances. The ruling on the validity could only be rendered on a right of action brought by the plaintiffs. The plaintiffs in *Dalton,* then, necessarily had to have had a private right of action in order to challenge the ordinances. That they did was confirmed in *East Diamond Head.*

In *East Diamond Head*, the court stated that the right of action recognized in *Dalton* was an adjoining landowners's right to "preserve the continued enjoyment of his realty by protecting it from threatening neighborhood change":

> Several weeks after the above mentioned ruling [by the board], we held in *Dalton*, 51 Haw. at 403, 462 P.2d [at 202,] that an owner whose property adjoins land subject to rezoning has a legal interest worthy of judicial recognition should he seek redress in our courts to preserve the continued enjoyment of his realty by protecting it from threatening neighborhood change.

52 Haw. at 521–22, 479 P.2d at 798. Therefore, contrary to the majority's position, *Dalton* decided, apart from the issue of standing, that a right of action inured to adjoining landowners to protect the enjoyment of their property. Thus, as observed previously, *Dalton* stands for the proposition that adjoining landowners have a right to challenge land use decisions in order to preserve the continued enjoyment of their property.

In *East Diamond Head*, the recognition of that right of action was reconfirmed inasmuch as this court said, in referring to *Dalton*, "Each appellant *here* [in *East Diamond Head* ] asserts *just such a right*." *E. Diamond Head*, 52 Haw. at 522, 479 P.2d at 798 (emphasis added). As *East Diamond Head* expressly stated, that right of action was affirmed in both *Dalton* and *East Diamond Head*.

In *East Diamond Head*, the determination that this right of action existed was quite apart from the standing issue of whether the plaintiffs were persons "aggrieved by a final decision and order in a contested case . . . as provided for in HRS Chapter 91 and HRS § 91–14(a)." 52 Haw. at 521, 479 P.2d at 798 (internal quotation marks omitted). As to

the standing issue, this court said that plaintiffs were "aggrieved" because "the board's zoning variance immediately and directly affect[ed] each homeowner." *Id.*

As to (b), the majority disagrees that "*Dalton* should control," because it "was decided prior to the United States Supreme Court's decision in [*Cort*], . . . [,]" that this court utilized in *Reliable*, "for determining whether a statute authorized an implied private right of action[,]" and thus, the majority asserts, "our analysis of private rights of action has been modified since our decision in *Dalton* [.]" Majority opinion at 419, 235 P.3d at 1131 n. 38. However, this court required that plaintiffs have a right of action even *prior* to this court's decision in *Reliable*.[13] Thus, the fact that *Rees* and *Reliable* were decided subsequent to *Dalton* does not suggest that plaintiffs prior to *Reliable* could bring suit without a right of action. Moreover, as discussed *supra*, the test set forth in *Rees* and *Reliable* would not apply where an existing right of action has already been afforded by the courts, as in this case. In light of the fact that *Dalton* necessarily addressed whether the adjoining landowner had a cause of action, and this court required that plaintiffs have a right of action even *prior* to this court's decision in *Reliable*, *Dalton* and its progeny are controlling here.

As to (c), *East Diamond Head*, *Perry*, *Town*, and *Mahuiki* reaffirmed that "owner[s] whose property adjoins land subject to rezoning" have "such a right" of action "to preserve" and "protect" that right "from threatening neighborhood change" through "redress *in our courts*." *E. Diamond Head*, 52 Haw. at 521–22, 479 P.2d at 798 (citing *Dalton*, 51 Haw. at 403, 462 P.2d at 202) (emphasis added). In these cases, the question of standing was either separate and apart from any reference to a private right of

---

**13.** *See, e.g., Fonseca v. Pac. Const. Co.*, 54 Haw. 578, 579, 513 P.2d 156, 157 (1973) (determining whether a worker, who received a compensable injury against a third person other than his direct employer, had a common law rights of action); *Halberg v. Young*, 41 Haw. 634, 646 (Haw. Terr.1957) (determining whether a child has a right of action for personal injury to a parent not resulting in death); *Kamanu v. E.E. Black, Ltd.*, 41 Haw. 442, 444 (Haw.Terr.1956) (determining "whether the widow and children had a com-

mon-law right of action for the wrongful death of the husband and father at 'Hawaiian common law' "); *cf. Olokele Sugar Co. v. McCabe, Hamilton & Renny Co.*, 53 Haw. 69, 71, 487 P.2d 769, 770 (1971) (recognizing that "in the absence of a contractual or statutory provision authorizing a direct action against or the joinder of a liability insurer, an injured person . . . has no right of action at law against the insurer and cannot join the insured and the liability insurer as parties defendant").

**438**

action, or was not in dispute. For example, as discussed above, in *East Diamond Head,* the determination that adjoining landowners had a right of action derived from *Dalton* was decided separately from the standing issue of whether the plaintiffs were persons "aggrieved by a final decision and order . . . as provided for in HRS [c]hapter 91[.]" *Id.* (internal quotation marks omitted).

Contrary to the majority's view, *Town* did not involve any standing dispute. The question in *Town* was whether the proceeding was a contested case within the meaning of HRS § 91–1(5). 55 Haw. at 548, 524 P.2d at 91. This court found that the proceeding was a contested case because "the petition for boundary change is a proceeding in which appellant has legal rights as a specific and interested party[.]" *Id.* However, this court first established that the legal rights existed, citing *East Diamond Head* and *Dalton,*[14] because "the appellant ha[d] a property interest in the amending of a district boundary when his property adjoins the property that is being redistricted." *Id.* (citing *E. Diamond Head,* 52 Haw. 518, 479 P.2d 796; *Dalton,* 51 Haw. 400, 462 P.2d 199).

In *Mahuiki,* the question related to "the appellants' standing to seek review of the administrative action" approving applications to develop a parcel of land. 65 Haw. at 508, 654 P.2d at 876. Appellants challenged that approval. This court noted that appellants had standing because "such a party should have a chance to show that the action that hurts his legal interest is illegal." *Id.* at 513, 654 P.2d at 878 (citing *E. Diamond Head,* 52 Haw. at 523 n. 5, 479 P.2d at 799 n. 5). Again, *East Diamond Head* indicated that recognizing the adjoining landowner's right was treated separately from the question of whether the particular landowner had standing.

As discussed *supra, East Diamond Head*'s discussion of an adjoining landowner's right of action was derived from *Dalton,* which was

a court action, and not an action brought under HRS chapter 91. This same legal right was the same one asserted in the HRS chapter 91 proceedings in *East Diamond Head, Town* and *Mahuiki.* Thus the majority's contention that these cases only pertained to standing under chapter 91 and not to a right that could be asserted in court and in an administrative proceeding is plainly wrong.

As to (d), the majority maintains that "although *Perry* provides an example of adjoining landowners bringing a [HRS] chapter 91 appeal of a LUC decision, it contains no discussion directly relevant to the issues here." Majority opinion at 421, 235 P.3d at 1133 (footnote omitted).[15] To the contrary, *Perry* is obviously relevant here. It is a clear example of this court affording adjoining landowners the right to bring an administrative action challenging the grant of a special permit for failing to comply with the provisions of HRS § 205–6, reconfirming the line of cases originating in *Dalton.* As discussed *supra, Perry* stated that this court "would not hesitate to follow *Town*" where "private rights are adversely affected." 62 Haw. at 678, 619 P.2d at 104. These private rights are the same rights of adjoining landowners acknowledged in *Town,* which rested on *Dalton* and *East Diamond Head.*

### 2.

With regard to the majority's second argument, the majority asserts that *East Diamond Head, Town, Perry,* and *Mahuiki* "addressed questions relating to . . . standing . . . under HRS § 91–14[,]" majority opinion at 72, but "do not establish the existence of a private right of action outside of that context[,] *id.*" 419, 421–22, 235 P.3d at 1131, 1133–34. This is incorrect, as the foregoing discussion points out. The majority also states in two footnotes that this court has (1) "characterized the determination of whether a party is 'a person aggrieved' . . . as com-

---

14. It should be noted that *Town, East Diamond Head,* and *Dalton* were all authored by Justice Bert Kobayashi.

15. Contrary to the majority's assertion, *Perry* is not "an example of adjoining landowners bringing a[HRS] chapter 91 appeal of a LUC deci-

sion[.]" Majority opinion at 421, 235 P.3d at 1133, 1133 n. 41. It should be evident from a plain reading of *Perry* that this court neither cited nor discussed HRS chapter 91 or maintained that chapter 91 applied, but relied only on the procedure set forth in HRS chapter 205 in deciding the case.

prising part of the standing inquiry[,]" *id.* at 419, 235 P.3d at 1131 n. 39, and (2) "characterized a party's participation in a 'contested case' as a standing requisite[,]" *id.* at 420, 235 P.3d at 1132 n. 40.

The majority's first footnote does not raise anything in dispute. The determination of a person aggrieved is part of the standing inquiry under chapter 91 and it is not argued otherwise. The majority's contention that *East Diamond Head* decided issues of whether a party is a "person aggrieved" does not mean that the right asserted by adjoining landowners found its source in HRS chapter 91. That was but one issue in the case. As shown above, prior to deciding whether the adjoining landowner was a person aggrieved in *East Diamond Head,* this court reconfirmed adjoining landowners' rights pursuant to *Dalton.* Similarly, the majority's second footnote, stating that a party's participation in a "contested case" is a standing requisite, is also not in dispute. As discussed *supra, Town* did not involve a standing dispute. Furthermore, *Town* established that the legal rights of adjoining landowners existed under *Dalton* and *East Diamond Head.*

As evident from the foregoing discussion, while *East Diamond Head, Town,* and *Mahuiki* may have been *subject* to HRS chapter 91 judicial review because these cases were decided by agencies, the right upon which adjoining landowners could sue was not derived from HRS chapter 91. HRS chapter 91 is not a source of substantive rights. Instead, HRS chapter 91 applies if there exists the attributes of a proceeding defined as a contested case under HRS § 91–1(5). In such a contested case, a person may be considered aggrieved for HRS chapter 91 purposes if the person's "personal or property *right* has been injuriously or adversely affected by an agency's action." *Life of the Land, Inc. v. Land Use Comm'n,* 61 Haw. 3, 7, 594 P.2d 1079, 1082 (1979) (emphasis added); *Application of Hawaiian Elec. Co.,* 56 Haw. 260, 264, 535 P.2d 1102, 1105 (1975) (emphasis added). Thus, if a contested case exists, an aggrieved person is entitled to "judicial review under [HRS chapter 91.]" HRS § 91–14(a). As our case law indicates, the personal or property rights of the landowners whose cases are discussed *supra,* that were asserted in HRS chapter 91 pro-

ceedings, however, have a source independent of HRS chapter 91. *See E. Diamond Head,* 52 Haw. at 521, 479 P.2d at 798. In this case, the right afforded to neighboring landowners rests on case law as established in *Dalton* and reconfirmed in *East Diamond Head, Town, Perry,* and *Mahuiki.*

In sum, HRS chapter 91 is relevant in the foregoing cases insofar as the adjoining landowners' interests were affected by "a final decision and order [of an agency] in a contested case[.]" HRS § 91–14(a). As made clear in *Dalton,* upon which *Town, East Diamond Head,* and *Mahuiki* relied, the concrete interest of adjoining landowners to protect their land from, among other things, "restrict[ion of] scenic view, limit[ations in the] sense of space, and increas[e in] the density of the population," bore a right of action recognized without respect to HRS chapter 91. *Dalton,* 51 Haw. at 403, 462 P.2d at 202. Accordingly, the majority's argument that the right of adjoining landowners is not "independent of" HRS chapter 91, majority opinion at 421–22, 235 P.3d at 1133–34, is wrong.

3.

With regard to the majority's third argument, the majority's assertion that *East Diamond Head, Town, Perry, Mahuiki* and *Punohu,* do not "suggest that [there is] a cause of action independent of chapter 91[,]" majority opinion at 422, 235 P.3d at 1134, is also wrong. As discussed in depth *supra, Dalton* recognized an adjoining landowner's right of action. *East Diamond Head* reconfirmed this right, recognizing this right as separate from the issue of standing under HRS chapter 91. Similarly, *Town, Mahuiki,* and *Perry* reconfirmed the right originating in *Dalton;* thus, these cases do not suggest that the right is limited to cases pursuant to HRS chapter 91, as the majority would have it.

*Punohu* does not alter the foregoing. In *Punohu,* welfare recipients sought declaratory and injunctive relief against reductions in benefits paid by the Department of Social Services and Housing of the State of Hawai'i (the Department). 66 Haw. at 487, 666 P.2d at 1134. The Department had sent each of the recipients notices informing him or her of the reductions and of his or her right to

appeal and have a "fair hearing" before the Department as mandated by HRS § 346–12 (1983).[16] *Id.* This court said that "[s]uch a hearing was held in each case and the reductions in benefits were upheld." *Id.* The recipients then filed suit in circuit court asking for declaratory and injunctive relief on the grounds that the notice given was inadequate. *Id.*

This court declared that "we have held that where such a statutory remedy exists, declaratory judgement does not lie." *Id.* (citing *Travelers Ins. Co. v. Hawaii Roofing, Inc.*, 64 Haw. 380, 641 P.2d 1333 (1982)). *Punohu* recognized that "the *fair hearing was a 'contested case'* under the provisions of [HRS] § 91–1(5)" and, therefore, "*was reviewable only in accordance with the provisions of § 91–14*, HRS." *Id.* at 488, 666 P.2d at 1135 (emphases added). Because the welfare recipients were entitled to a fair hearing under HRS § 346–12 regarding the reduction of benefits, the fair hearing was subject to the "contested case" requirements of HRS § 91–1(5). This court applied the holding in *Travelers*, recognizing that "where such a statutory remedy exists, declaratory judgment does not lie." *Id.* at 488, 666 P.2d at 1134 (citing *Travelers*, 64 Haw. 380, 641 P.2d 1333). Thus, *Punohu* held "that the remedy of appeal provided by § 91–14, HRS, is a statutorily provided *special form of remedy for the specific type of case* involved here and that declaratory judgment action, pursuant to § 632–1, HRS, did not lie." *Id.* at 488, 666 P.2d at 1135 (emphasis added). Unlike *Punohu*, Ala Loop did not have any hearing that would be considered a contested case under the provisions of HRS § 91–1(5). As a result, Ala Loop could not seek judicial review under HRS § 91–14, and thus, "there is no statutorily provided special form of remedy" available in the instant case. Therefore, the holding of *Punohu* does not foreclose the right to a declaratory judgment action brought by Ala Loop.

Given that (1) case law has recognized that adjoining landowners have rights independently derived from *Dalton*, (2) Ala Loop was entitled to assert its rights in a HRS § 205–6 special permit proceeding against Wai'ola on the same basis as the adjoining landowners in *Town, Perry, East Diamond Head*, and *Mahuiki*, (3) Ala Loop was denied that proceeding when Wai'ola and the County took the position that a special permit was not necessary under HRS chapter 205, and (4) declaratory judgments are to be liberally interpreted and administered under HRS § 632–1, Ala Loop was entitled to bring its action for declaratory judgment.

### III.

On certiorari, Ala Loop argues that it had standing under both the traditional injury-in-fact and procedural injury tests iterated in *Superferry I*, 115 Hawai'i at 319, 167 P.3d at 312, to file suit. In regard to injury-in-fact standing, Ala Loop contends that it "had presented ample evidence of the personal stake its members had in the health and safety aspects of [Wai'ola's] operations, being noise, traffic, inadequate infrastructure, fire protection, sewage and water issues." In regard to procedural standing, Ala Loop contends that because of the County's "fail[ure] to mandate the special permit process, [it] had no opportunity to present its position to both the Planning Commission and the LUC" and that "[t]his denial of a procedural right was clearly coupled with the concrete interest of [Ala Loop] and its members, who clearly had the requisite geographical nexus and interest in providing input on health and safety issues."

With respect to injury in fact standing, the three-part standing test requires that the following questions be answered in the affirmative: "(1) has the plaintiff suffered an actual or threatened injury; (2) is the injury fairly traceable to the defendant's actions; and (3) would a favorable decision likely provide relief for plaintiff's injury." *Id.* (quoting *Mottl v. Miyahira*, 95 Hawai'i 381, 389, 23

---

**16.** HRS § 346–12 entitles an applicant or recipient aggrieved to an appeal and a fair trial. HRS § 346–12 states:

 **Fair Hearing.** An applicant or recipient, deeming oneself aggrieved, shall be entitled to appeal to the director of social services in the manner prescribed by department of social services and housing regulations and shall be afforded reasonable notice and opportunity for a fair hearing.

P.3d 716, 724 (2001)) (ellipses, footnote and citation omitted). The members of Ala Loop satisfy the foregoing test.

First, the members of Ala Loop have shown both actual an threatened injury to their health and safety interests from Wai'ola's activity on Sunshine Farms. There is ample evidence in the record to support Ala Loop's assertion that the proposed school may adversely impact the health, safety, and welfare of Ala Loop's small community because of the increase in noise and traffic, and the inadequate infrastructure, fire protection, sewage, and water facilities.[17] These were concrete interests, some of which are similar to those recognized as concrete interests in past cases. *See id.* at 331, 167 P.3d at 324 (recognizing the "potential impact of the Superferry on increasing traffic, possible increase in the movement of drugs, and possible effects on recreational users of the harbor" as concrete interests); *Pele Def. Fund v. Puna Geothermal Venture,* 77 Hawai'i 64, 70, 881 P.2d 1210, 1216 (1994) (recognizing the "potential harm including diminished property values ... and possible physical injury resulting from the permitted operations").

Second, these actual and threatened injuries were directly traceable to Wai'ola's use of Sunshine Farms as a school. Ala Loop alleged on behalf of its members that "[Wai'ola's] operations constitute[d] an unlawful use of [Sunshine Farms], a threat to their health, safety and welfare, and a risk of harm to their well being." Ala Loop's declarations established that Wai'ola's use of the property created traffic risks on Ala Loop's narrow road. For example, Ala Loop member Paul Saviskas stated in his declaration that he observed a Wai'ola student walking around the blind corner of Ala Loop Road, and that once, while driving his truck, he had to slow down to go around a group of Wai'ola students who were in the middle of the road. Ala Loop member Ed Torrison also confirmed in his declaration that he had seen children from Wai'ola playing around the front of the property and on the street. Accordingly, the second prong is also met inasmuch as the alleged injuries are "fairly traceable" to Wai'ola's actions. *Superferry I,* 115 Hawai'i at 319, 167 P.3d at 312.

Third, the court's decision in favor of Ala Loop for a declaratory judgment and injunctive relief would likely provide relief for the injury. The actual and threatened injuries raised by Ala Loop would have been addressed and potentially mitigated or avoided had Wai'ola applied for a special permit under HRS § 205-6. Thus, a decision granting a declaratory judgment and temporary and permanent injunctions in Ala Loop's favor would "likely provide relief" for Ala Loop's injury. *Id.* Because Ala Loop had standing under the injury-in-fact test and is entitled to bring a declaratory judgment action, it is not necessary to address Ala Loop's argument that it had procedural standing in detail.[18]

---

17. Kerinne Smith, president of Ala Loop and a resident of that community, expressed concerns about the health and safety impact a school would have on Ala Loop's small community. She asserted that according to the fire department requirements, Ala Loop Road was a substandard road that would need to be widened for a school and that the water supply was not sufficient. Shelley Hanaoka, a farmer who shared a property line with Wai'ola, was concerned that Wai'ola did not have sanitary facilities for the 300 projected students, and operation of a school without the facilities posed a risk to residences and students as the property is bisected by an active flood channel. She was also concerned about the safety issues posed by a single-lane blind-turn road, and dangerous highway access. Paul Saviskas, who worked sixty feet away from, and shares a property line with Wai'ola's property, was concerned about Wai'ola's unsafe practices of allowing students to walk through a flood zone to get to their classes and allowing its students to walk on Ala Loop Road unsupervised. Ed Torrison, another farmer on Ala Loop Road, also expressed his concerns with possible pesticide contamination because Wai'ola's property was previously used as a nursery. He also expressed traffic concerns with the scores of cars going in and out of Ala Loop Road.

18. In order to establish procedural injury standing, Ala Loop is required to demonstrate that: (1) the plaintiff has been accorded a procedural right, which was violated in some way, ... (2) the procedural right protects the plaintiff's concrete interests; and (3) the procedural violation threatens the plaintiff's concrete interests, thus affecting the plaintiff "personally," which may be demonstrated by showing (a) a "geographic nexus" to the site in question and (b) that the procedural violation increases the risk of harm to the plaintiff's concrete interests.

## IV.

Having decided that Ala Loop had a right of action and standing to sue for a declaratory judgment, I respectfully disagree with the majority's position that the court abused its discretion when it denied Wai'ola's motion to set aside default under Hawai'i Rules of Civil Procedure (HRCP) Rule 55(c).[19] A motion to set aside an entry of default under HRCP Rule 55(c) is addressed to the sound discretion of the trial court. *Nature Conservancy v. Nakila,* 4 Haw.App. 584, 589, 671 P.2d 1025, 1030 (1983). Generally, to constitute an abuse of discretion, a court must have clearly "exceed[ed] the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party" litigant. *Rearden Family Trust v. Wisenbaker,* 101 Hawai'i 237, 253, 65 P.3d 1029, 1045 (2003) (quoting *Shanghai Inv. Co. v. Alteka Co.,* 92 Hawai'i 482, 491–92, 993 P.2d 516, 525–26 (2000)). With regard to motions to set aside default judgment, a court may and should grant a motion to set aside a default "whenever the court finds (1) that the nondefaulting party will not be prejudiced by the reopening, (2) that the defaulting party has a meritorious defense, and (3) that the default was not the result of inexcusable neglect or a wilful act." *BDM, Inc. v. Sageco, Inc.,* 57 Haw. 73, 76, 549 P.2d 1147, 1150 (1976) (citations omitted).

### A.

To reiterate, on November 20, 2003, Ala Loop filed its cross-claim against Wai'ola and a third-party complaint against the LUC. On January 30, 2004, Ala Loop and Wai'ola stipulated to an extension for Wai'ola to file an answer or responsive pleading, which extended the deadline from January 15, 2004 to February 16, 2004. The parties subsequently agreed to a second extension, giving Wai'ola until February 25, 2004, to file its answer or responsive pleading. On February 25, 2004, Wai'ola filed a motion to extend its time to answer or file a responsive pleading for a third time. In its motion, Wai'ola asked for "an extension of *no more than 30 days* after the motion is decided *to answer or otherwise file a responsive pleading.*" (Emphases added.) On March 18, 2004, the court granted this motion, giving Wai'ola until April 19, 2004, to comply with its motion.

The court explicitly informed Wai'ola in a written order on April 6, 2004, that if an answer or other responsive pleading was not filed by April 19, 2004, then Ala Loop would be permitted to request entry of default. Rather than comply with its own representations to the court that it required an extension of "*no more* than 30 days," (emphasis added), Wai'ola apparently abandoned any effort to file an answer or responsive pleading. Despite having been previously notified by the court that entry of default may enter against Wai'ola for failure to answer or respond on April 19, 2004, Wai'ola did not file an answer on April 19, 2004 as ordered. Instead, on the April 19, 2004 deadline,

*Superferry I,* 115 Hawai'i at 329, 167 P.3d at 322 (citation omitted).

While this procedural injury standing need not be discussed in detail, the following may be observed. First, HRS § 205–6(b) accorded Ala Loop a procedural right, which was violated when Wai'ola and the County took the position that a HRS § 205–6 special permit was not necessary. As noted before, HRS § 205–6(b) states in part that "[t]he county planning commission shall notify the [LUC] and such persons and agencies that may have an interest in the subject matter of the time and place of the hearing." Ala Loop and its members are persons with interests in the subject matter of the hearing.

Second, similar to the first prong of the injury-in-fact standing test, Ala Loop's concerns that the school would adversely impact the health and safety of Ala Loop's small community because of the increase in noise and traffic, and inadequate infrastructure, fire protection, and sewage and water facilities are concrete interests similar to those recognized as concrete interests in past cases. *See id.* at 334, 167 P.3d at 331.

Third, the procedural violation threatened the plaintiff's concrete interests. As adjoining landowners of Sunshine Farms, the members of Ala Loop have a "geographical nexus to the site in question." *Id.* at 329, 167 P.3d at 322. Moreover, the denial of the HRS § 205–6 procedures increased the risk of harm to Ala Loop's concrete interests, because a special permit hearing would have allowed the threatened injuries raised by Ala Loop to be addressed and potentially remedied. Thus, Ala Loop has shown it is entitled to procedural standing.

**19.** HRCP Rule 55(c) states: "Setting Aside Default. For good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b)."

Wai'ola filed a motion for stay or, in the alternative, for another extension of time, even though Wai'ola had requested and had been granted the 30–day extension, in addition to the other two extensions. While this motion was pending, Wai'ola filed a writ of mandamus in this court. It appears Wai'ola moved to stay the proceedings so that it could pursue its application for a writ. Wai'ola's decision not to answer the complaint after *three* extensions was plainly deliberate. Hence, Wai'ola's actions were, at the least, a result of inexcusable neglect, and more likely, a wilful act. *Black's Law Dictionary* at 1133 (defining "inexcusable neglect" as "neglect that implies more than unintentional inadvertence" and "wilful" as "[v]oluntary and intentional, but not necessarily malicious").

### 1.

Wai'ola's actions were more than an "unintentional inadvertence." *Id.* Ala Loop filed its cross-claim against Wai'ola on November 20, 2003. Subsequently, Wai'ola had from November 20, 2003, until April 19, 2004, to file its answer. During this time Wai'ola was given two extensions of time by agreement of the parties, and one extension of time by the court. In the April 6, 2004 order granting Wai'ola's third extension, the court specifically warned that if Wai'ola failed to answer by April 19, 2004, the court would allow Ala Loop to file an entry of default against Wai'ola. Wai'ola knew that it needed to file its answer by April 19, 2004, and was aware of the court's warning. Thus, it cannot be said that Wai'ola's failure to answer was inadvertent or unintentional. Instead, Wai'ola's failure was at the least a result of inexcusable neglect. *Citicorp Mortgage, Inc. v. Bartolome,* 94 Hawai'i 422, 439, 16 P.3d 827, 844 (2000) ("[W]e conclude that [defendant's] failure to answer the complaint or otherwise appear prior to the entry of summary judgment (or, the alleged default judgment) was indeed the product of " 'inexcusable neglect' "); *Pogia v. Ramos,* 10 Haw.App.

411, 416, 876 P.2d 1342, 1345 (1994) ("[T]he weight of authority has not recognized ignorance of the law ... to be excusable neglect justifying invocation of relief[.]"); *Nakila,* 4 Haw.App. at 591, 671 P.2d at 1031 (finding no abuse of discretion in denying motion to set aside entry of default when non-defaulting party would suffer prejudice, and there was no excusable neglect when defaulting party failed to take any action for more than six months); *Paxton v. State,* 2 Haw.App. 46, 49, 625 P.2d 1052, 1055 (1981) (determining that failure to answer interrogatories was the result of inexcusable neglect where the appellant did nothing to attempt to alleviate the problem of his failure to respond for 24 days); *Hupp v. Accessory Distrib., Inc.,* 1 Haw.App. 174, 176–78, 616 P.2d 233, 235–36 (1980) (holding that the court properly refused to set aside a default when defendant's insurer failed to file an answer for nine months based on the insurer's understanding that it had an "open extension of time" (quotation marks omitted)). Wai'ola failed to answer Ala Loop's cross-claim from November 20, 2003, to April 19, 2004. This delay of approximately five months, which is well over the 20 days provided under HRCP Rule 12 to file an answer,[20] cannot be excused as inadvertent.

### 2.

Wai'ola's failure to file an answer or responsive pleading by the April 19, 2004 deadline is also a wilful act. Again, the court explicitly informed Wai'ola in its April 6, 2004 order that if an answer or other responsive pleading was not filed by April 19, 2004, Ala Loop would be permitted to request entry of default. Instead of complying with its own representations to the court that it needed an extension of *"no more* than 30 days" (emphasis added), Wai'ola abandoned any effort to file an answer or responsive pleading. Wai'ola knew that the court's order required it to file its answer on April 19, 2004, or be subject to a possible entry of default by the

---

**20.** Rule 12(a)(2) of the HRCP states:

 A party served with a pleading stating a cross-claim against that party *shall serve an answer thereto within 20 days after being served.* The plaintiff shall serve a reply to a counter-

claim in the answer within 20 days after service of the answer or, if a reply is ordered by the court, within 20 days after service of the order, unless the order otherwise directs. (Emphasis added.)

County or Ala Loop. However, on April 19, 2004, Wai'ola made a conscious decision to file a motion to stay or, in the alternative, to extend time so that it could pursue an application for writ of mandamus with this court. Consequently, Wai'ola failed to answer the complaint and was defaulted.

Wai'ola's decision not to file an answer, in complete disregard of the previous representation it had made to the court, was a voluntary and wilful act. *Dillingham Inv. Corp. v. Kunio Yokoyama Trust*, 8 Haw.App. 226, 228–29, 797 P.2d 1316, 1317 (1990) (holding there was no abuse of discretion where appellants wilfully failed to answer the complaint after determining that their land was not involved with the lawsuit); *Chrysler Credit Corp. v. Macino*, 710 F.2d 363, 367 (7th Cir.1983) (stating that "failure to file an answer for over two months after it was due, despite the fact that the district court granted the extension of time requested, is strong evidence that the litigation was not handled with due diligence[;] . . . counsel's failure to efficiently handle his docket constitutes wilfulness"). In *Dillingham*, the appellants' motion to set aside default was denied after the appellants failed to respond to the complaint. The appellants had determined the complaint "talked about" Grant 3038, which was not the three kuleanas owned by the appellants. *Dillingham*, 8 Haw.App. at 232, 797 P.2d at 1319. The ICA held that the trial court did not abuse its discretion because the appellants " 'wilfully' failed to answer the complaint" when they determined that their land was not involved in the lawsuit, and therefore failed to satisfy the third-prong *BDM* test. *Id.* at 236, 797 P.2d at 1321. Similarly, in this case, Wai'ola failed to answer Ala Loop's cross-claim, after three extensions of time, when it apparently determined that it would rather pursue a writ of mandamus instead of filing its answer on the April 19, 2004 deadline, as it had previously represented it would. As a consequence, the court permitted Ala Loop to move for entry of default against Wai'ola as it indicated it might.

Based on the facts that Wai'ola (1) was allowed two extensions by agreement, (2) made representations in its February 25, 2004 motion to extend time that it needed an extension of "no more than 30 days," (3) was granted the third extension by the court, (4) was warned that default may enter in the absence of a filing, and (5) voluntarily chose not to file an answer, Wai'ola's actions were obviously wilful. Thus, the court acted within reason when it determined that "[Wai'ola] made a conscious choice not [to] be represented by private legal counsel and therefore, failed to answer Ala Loop's cross-claim in a timely manner."

## B.

The majority cites three reasons to support its conclusion that default judgment must be set aside and the motion to set aside the default should have been granted. The majority states that (1) "the showing necessary to set aside the entry of default was lower than that needed to set aside a default judgment[,]" majority opinion at 423, 235 P.3d at 1135, (citing *BDM*, 57 Haw. at 76, 549 P.2d at 1150) (2) [d]efaults are generally disfavored[,] *id.* at 75, and (3) denial of the motion was the "ultimate sanction" and lesser sanctions would better serve the interest of justice, *id.* at 424–25, 235 P.3d at 1136–37.

As to the majority's first point, the majority argues that a "showing necessary to set aside default [may be] lower than [what is] needed to set aside a default judgment." [21] *Id.* at 423, 235 P.3d at 1135. However, *BDM* states that "[d]espite [the difference between defaults and default judgments], the elements advanced in support of a motion under Rule 55(c) will be the *same* whether relief is sought from a default entry or from a default judgment." 57 Haw. at 76, 549 P.2d at 1150 (emphasis added). As stated above, one of the three elements that would support relief from the entry of default is that "the default was not the result of inexcusable neglect or a wilful act." *Id.* Thus, a motion to set aside

---

21. For this proposition, the majority quotes *BDM* which states, "It should be noted that a motion to set aside a default entry, which may be granted under Rule 55(c) 'for good cause shown', gives the court greater freedom in granting relief than is available on a motion to set aside a default judgment where the requirements of Rule 60(b) must be satisfied." Majority opinion at 423, 235 P.3d at 1135 (quoting *BDM*, 57 Haw. at 76, 549 P.2d at 1150).

default can be properly denied where entry of default was a result of inexcusable neglect or a wilful act.

As to the majority's second point, while defaults are generally disfavored, under the three-part *BDM* test, a default should not be set aside if the default results from inexcusable neglect or a wilful act. *Id.* (stating that a motion to set aside stay should be only granted if "(1) . . . the nondefaulting party will not be prejudiced by the reopening, (2) . . . the defaulting party has a meritorious defense, and (3) . . . the default was not the result of inexcusable neglect or a wilful act"). This approach is consistent with *GLA Inc. v. Spengler*, 1 Haw.App. 647, 649, 623 P.2d 1283, 1285 (1981), wherein the ICA recognized that "there is a policy favoring a full trial on the merits," but concluded that this policy "do[es] not cause us to reverse the lower court's decision in this case" where dismissal was due to inexcusable neglect.

As to the majority's third point, the majority relies on *Rearden* in asserting that " 'lesser sanction[s]' would 'better serve the interest of justice[.]' " Majority opinion at 425, 235 P.3d at 1137 (quoting *Rearden*, 101 Hawai'i at 255, 65 P.3d at 1047). However, setting aside the default does not "better serve the interest of justice" in the situation where a party deliberately fails to file its answer or responsive pleading after having been given three extensions of time and after making representations that it would file an answer by a date certain. This court should refuse to reverse the court's decision where the circumstances indicate the court exercised its discretion within the bounds of reason and dismissal followed inexcusable neglect or a wilful act. *GLA*, 1 Haw.App. at 649, 623 P.2d at 1285. In *GLA*, the court recognized that there is a "policy disfavoring dismissals with prejudice if there are lesser sanctions that could vindicate the purpose of the rules and the desire to avoid court congestion." *Id.* However the ICA refused to reverse the lower court's decision because the dismissal was not due to excusable neglect. *Id.* Similarly, in this case, Wai'ola's default was not due to excusable neglect, and thus this court should affirm the court's decision.

This case is also distinguishable from *Rearden*. In *Rearden*, this court held that the trial court abused its discretion in denying the defendant's motion to set aside default judgment, when defendant failed to attend a settlement conference, violating a court order requiring him be present. 101 Hawai'i at 255, 65 P.3d at 1047. The settlement conference was rescheduled from April 12, 1997, to April 20, 1997, because the defendant had a prior business commitment on April 12, 1997. *Id.* at 241, 65 P.3d at 1033.

Prior to the date of the settlement conference, defendant requested that the court continue the settlement conference and submitted an affidavit averring that he was "unable to travel from Dallas, Texas to Hilo" for the April 20, 1997 settlement conference, he needed to care for his eighty-four-year-old father, and his personal appearance at the conference was an extreme and personal hardship. *Id.* at 242, 65 P.3d at 1034. Additionally, the *Rearden* court noted that defaulting the defendant for failing to appear at the conference did not appear warranted when the plaintiffs had also violated the same order by not timely filing a "settlement conference statement until June 10, 1997, well after the April 20, 1997 conference date." *Id.* at 255, 65 P.3d at 1047.

In *Rearden*, there were no facts to indicate that the defendant ever made statements to the court that he could attend the April 20, 1997 settlement conference. In contrast, Wai'ola made an explicit representation to the court that it needed an extension of "*no more* than 30 days" to file its answer (emphasis added), and then failed to carry out its commitment. Additionally, unlike the plaintiffs in *Rearden*, who failed to follow the order themselves, there is no indication that Ala Loop had violated any orders or had not fulfilled its obligations to the court.

C.

Inasmuch as Wai'ola (1) failed to answer Ala Loop's cross-claim for approximately five months, (2) was allowed two extensions by agreement of the parties, (3) made representations in its February 25, 2004 motion to extend time that it needed an extension of "no more than 30 days," (4) was given until

April 19, 2004 to file an answer or responsive pleading, (5) was warned by the court that default may enter if an answer was not filed by April 19, 2004, and (6) voluntarily chose not to file an answer on the April 19, 2004 deadline, the court did not "exceed[ ] the bounds of reason or disregard[ ] rules or principles of law or practice to the substantial detriment of a party." *Rearden*, 101 Hawaiʻi at 253, 65 P.3d at 1045. The court acted within reason when it determined that "[Waiʻola] made a conscious choice not [to] be represented by private legal counsel and therefore, failed to answer Ala Loop's cross-claim in a timely manner." Thus, I respectfully disagree with the majority's view that the court abused its discretion and that the First Amended Final Judgment should be vacated.

V.

A.

Because the court did not abuse its discretion in denying Waiʻola's motion to set aside the default, it is appropriate to determine whether the court erred in finding that Ala Loop was not entitled to attorney's fees under HRS § 607–25. HRS § 607–25 is a fee recovery statute that authorizes the recovery of attorneys' fees and costs by private parties against other private parties who undertake a "development" without obtaining all the permits or approvals required by law. HRS § 607–25(e) states in part:

> In any civil action in this State where a private party sues for injunctive relief *against another private party* who has been or is undertaking any development without obtaining all permits or approvals required by law from government agencies:
>
> (1) The court may award reasonable attorneys' fees and costs of the suit to the prevailing party.
>
> . . . .

(Emphasis added.) This court has made clear that only two types of parties may be

awarded attorney's fees under HRS § 607–25.

> [T]he two types of parties who may be awarded [statutory] attorneys' fees [as prevailing party, in suit for injunctive relief relating to property development,] are: (1) *a member of the public who prevails against a private party* who has been or is undertaking development without obtaining all permits or approvals required by law from government agencies; and (2) *a defendant private party who prevails against a plaintiff who has brought a frivolous action.*

*Kahana Sunset Owners Ass'n v. Maui County Council*, 86 Hawaiʻi 132, 135, 948 P.2d 122, 125 (1997).

In this case, Ala Loop failed to prove either of these requirements. First, Ala Loop is not a member of the public who prevailed against a private party who has been undertaking development. Although Waiʻola was originally a non-profit organization, it became a public entity when it received its charter in July of 2000. As a charter school, Waiʻola is a state agency, and is therefore not a private party. Second, while Ala Loop may be a private party, it did not prevail against "a plaintiff who has brought a frivolous action." *Id.* Thus, Ala Loop is not entitled to attorney's fees under this statute.

B.

As to the first requirement,[22] Ala Loop argues that even if Waiʻola is a charter school, the statutory framework did not recognize charter schools as public entities until July 1, 2005, after the legislature amended the definition of "public schools" to include charter schools. Thus, Ala Loop contends that since all claims and actions in this case occurred before July 1, 2005, Waiʻola was a private party and, until then, Ala Loop is entitled to recover attorney's fees. In response, Waiʻola argues that there is substantial evidence to show that the legislative history, the Board of Education, and the attorney general treated

---

**22.** Further discussion of the second ground is not undertaken inasmuch as Waiʻola is not a plaintiff.

charter schools as public entities prior to July 1, 2005. Wai'ola's argument is persuasive.

While the definition of "public schools" did not expressly refer to charter schools until July 1, 2005, the legislative history of Act 62 of the 1999 legislative session, which created new century charter schools, indicates that the Act was passed to re-create and add more public schools with alternative education programs. Act 62, Section 1 states in part:

Both existing public schools and new schools may be established as new century charter schools, and these schools will allow educators to better tailor the curriculum to enhance the learning of the students.

The purpose of this Act is to increase the flexibility and autonomy at the school level by allowing existing public schools and new schools to be designated as new charter schools[.]

1999 Haw. Sess. Laws, Act 62, § 1 at 77. Part of the legislature's intent in creating charter schools was to allow existing public schools "greater autonomy and flexibility in the formation of alternative educational programs independent from the governance of the board of education[,]" S. Stand. Comm. Rep. No. 819, in 1999 Senate Journal, at 1283, and to "allow the State to dramatically improve its educational standards for the twenty-first century." H. Stand. Comm. Rep. No. 1404, in 1999 House Journal, at 1571. The Act created new charter schools consisting of both "public schools and new schools" to "allow the *State* ... to improve *its* educational standards." 1999 Haw. Sess. Laws Act 62, § 1 at 77. By the use of this language, the legislature signified that charter schools were considered part of the State's efforts to improve "its" standards, signifying that charter schools would be part of the "State" educational system. Thus, the legislative history indicates that charter schools were public entities. Wai'ola, then, upon receiving its charter, became a public entity, and therefore is not a private party under HRS § 607–25.

The assertion that charter schools are public entities is also consistent with Wai'ola's charter school application form submitted to the Hawai'i Department of Education and the audit report to the Governor and the Legislature of the State of Hawai'i on the Audit of Na Wai Ola Waters of Life Charter School. The heading of Wai'ola's charter school application form for the Hawai'i Department of Education is entitled, "HAWAI'I DEPARTMENT OF EDUCATION, New Century Public Charter School, Detailed Implementation Plan." The application also states that "the term *'Public Charter School' shall be included in the name or identified clearly as a public school to communicate that it is a public school* that subscribes to the precepts of public education, e.g., open enrollment, no tuition, non-discriminatory, etc.). (Emphasis added.)

The State audit on Wai'ola conducted in January 2005 also indicated that charter schools are considered public entities. For example, the report declared, "The audit was conducted pursuant to Section 23–4, [HRS], which requires the Auditor to conduct post-taudits of the transactions, accounts, programs, and performance of all departments, offices, and agencies of the State and its political subdivisions." Also, the report recognized that the attorney general took the position that charter schools were a public entity. The report recounted that "[i]n some states, charter schools are considered legally independent entities. Hawai'i's charter schools, on the other hand, have recently been determined by the attorney general to be state agencies under current law."

## VI.

Finally, I cannot agree with the majority's view that HRS chapter 205 is "a law relating to environmental quality within the meaning of article XI, section 9" of the Hawai'i Constitution. Majority opinion at 409, 235 P.3d at 1121 (internal quotation marks omitted). In my view, (1) the issue of whether Ala Loop has a private right of action should not be decided on constitutional grounds, (2) the findings of fact (findings) issued by the court related to land use, not environmental quality, and these findings are binding on this court, (3) the legislative history of HRS chapter 607 does not apply to establish that HRS

chapter 205 relates to "environmental quality," (4) Ala Loop does not have a private right of action under article XI, section 9, and (5) the legislative reports that the majority relies upon to contend that HRS chapter 205 is a "law relating to environmental quality" under article XI, section 9 are not dispositive because ultimate authority to interpret that provision is vested in the courts, and not the legislature.

## A.

First, because Ala Loop, as an association of members whose properties adjoin Ala Loop Road, had the right to bring a declaratory judgment action following the denial of a HRS § 205–6 hearing, as discussed *supra,* I would refrain from deciding the constitutional question of whether HRS chapter 205 is a law relating to environmental quality under article XI, section 9 of the Hawai'i Constitution, as it is unnecessary. This court has said that "if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, ... [this court] will decide only the latter." *State v. Lo,* 66 Haw. 653, 657, 675 P.2d 754, 757 (1983) (quoting *Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936)) (ellipses and brackets in original). Thus, "[t]he question at threshold whenever constitutional questions are passed upon us for decision, [ ] is whether there may be another ground upon which the case can be decided." *Id.* (citations omitted).

In its application for writ of certiorari, Ala Loop argues that it has a private right of action for the reasons following. First, Ala Loop argues that "HRS § 632–1 grants the courts the ability to make binding adjudications where an actual controversy exists." Second, Ala Loop argues that article XI, section 9 expressly provides for a private right of action to enforce Hawaii's land use laws. Third, Ala Loop argues that HRS § 607–25 provides a private party with a right of action "where a government agency does nothing to actively enforce laws it was intended to initially have a right to enforce." As explained above, Ala Loop's first argument that it has a right to seek a declaratory

judgment is meritorious. Applying the principles of *Lo,* I would not decide this case on constitutional grounds.

## B.

Furthermore, this case involves issues of land use, and not issues relating to environmental quality. The question is whether Ala Loop had standing to assert a right of action against Wai'ola for conducting school activities in an agricultural district without a special permit required under HRS § 205–6. The court's findings, entered on February 4, 2005, indicate that this case alleged the illegal *use* of land. The findings stated, in pertinent part:

3. The real property which is the subject of this action is located at 17–705 Ala Loop Road and is designated as TMK No. (3) 1–7–08:003.... [Sunshine Farms] contains approximately 28 acres and located [sic] *in an agricultural use district designated by the [LUC].*

4. In or about July, 2003, Wai'ola acquired ownership of [Sunshine Farms].

5. On November 14, 2003, the County filed the Complaint for Declaratory Relief (the "Complaint) against Wai'ola and the [Ala Loop]. *The Complaint sought a declaratory judgment determining that HRS § 302A–1184 exempts Wai'ola from having to obtain a special permit pursuant to HRS § 205–6, but that Wai'ola is required to obtain a use permit pursuant to Chapter 25 of the Hawai'i County Code.*

6. On November 20, 2003 [Ala Loop] answered the Complaint and filed a cross-claim against Wai'ola (the "Cross–Claim").

7. In the Cross–Claim, [Ala Loop] sought a *declaratory judgment determining that Wai'ola was required to obtain a special permit pursuant to HRS § 205–6 before operating a school on [Sunshine Farms].* Further, [Ala Loop] sought injunctive relief *enjoining Wai'ola from engaging in classes or school-related activities* on [Sunshine Farms] *unless Wai'ola first obtains a special permit.*

....

12. Since the acquisition of [Sunshine Farms], *Wai'ola has used [Sunshine*

*Farms] for the following purposes*: (a) operating its administrative offices; (b) storing its office equipment, files, computers and books; (c) holding instructional and laboratory classes; and (d) the growing of crops and associated activities, such as testing, conducting experiments and making observations.

13. Wai'ola students have been bussed to [Sunshine Farms].

14. *It is Wai'ola's intention to use [Sunshine Farms] for school activities and associated facilities,* to include a school building, an athletic field, athletic building, amphitheater and smaller structures for class.

15. If Wai'ola is to use [Sunshine Farms] as a school, certain improvements relating to health and safety are necessary or appropriate; to include: (a) and expansion of the Ala Loop [Road], (b) an increase in water availability to fight fires, and (c) an individual waste water system.

16. Members of [Ala Loop], as neighbors of [Sunshine Farms], *may suffer injury if [Sunshine Farms] is used as a school.*

. . . .

18. While Wai'ola now asserts that it intends to obtain a special permit, *it seeks to use [Sunshine Farms] for uses other than permitted under Chapter 205, HRS, while its application for a special permit is pending.*

(Emphases added.) A review of the findings demonstrate that 1) the County's complaint sought a declaratory judgment that Wai'ola was exempt "from having to *obtain a special permit under HRS § 205-6,*" 2) in its cross-claim, Ala Loop sought a "declaratory judgment determining that Wai'ola was required to obtain a special permit pursuant to HRS § 205-6 before *operating a school* on [Sunshine Farms]" and injunctive relief from Wai'ola for "*engaging in classes and school related activities* on [Sunshine Farms] *unless Wai'ola first obtains a special permit,*" 3) "*Wai'ola has used* [Sunshine Farms]" for administrative offices, storage, and holding instructional classes, 4) Wai'ola intends to "*use [Sunshine Farms]* for school activities and associated facilities," 5) Wai'ola may

"suffer injury if [Sunshine Farms] is *used as a school* [,]" and 6) Wai'ola seeks *to use [Sunshine Farms]* while its application for a special permit is pending. Thus, the findings indicate that the crux of this litigation was Ala Loop's objection to Wai'ola's *present and future use* of Sunshine Farms as a school. None of the findings involve "environmental quality" or the "conservation, protection and enhancement of natural resources." Majority opinion at 409, 235 P.3d at 1121.

Since neither Ala Loop nor Wai'ola has challenged the court's findings, the findings are binding on this court. *Kelly v. 1250 Oceanside Partners,* 111 Hawai'i 205, 227, 140 P.3d 985, 1007 (2006) (stating that, "[g]enerally, a court finding that is not challenged on appeal is binding upon [the appellate court]"). The findings reflect that the injuries sustained and relief sought derived from Wai'ola's present and proposed *uses* of Sunshine Farms as a school in violation of HRS § 205-6. Thus, it must be concluded that the application of land use law rather than "environmental quality" law is primarily at issue.

C.

The majority uses the legislative history of HRS § 607-25 to support the propositions that "chapter 205 is a law relating to environmental quality within the meaning of article XI, section 9." Majority opinion at 410–11, 235 P.3d at 1122–23 (internal quotation marks and brackets omitted). However, HRS § 607-25 does not apply in this case. As fully discussed *supra,* Ala Loop failed to prove that it is one of the two types of parties that may be awarded attorney's fees under HRS § 607-25. First, Ala Loop is not "a member of the public who prevail[ed] against a private party who has been or is undertaking development without obtaining all permits or approvals required by law[,]" *Kahana,* 86 Hawai'i at 135, 948 P.2d at 125, because Wai'ola, as a state agency, is not a private party. Second, Ala Loop is not "a defendant private party who prevail[ed] against a plaintiff who [ ] brought a frivolous action." *Id.* Accordingly, HRS § 607-25 and

its legislative history are not pertinent to this case.

### D.

Inasmuch as the majority nevertheless concludes that Ala Loop has a right of action under article XI, section 9 to enforce HRS chapter 205, I must respectfully disagree. As noted *supra,* section 9 of article XI states:

> Each person has the right to a clean and healthful environment, *as defined by laws* relating to environmental quality, including control of pollution and conservation, protection and enhancement of natural resources. Any person may enforce this right against any party, public or private, through appropriate legal proceedings, subject to reasonable limitations and regulation *as provided by law.*

(Emphases added.) The plain language of article XI, section 9 provides that "[a]ny person may enforce this right [to a clean an healthful environment] against any party[.]" However, this enforcement right is to be enforced "through appropriate legal proceedings, *subject to* reasonable limitations and . regulation *as provided by law.*" Haw. Const. art. XI, § 9 (emphases added). Because the phrases "as defined by laws relating to environmental quality" and "as provided by law" are undefined, examination of the framers' intent is necessary.

A report by the Committee on Environment, Agriculture, Conservation and Land during the 1978 Constitutional Convention states in part as follows:

> Your committee believes that a clean and healthful environment is an important right of every citizen and that this right deserves constitutional protection. The definition of this right would be accomplished by relying on the large body of statutes, administrative rules and ordinances relating to environmental quality.
> . . . .
> *Developing a body of case law defining the content of the right could involve confusion and inconsistencies.* On the other hand, legislatures can adopt, modify or repeal environmental laws and regulation laws in light of the latest scientific evidence and federal requirements and opportunities. Thus *the right can be reshaped and redefined through statute, ordinance*

*and administrative rule-making procedures and not inflexibly fixed.*

> Your Committee believes that this important right deserves enforcement and has removed the standing to sue barriers, which often delay or frustrate resolutions on the merits of actions or proposals, and provides that individuals may directly sue public and private violators of statutes, ordinances and administrative rules relating to environmental quality. The proposal adds no new duties but does add potential enforcers. This private enforcement right complements and does not replace or limit existing government enforcement authority.

> *Your Committee intends that the legislature may reasonably limit and regulate this private enforcement right by, for example, prescribing reasonable procedural and jurisdictional matters, and a reasonable statute of limitations.*

> Your Committee believes that this new section adequately recognizes the right to a clean and healthful environment *and at the same time would prevent abuses of this right.* Concern was expressed that the exercise of this right to a clean and healthful environment would result in a flood of frivolous lawsuits. However your Committee believes that if environmental law enforcement by government agencies is adequate in practice, then there should be few additional lawsuits, given the barriers that litigation costs present.

> Moreover, *your Committee is convinced that the safeguard of reasonable limitations and regulations as provided by law should serve to prevent abuses* of the right to a clean and healthful environment.

Stand. Comm. Rep. No. 77, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 689–90 (1980) [hereinafter the Report] (emphases added).

As reflected in the Report, the constitutional convention intended that "the definition of this right would be acknowledged by *relying on the large body of statutes, administrative rules and ordinances relating to environmental quality.*" *Id.* at 689 (emphasis added). The term "laws" in the phrase "as defined by laws," then, has a particular

and concrete meaning and refers to the legislative product of the legislature, administrative agencies, and county councils. Accordingly, although the constitutional right is guaranteed, it is one demarcated by specific legislative enactments having to do with "environmental quality." The right is not intended to be a fixed and immovable one inasmuch as the Report states that "the right can be reshaped and modified through *statute, ordinance and administrative rule-making* procedure and [is] not inflexibly fixed." *Id.* (emphasis added).

The Report vests the responsibility for defining the content of the right in "legislatures, county councils[,] and administrative agencies" because, according to the Report, these bodies "can adopt, modify, or repeal environmental laws and regulation laws in light of the latest scientific evidence and federal requirements and opportunities." *Id.* Indeed, the Committee specifically eschews development of the right by the courts in favor of the foregoing legislative bodies. As stated in the Report, "[d]eveloping a body of case law defining the content of the right could involve confusion and inconsistencies." *Id.* Hence, the right is referable to specific legislative enactments.

This is also confirmed by the second sentence in section 9, having to do with enforcement. That provision provides that "[a]ny person may enforce this right ... through appropriate legal proceedings, subject to reasonable limitations and regulations *as provided by law.*" Haw. Const. art. XI, § 9 (emphasis added). Contrary to the majority's view that the Report "does not indicate that the framers understood that implementing legislation was needed before enforcement actions could be brought[,]" majority opinion at 414, 235 P.3d at 1126, the Report, with respect to the phrase "as provided by law," indicates (a) that "the Committee intends that the legislature may reasonably limit and regulate this right *by ... prescribing* reasonable procedural and jurisdictional matters and a reasonable statute of limitations[,]" and (b) by "safeguards of reasonable limitations and regulations as provided by law ... to prevent abuses of the right[,]" the Report at

690 (emphases added). Apparently no legislative enactments exist with respect to these prescriptions.

Accordingly, the Committee intended that the legislature regulate the right to sue under the constitution, by "prescribing" safeguards such as a reasonable statute of limitations. However, as to a right to sue under article XI, section 9, there are *no* procedural or jurisdictional bases, *no* specific safeguards, and *no* statute of limitations for bringing suit that are presently in place. In light of these circumstances, reasonably, there can be no private enforceable rights to sue unless such rights are discretely set forth in particular statutes, ordinances, or rules.

While the term "may" is "generally construed to render optional, permissive or discretionary the provision in which it is embodied[,]" majority opinion at 414, 235 P.3d at 1126 n. 33, the "may" in the Report must be viewed as confirming authority. As noted before, the Report states that "the legislature *may* reasonably limit and regulate this private enforcement right." The Report at 690 (emphasis added). However, article XI, section 9 itself provides that "[a]ny person may enforce this right" "subject to reasonable limitations and regulations as provided by law." This language, unlike the statement in the Report, assumes that enforcement *is* "subject to" "reasonable limitations and regulations" that are "provided by law." In light of the controlling textual language in article I, section 9, "may," as used in the Report (stating that the "Committee intends that the legislature may reasonably limit and regulate this private enforcement right"), must be viewed as confirming authority to prescribe regulation of the right, rather than as permissive only. The Report at 690; *cf. Bd. of Educ. of State of Hawaii v. Waihee,* 70 Haw. 253, 264 n. 4, 768 P.2d 1279, 1286 n. 4 (1989) ("The phrase 'as provided by law' in the context of ... state constitutional provisions [is a directive] to the legislature to enact implementing legislation.... And the subject matter modified by the phrase 'may be dealt with by the Legislature as it deems appropriate.'" (Brackets in original.)) (In-

ternal citations omitted.).[23] *Black's Law Dictionary* at 1000 ("In dozens of cases, courts have held *may* to be synonymous with *shall* or *must,* usu[ally] in an effort to effectuate legislative intent." (Emphases in original.)). Enforcement procedures for such rights, then, must be found in a specific statute, ordinance, or rule. This construction of the enforcement provision is consistent with the overall intent of the framers that the content of the right be defined by flexible legislative prescription and not by judicial case law.[24]

On the other hand, the majority's position is contrary. The majority attempts to define the constitutional right as encompassing the *entirety* of HRS chapter 205 through judicial "case law" in its opinion. Without the prescription of "reasonable procedural and jurisdiction matters, and a reasonable statute of limitations[,]" the Report at 690, this approach invites havoc in future applications of a private right of action with respect to HRS chapter 205. HRS chapter 205 contains none of the aforementioned parameters and is primarily related to land use, as indicated in the previous section.

As noted in the Report, defining the right by case law "can involve confusion and inconsistencies," and such definition should be legislative in nature. *Id.* at 689. Thus, the majority's approach conflicts with the framers' intent. There is no jurisdictional or procedural basis for enforcing such a right and certainly no statute of limitations as to such a right under article XI, section 9. Hence, under the majority's approach, a suit on an alleged violation of HRS chapter 205 pursuant to article XI, section 9 could be brought in perpetuity and without the specific safeguards contemplated in the Report.

Nevertheless, the majority believes that "[w]hile the [committee] report recognizes that the legislature retains the power to impose reasonable limits on the right to bring suit, such as statutes of limitations, it does not suggest that such limits must be in place before actions can be brought." Majority opinion at 414, 235 P.3d at 1126 (citing the Report at 689–90) (footnotes omitted). Also, the majority states in two footnotes that "the text of article XI, section 9 unambiguously establishes a self-executing private right of action," *id.* at 414, 235 P.3d at 1126 n. 34, and the Report recognizes that "the legislature may, consistent with article XI, section 9, be able to enact a specific statute of limitation applicable to actions seeking to enforce the

---

23. The majority states that *Waihee* is distinguishable from the instant case because "*Waihee* concerned whether what had been 'provided by law' was consistent with the constitutional provisions, not whether the provisions were self-executing." Majority opinion at 412, 235 P.3d at 1124 n. 31. To the contrary, in *Waihee*, the Board of Education (Board), some of the members of the Board, and the Hawai'i State Teachers Association [collectively, "the plaintiffs"] challenged the acts of the governor and director of budget and finance [collectively, "the defendants"] in connection with the state education budget as violating article X, section 3 of the Hawai'i Constitution, which stated in relevant part that the "[Board] shall have the power, as provided by law, to formulate policy and to exercise control of the public school system[.]" 70 Haw. at 256, 768 P.2d at 1282. In determining what powers were vested to the Board under article X, section 3, this court noted that "the phrase 'as provided by law' in the context of ... state constitutional provisions [is a directive] to the legislature to enact implementing legislation." *Id.* at 264 n. 4, 768 P.2d at 1286 n. 4 (brackets and ellipses in original) (citation omitted).

*Waihee* recognized that article X, section 3 could "hardly be characterized as a constitutional declaration emancipating the [Board] from all

executive direction[,]" and also "what ha[d] been 'provided by law' [wa]s consistent with the intent of the framers not to divest the Governor of his ... 'executive powers' or his authority over the executive budget." *Id.* at 264, 768 P.2d at 1286. Thus, *Waihee* exemplifies that this court has recognized the phrase "as provided by law" as a directive to the legislature to enact implementing legislation.

24. According to the majority, the Report states that "the provision 'provides that individuals may directly sue public and private violators.'" Majority opinion at 414, 235 P.3d at 1126 (quoting the Report at 690). However, the Report also states that the committee "intends that the legislature may reasonably limit and regulate this private enforcement by, for example ... a reasonable statute of limitations." The Report at 690. As just discussed, inasmuch as the article I, section 9 states that the right is subject to reasonable limitations, the term "may" in the Report must be viewed as confirming authority to enact "reasonable procedural and jurisdictional matters" as well as a "reasonable statute of limitations." *Id.* Therefore, I respectfully disagree with the majority's assertion that the Report "does not indicate that the framers understood

provisions of HRS Chapter 205" or "[a]lternatively, statutes of general application can be applied to such claims consistent with article XI, section 9[,]" *id.* at 414, 235 P.3d at 1126 n. 33. These assertions are incorrect for the reasons following.

First, the text of article XI, section 9 does not "unambiguously establish[ ] a self-executing private right of action[.]" *Id.* at 414, 235 P.3d at 1126 n. 34. As mentioned *supra,* the text of article XI, section 9 states that a right of enforcement under that article was "*subject* to reasonable limitations as provided by law." (Emphasis added.) The phrase "as provided by law" must be construed. Thus, the text of article XI, section 9, including that phrase, is not unambiguous and must be interpreted. Moreover, because the right to sue would be "*subject to*" reasonable limitations, it would appear self evident that indeed, "such must be in place before the actions can be brought." To allow such actions without defining parameters only engenders "confusion and inconsistencies" the Committee sought to avoid. The Report at 689.

Second, the Report stated that the "Committee intends that the legislature may reasonably limit and regulate *this private enforcement right* by ... *a* reasonable statute of limitations." The Report at 689 (emphases added). This statement in the Report, contrary to the majority's assertion, does not recognize that the legislature may enact a "specific statute of limitations applicable to ... enforce the provisions of HRS Chapter 205[,]" majority opinion at 414, 235 P.3d at 1126 n. 33, but instead contemplates the legislature's ability to enact a *specific* statute of limitations to limit and to regulate the "private enforcement right" that was created in article XI, section 9.

Third, the majority's assertion that "[a]lternatively, statutes of limitations of general application [could] be applied to such claims consistent with article XI, section 9[,]" *id.,* is

incongruent with the intent of the framers as reflected in the Report. To reiterate, the Report stated that the "Committee intends that the legislature may reasonably limit and regulate *this* private enforcement right by ... *a* reasonable statute of limitations" and the "Committee is convinced that the safeguards of reasonable limitations and regulations as provided by law should serve to prevent abuses of *the right* [.]" The Report at 689 (emphases added). Hence, the use of a general statute of limitations was not considered for this particular private right of enforcement, but the framers clearly intended that *a* specific statute of limitations be enacted by the legislature to enforce *a* new private *right* of action under article XI, section 9.

Furthermore, if the framers contemplated that an existing general statute of limitations would be applied, the Report could have plainly said so. However, the Report does not reference any existing general statute of limitations. *See id.* Instead, the Report refers to "*a*," i.e. single, "reasonable statute of limitations and regulations as provided by law," indicating that one would be enacted with respect to "*this* private right of action." *Id.* at 690 (emphases added). To date, no statute of limitations nor any "reasonable procedural and jurisdictional matters" have been enacted by the legislature with respect to "this private enforcement right" under article XI, section 9. *Id.* Yet these statutes of "reasonable limitations and regulations" were advanced as "safeguards" to prevent "abuses of the right" of action under article XI, section 9.

The majority contends that this case "is similar to that in [*United Public Workers, AFSCME, Local 646, AFL–CIO v. Yogi,* 101 Hawai'i 46, 62 P.3d 189 (2002)], where the phrase 'as provided by law' ... was interpreted as a reference to the existing law of collective bargaining,[25] rather than that in

---

that implementing legislation was needed[.]" Majority opinion at 414, 235 P.3d at 1126.

**25.** *Yogi* determined that article XIII, section 2 of the Hawai'i Constitution was self-executing. Article XIII, section 2 provided that "persons in public employment shall have the right to organize for the purpose of collective bargaining as provided by law." 101 Hawai'i at 58 n. 4, 62

P.3d at 201 n. 4 (quoting Haw. Const. art. XIII, § 2). Unlike article I, section 11 in *State v. Rodrigues,* 63 Haw. 412, 629 P.2d 1111 (1981), article XIII, section 2 did not direct the legislature to implement further legislation. Rather, this court distinguished *Rodrigues,* noting that the phrase " 'collective bargaining as provided by law' had a well recognized meaning, usage, and application under both federal and state laws as

*Rodrigues,* where ... the phrase 'as provided by law' reflected the framers' understanding that administrative details such as the compensation of the counsel needed to be addressed by the legislature first." Majority opinion at 413, 235 P.3d at 1125; *see* majority opinion at 412, 235 P.3d at 1124 n. 31. I respectfully disagree.

In *Rodrigues,* this court held, *inter alia,* that article I, section 11 of the Hawai'i Constitution was not self-executing. 63 Haw. at 414, 629 P.2d at 1113. In deciding that article 1, section 11 was not self-executing, it was noted that "[a]t the time the amendment was adopted, there was no other constitutional provision or statute to which the phrase could refer[,]" *id.* at 415, 629 P.2d at 1114, and that "[w]hile the framers created the position of an independent grand jury counsel, they instructed the legislature to enact legislation defining the appointment, term, and compensation of the independent counsel[,]" *id.* at 416, 629 P.2d at 1114 (citing Stand. Comm. Rep. No. 69, 3d Hawai'i Const. Conv. 4, reprinted in I Proceedings of the Constitutional Convention of Hawai'i of 1978 at 673 (1978); II Proceedings of the Constitutional Convention of Hawai'i of 1979 at 670 (1979)).

*Rodrigues* cited to cases in other jurisdictions to support its ruling that "[t]he phrase 'as provided by law' in the context of other state constitutional provisions has been construed as a direction to the legislature to enact implementing legislation[,]" 63 Haw. at 415, 629 P.2d at 1114, and that " 'the subject matter which this phrase modifies is not "locked" into the Constitution but may be dealt with by the [l]egislature as it deems appropriate[,]' " *id.* (quoting *Agnew v. Schneider,* 253 N.W.2d 184, 187 (N.D.1977)), and "the phrase 'directs the legislature to provide the rules by which the general rights which it (constitutional provision) grants may be enjoyed and protected,' " *id.* (quoting *Wann v. Reorganized Sch. Dist. No. 6,* 293 S.W.2d 408, 411 (Mo.1956)). In this case, article XI, section 9 of the Hawai'i Constitution instructs the legislature to enact "reasonable limitations and regulations as provided by law." Like the framers' actions with regard to article I, section 11 in *Rodrigues,*

the Report for article XI, section 9 instructed the legislature to *"prescrib[e]* reasonable procedural and jurisdictional matters, and a reasonable statute of limitations." The Report at 690 (emphasis added). As explained *supra,* the legislature has not prescribed any "reasonable procedural and jurisdictional matters" or "a reasonable statute of limitations." *Id.*

### E.

Finally, the majority cites various *legislative reports* issued *subsequent* to the 1978 constitutional convention to support its position that Ala Loop had a private right of action to enforce HRS chapter 205 under article XI, section 9. As noted *supra,* the majority relies upon the legislative history of HRS § 607-25 to support its determination that HRS chapter 205 is an environmental quality law. Majority opinion at 410–11, 235 P.3d at 1122–23. The majority also relies upon a 1979 special committee report, *id.* at 414–15, 235 P.3d at 1126–27, and the legislative history of HRS § 607-25, *id.* at 415, 235 P.3d at 1127, as evidence to support its position that article XI, section 9 is self-executing. With all due respect, such reliance is misplaced.

The ultimate authority for interpreting Hawai'i's constitutional guarantees is vested in the courts of this state. *In re Water Use Permit Applications,* 94 Hawai'i 97, 143, 9 P.3d 409, 455 (2000) ("The public trust ... is a state constitutional doctrine" and "[a]s with other state constitutional guarantees, the ultimate authority to interpret and defend the public trust in Hawai'i rests with the courts of this state." (Citing *State v. Quitog,* 85 Hawai'i 128, 130 n. 3, 938 P.2d 559, 561 n. 3 (1997) (recognizing the Hawai'i Supreme Court as the "ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution")).). The legislature is not the final arbiter of the meaning of constitutional provisions. Rather, "American legislatures must adhere to the provisions of a written constitution.... Our ultimate authority is the Constitution; and *the courts, not the legislature, are the ultimate interpreters of the Constitution.*"

well as case law." 101 Hawai'i at 51, 62 P.3d at 194.

*State v. Nakata,* 76 Hawai'i 360, 370, 878 P.2d 699, 709 (1994) (quoting *State v. Shak,* 51 Haw. 612, 617, 466 P.2d 422, 425, *cert. denied,* 400 U.S. 930, 91 S.Ct. 191, 27 L.Ed.2d 190 (1970) (emphasis added)); *id.* (citing *Marbury v. Madison,* 1 Cranch 137, 5 U.S. 137, 180, 2 L.Ed. 60 (1803) (laws repugnant to the Constitution are void)); *Convention Ctr. Auth. v. Anzai,* 78 Hawai'i 157, 164, 890 P.2d 1197, 1204 (1995) (determining that the legislative findings were not dispositive of whether the revenues met the "substantially derived" test under article VII, section 12(9) of the Hawai'i Constitution because "the courts, not the legislature, are the ultimate interpreters of the Constitution," and therefore, this court turned to its own analysis of the issue); *accord Taomae v. Lingle,* 108 Hawai'i 245, 256, 118 P.3d 1188, 1199 (2005) ("It is well settled that the courts, not the legislature, are solely vested with the responsibility to determine whether a constitutional amendment has been validly adopted.") *Del Rio v. Crake,* 87 Hawai'i 297, 304, 955 P.2d 90, 97 (1998) (stating that "the question as to the constitutionality of a statute is not for legislative determination, but is vested in the judiciary, and a statute cannot survive constitutional challenge based on legislative declaration alone" (citation omitted)). In that regard, the constitutional convention history is what is pertinent and controlling. *See Sierra Club v. Dep't of Transp. of State of Hawai'i,* 120 Hawai'i 181, 196, 202 P.3d 1226, 1241 (2009) (observing that this court has "long recognized that the Hawai'i Constitution must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional provision is to give effect to that intent" (quoting *Hanabusa v. Lingle,* 105 Hawai'i 28, 31–32, 93 P.3d 670, 673–74 (2004))); *Kaho'ohanohano v. State,* 114 Hawai'i 302, 342, 162 P.3d 696, 736 (2007) (construing the intent of article XVI, section 2 of the Hawai'i Constitution from the Committee of the Whole Report of the Constitutional Convention of 1950); *State v. Mallan,* 86 Hawai'i 440, 448, 950 P.2d 178, 186 (1998) (utilizing "the committee reports and debates in the Constitutional Convention" to determine the intent of the framers); *Cobb v. State by Watanabe,* 68 Haw. 564, 565, 722

P.2d 1032, 1033 (1986) (recognizing that "[w]hen resolving ambiguity, we have repeatedly held 'that the fundamental principle in construing a constitutional provision is to give effect to the intention of the framers and the people adopting it' " (quoting *Huihui v. Shimoda,* 64 Haw. 527, 531, 644 P.2d 968, 971 (1982))). The meaning of constitutional provisions must be gleaned from the convention that drafted it, *see Anzai,* 78 Hawai'i at 167, 890 P.2d at 1207 (stating that "we have long recognized that the Hawai'i Constitution must be construed with due regard to the intent of the framers and the people adopting it, and that the fundamental principle in interpreting a constitutional provision is to give effect to that intent") (internal quotation marks and citations omitted), not from post ad hoc legislative reviews which may reflect conflicting contemporary views, *see United States v. Texas,* 507 U.S. 529, 535, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993) (stating that "subsequent legislative history is a 'hazardous basis for inferring the intent of an earlier' Congress" (quoting *Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990))); *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960) (noting that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one"); *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), *superseded by statute on other grounds* as stated in *Pac. Rivers Council v. Thomas,* 30 F.3d 1050 (9th Cir.1994); *SEC v. Sloan,* 436 U.S. 103, 119–22, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978). Thus, a *subsequent* legislature's opinion of what the constitutional convention intended by virtue of article XI, section 9 is not determinative of the meaning of a constitutional provision.

## VII.

For the foregoing reasons, I would hold that Ala Loop has the right to bring a declaratory judgment action to enforce a HRS chapter 205 claim against Wai'ola, the court did not abuse its discretion in denying Wai'ola's motion to set aside default, and Ala Loop is not entitled to attorney's fees under HRS § 607–25. I would vacate the April 22,

2009 judgment of the ICA and affirm the court's December 12, 2005 First Amended Judgment. I disagree with the majority's conclusion that the court abused its discretion in denying Wai'ola's motion to set aside default, and that, in this case, Ala Loop had a private right of action to enforce HRS chapter 205 under article XI, section 9 of the Hawai'i State Constitution. For these reasons, I respectfully concur in part, *see supra* note 1, and dissent in part.